# EXHIBIT 1

TO PLAINTIFF'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

**Westlaw.**

Not Reported in F.Supp.
1997 WL 699299 (D.Del.)
**(Cite as: 1997 WL 699299 (D.Del.))**

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Mobilificio San GIACOMO S.p.A., an Italian Joint Stock Company, Plaintiff,
v.
Carlo Bargagli STOFFI, and Sangiacomo N.A., Ltd., a Delaware Corporation
Defendants.
**No. 96-415-SLR.**

Sept. 24, 1997.

Lawrence C. Ashby, Esquire, Randall E. Robbins, Esquire, Regina A. Iorii, and John S. Grimm, Esquire, of Ashby & Geddes, Wilmington, Delaware. Counsel for plaintiffs. Of Counsel: Francesco Camilotti, Avv., and Allessandra Gioi Rolandi, Dott. Proc., of Studio Legale Camilotti-Ceccon-Polettini, Padova, Italy.

F.L. Peter Stone, Esquire, of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington, Delaware. Counsel for defendants. Of Counsel: Melvin Goldstein, Esquire, of Goldstein & Assoc., P.C., Washington, D.C.; C. Robert Rhodes, Esquire, of Rhodes Coats & Bennett, L.L.P., Greensboro, North Carolina.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

*1 Plaintiff Mobilificio San Giacomo S.p.A. ("MSG") filed this action on February 21, 1997 seeking an order enjoining: 1) the use by defendants ("and any and all persons or entities acting on their behalf or in concert with them") of MSG's "San Giacomo" trademark and name; and 2) the return of all promotional and advertising materials bearing or referring to the name "San Giacomo" or any variant thereof by these same parties. (D.I. 80 at 23) On March 19, 1997, defendants SanGiacomo N.A., Ltd. ("SGNA") and Carlo Bargagli-Stoffi ("Bargagli") filed an action seeking to enjoin plaintiff's use of the "San Giacomo" mark or "any confusingly similar mark" in connection with the manufacture, sale, distribution, or promotion of furniture within the United States. (D.I. 85 at 1) The court has jurisdiction over plaintiff's trademark infringement and unfair competition claim pursuant to 28 U.S.C. § 1338(a)-(b). Oral argument on plaintiff's request for preliminary injunctive relief and defendants' cross motion for injunctive relief was heard on July 31, 1997.

II. BACKGROUND

Plaintiff MSG is an Italian joint stock corporation, principally owned by Luciano Biscontin and Gabriele Piovesana, engaged in the manufacture, design, and sale of furniture since 1968. (D.I. 81 at 2) MSG is one of a group of affiliated companies known as the San Giacomo Group. (D.I. 80 at 4) Defendant SGNA is a Delaware corporation engaged in the business of selling and distributing in the United States furniture supplied to it by Italian manufacturers, including MSG. (D.I. 31 at ¶ 2) Defendant Bargagli, a New Jersey resident, is a director and the sole stockholder of SGNA as well as its chief executive officer. (D.I. 31 at ¶ 3) Prior to 1972, MSG's sales were limited to Europe. Beginning in 1982, MSG attempted to establish itself as a supplier of Italian furniture under the "San Giacomo" mark in the U.S. through export agents and Sipem, the San Giacomo Group's service company; however, initial attempts were unsuccessful. (D.I. 31 at ¶¶ 12-13) In 1988 Biscontin began discussions with Bargagli, who was in the export business, regarding a joint venture for selling furniture in the United States. (D.I. 81 at 2) Pursuant to the agreement, Biscontin and Piovesana were to provide financial backing while Bargagli would manage the venture, for which he would be entitled to a percentage ownership of the company. (D.I. 81 at 2-3) Subsequently, SGNA was incorporated in Delaware on December 5, 1988 as a U.S. distributor of MSG. (D.I. 31 at ¶ 14) By the end of 1988, both MSG and Bargagli were doing business through SGNA. On May 9, 1989, at a meeting with Biscontin, Piovesana, and MSG's Italian attorney, Bargagli (without objection, D.I. 89, Ex. 2 Bargagli Dep. at 136) signed a joint venture and shareholding agreement, a distribution agreement ("Distribution Agreement"), and a management agreement. (D.I. 81 at 3)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 699299 (D.Del.)
**(Cite as: 1997 WL 699299 (D.Del.))**

Page 2

In connection with the formation of SGNA, MSG applied on February 27, 1989 for federal registration of the mark "MSG Mobilificio San Giacomo" ("San Giacomo") in the United States. (D.I. 80 at 5) The registration disclaims the right to use "Mobilificio" (furniture factory) apart from the mark. (D.I.96, Ex. 1) The date of first use in commerce with the United States was recorded as March 24, 1982. (D.I.82, Ex. D) As required, the application contained a specimen of the mark as used. The specimen showed a box of furniture with the model name Medea. (D.I.82, Ex. D) Registration of the trademark (Registration No. 1,587,857) became effective on March 20, 1990. (D.I.96, Ex. 1) On August 21, 1996, MSG submitted an affidavit under section 8 of the Trademark Statute certifying the continued use of the MSG trademark in commerce with the United States. (D.I.82, Ex. J) The same specimen as was filed with the initial registration was filed as part of the section 8 affidavit. (D.I.82, Ex. J)

*2 On May 5, 1993, Bargagli wrote to MSG, terminating the agreements which existed between SGNA and MSG. (D.I. 81 at 4; D.I. 101, Ex. 13) The parties entered into a settlement agreement ("Settlement Agreement") that terminated any previous agreements and provided for a new exclusive distribution agreement and security agreement. (D.I. 81 at 4) Although the Settlement Agreement set forth the scope of distribution and security agreements, negotiations were unsuccessful and no further agreements were executed. (D.I. 80 at 9) Nevertheless, the parties continued to conduct business pursuant to the terms contemplated by the Settlement Agreement. (D.I. 80 at 9-10)

In February 1993, SGNA applied for federal registration of the name "San Giacomo" as its own trademark in the United States (Trademark Application Serial No. 74,638,241). (D.I 96, Ex. 10) The font and style of SGNA's "San Giacomo" mark was the same as that of MSG's "San Giacomo" mark. (D.I.96, Ex. 10) The Patent and Trademark Office ("PTO") refused registration of the mark on August 3, 1995 because of the similarities between SGNA's proposed mark and the already registered MSG mark and the goods and services identified in the registration. (D.I.96, Ex. 11) The PTO went on to state that the "similarities between the marks and the goods and services are so great as to create a likelihood of confusion." (D.I.96, Ex. 11) On March 16, 1995 SGNA unsuccessfully petitioned the Trademark Trial and Appeal Board to cancel MSG's mark. (D.I.96, Ex. 12)

According to defendants, SGNA sales from 1989 through 1996 totaled over $200 million; in 1996 $50 million worth of furniture was sold. (D.I. 81 at 6) Between 1990 and 1996, MSG supplied the United States market with over $58 million worth of furniture. (D.I. 91 at 5) In contrast, from 1982 through 1985, MSG sales in the United States amounted to only $150,000 and from 1985 through 1989 less than $400,000. (D.I. 81 at 5)

In July 1996, MSG provided notice to SGNA of termination of the distribution arrangement between the parties effective January 1997, requesting that SGNA change its name and cease all use of the "San Giacomo" trademark. (D.I.82, Ex. K) Simultaneously, MSG commenced this litigation, filing suit in the Court of Chancery of the State of Delaware. (D.I.1) The case was removed to this court in August 1996. (D.I.1) In addition to the application at bar, currently pending before the court is plaintiff's motion filed on the same day for partial summary judgment for amounts due on unpaid invoices and immediate entry of judgment with respect thereto. (D.I.74)

III. STANDARD OF REVIEW

It is beyond dispute that "the grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." ' *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989), *quoting, Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988). In ruling on a motion for a preliminary injunction, this court must consider: 1) the likelihood of success on the merits; 2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; 3) the extent to which the defendant will suffer irreparable harm if the requested relief is granted; and 4) the public interest. See *Clear Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995). An injunction should issue only if all four factors favor preliminary relief. See *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992).

IV. DISCUSSION

A. Likelihood of Success on the Merits

*3 In order to demonstrate a likelihood of success in a trademark infringement action, [FN1] a plaintiff must establish: 1) the mark is valid and legally protectable; 2) the plaintiff owns the mark; and 3) defendant's use of the mark is likely to cause

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 699299 (D.Del.)
**(Cite as: 1997 WL 699299 (D.Del.))**

confusion about the origin of the goods or services. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). In this case, the first and third elements of the analysis are undisputed and, therefore, the court will focus on the second element. [FN2]

>   FN1. At issue is a claim for trademark infringement, a statutory cause of action under the Lanham Act, not a claim for breach of contract. Therefore, any dispute over the forum selection clauses in the various contracts is irrelevant.

>   FN2. The parties agree that the question of likelihood of success on the merits centers on the question of ownership of the mark. (D.I. 81 at 8; D.I. 83 at 9)

The Lanham Act provides in part that "[a] certificate of registration of a mark upon the principal register ... shall be *prima facie* evidence of the validity of the registered mark ..., the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1057(b). Thus, the mere fact of registration establishes not only validity but also the registrant's ownership and exclusive right to use the registered mark. Under the Act, if an attacked registration is over five years old, infringement can be defended only on grounds enumerated in the Act 15 U.S.C. § 1064. In the case at bar, MSG's registration of the "San Giacomo" mark became effective in March 1990. Accordingly, SGNA can challenge ownership of the mark only on those grounds enumerated in the Act. Here, SGNA argues that several of the enumerated defenses are applicable, specifically those in sections 33(b)(1), (2), and (8) of the Act.

1. Fraudulent Procurance of the Registration

Defendant is not likely to succeed on the merits of its claim that MSG fraudulently procured and maintained its registration of the "San Giacomo" mark. [FN3] Section 33(b)(1) of the Act provides in part that infringement can be defended on the ground that "the registration ... was obtained fraudulently." Fraud arises in this context only when the party making the false statement knows or should have known that the facts represented were not true. *McCarthy on Trademarks and Unfair Competition §* 31:66 (4th Ed.1996).

>   FN3. Defendants assert that the mark in question is SGNA's "San Giacomo" mark not the MSG mark. (D.I. 81 at 8) However, defendants do not dispute that SGNA's "San Giacomo" mark is confusingly similar to MSG's registered mark, which involves the words "MSG Mobilificio San Giacomo" as well as a logo and design. (D.I. 81 at 13) Since the PTO has refused registration of SGNA's "San Giacomo" mark because of its similarity to MSG's registered mark, the court will consider the mark at issue to be MSG's registered mark.

In support of their fraud claim, defendants maintain that there is no documentary evidence of MSG's use of the "San Giacomo" mark in commerce with the United States prior to the filing of the registration application. Specifically, defendants contend that invoices bearing the trademark for furniture sold in the United States do not conclusively establish proof of use of the mark [FN4] and that the specimen of use filed with the PTO as part of the initial application for registration of the mark and its Section 8 affidavit in 1996 was of a box containing a style of furniture never sold in the United States. [FN5] (D.I. 81 at 26-27) The issue before the court, however, is not whether the use of the mark was sufficient to support the application, but whether the alleged misrepresentation was intentional. Defendants have failed to put forth in the record any evidence of MSG's intent to defraud the PTO. [FN6] Absent any showing of plaintiff's intent to defraud the PTO, the court concludes that defendants are not likely to succeed on the merits of their claim that MSG fraudulently procured its registration.

>   FN4. Although defendants assert that there is no evidence of MSG's use of the mark in the United States prior to 1989, correspondence between Bargagli's counsel and MSG counsel in 1995 indicates that Bargagli was aware of "some use of the mark" in the United States in the early 1980's, although he characterized that use as "minimal." (D.I.96, Ex. 9)

>   FN5. Although defendants contend that the registration is invalid because the specimen of the mark submitted was of a box of furniture that was never sold in the United States, nothing in the wording of the Lanham Act indicates that the item bearing the facsimile of the trademark be an item in commerce with the United States. Section 1(a)(1)(C) of the Act requires only that the specimens or facsimiles of the trademark

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

submitted as part of the application be that "of the mark as used". 15 U.S.C. § 1051(a)(1)(C) (emphasis added). The mark shown in the specimen submitted by MSG clearly was the mark used by plaintiff on the cartons of furniture shipped to the United States at the time of the application.

FN6. Defendants also maintain that all sales of MSG goods were "ex factory" and as such MSG was not responsible for the use of the goods in commerce within the United States. (D.I. 81 at 27; D.I. 82, Ex. H) However, it is irrelevant which entity distributed the product with the mark, rather the focus is on who placed the product into commerce. See Laboratories Roldan, C. Por A.V. Tex Int'l, Inc., 902 F.Supp. 1555, 1566 n. 12 (S.D.Fla.1995). Here, the record indicates that it was MSG who placed the goods bearing the "San Giacomo" mark into the stream of commerce.

2. Abandonment

*4 Alternatively, defendants argue that MSG abandoned the "San Giacomo" mark. Under section 45 of the Lanham Act, a mark is deemed abandoned when "its use has been discontinued with intent not to resume such use" or when the owner's conduct "causes the mark ... to lose its significance as a mark." 15 U.S.C. § 1127. There is a presumption of abandonment when use has been discontinued for three consecutive years. 15 U.S.C. § 1127. Defendants argue that, commencing in 1989, SGNA sold within the United States boxes containing furniture shipped to SGNA by MSG, which boxes either did not bear the "San Giacomo" logo or did so contrary to SGNA's instructions. [FN7] (D.I. 81 at 28) Defendants also contend that there is no documentary evidence of MSG's use of its registered mark in the United States between 1989 and 1995. (D.I. 91 at 13) Defendants point to statements of warehouse managers, shippers, and distributors in which they maintain that they had no recollection of observing the MSG logo; rather, cartons of furniture were stamped with either "San Giacomo," "SanGiacomo N.A.," or "San Giacomo N.A. Ltd." (D.I. 82, Ex. A at § 7) Plaintiff does not dispute that between July 1995 and March 1996 it shipped furniture to the United States without using the "San Giacomo" mark. (D.I. 31 at ¶¶ 48-50) According to MSG, it did so in reliance on Bargagli's statement that such was required to avoid possible complaint by United States customers in competition with one another who sold "San Giacomo" products in the same area. (D.I. 31 at ¶¶ 48-50) However, the record reflects that between 1987 and 1996 MSG continued to use its trademark in the United States through direct sales to certain customers. (D.I. 96, Ex. 13; D.I. 92 at ¶ 9, Ex. C)

FN7. In 1989, Bargagli requested that cartons shipped to SGNA bear a mark reading "SanGiacomo N.A., America's finest Italian furniture." (D.I.82, Ex. I) According to defendants, MSG complied with this request in 1991. (D.I.82, Ex. I)

Defendants also contend that after 1993, in the absence of a distribution agreement between the parties, MSG unintentionally abandoned its mark by knowingly allowing SGNA to conduct business in a manner that led U.S. customers to look to Bargagli, not MSG, as the entity behind the "San Giacomo" mark. (D.I. 81 at 29; D.I. 82, Ex. A at § 6) Plaintiff contends, however, that it was defendant Bargagli's conduct, not MSG's, that caused the mark to lose significance, if in fact it did. (D.I. 83 at 7) According to plaintiff, defendant Bargagli continuously misrepresented his and SGNA's association with MSG and the San Giacomo Group, thereby introducing confusion into the marketplace. (D.I. 88 at 24-26, 29) Of record are documents in which Bargagli characterizes himself as "president" of an "Italian manufacturing company" or of San Giacomo specifically and which describe SGNA as a "subsidiary" or "U.S. office" of MSG or of "Gruppo San Giacomo." (D.I. 90, Exs. 12, 13, 17-19; D.I. 100 at ¶ 22; D.I. 101 at Ex. 11)

In refuting defendants' assertion that it abandoned the "San Giacomo" mark, plaintiff argues that the 1989 Distribution Agreement and the 1993 Settlement Agreement clearly establish that MSG intended to retain ownership of the "San Giacomo" mark. [FN8] Although such agreements are not in themselves dispositive, "[t]he ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement." Premier Dental Products Co. v. Darby Dental Supply Co., Inc., 794 F.2d 850, 854 (3d Cir.), cert. denied, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986). Here, the 1989 Distribution Agreement and Joint Venture and Shareholding Agreement signed by Bargagli clearly delineated that MSG was the owner of the "San Giacomo" mark, that SGNA's role was that of distributor, and that upon termination of the agreement SGNA was to cease use of the "San Giacomo" mark if MSG so requested.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 699299 (D.Del.)
(Cite as: 1997 WL 699299 (D.Del.))

Page 5

(D.I. 96, Ex. 3 §§ 2.3, 8.1, 8.2, 8.3, 8.4, 13.1(b); Ex. 4 § 4.5) Terms of the 1989 Distribution Agreement manifested MSG's intent to retain all rights to the "San Giacomo" mark:

> FN8. Plaintiff does not argue for enforcement of the 1989 Distribution and Joint Venture and Shareholding Agreements, rather it cites to them as documentary evidence of the parties' understanding regarding the ownership of the "San Giacomo" mark. Therefore, in this context, the fact that the court granted Bargagli's motion to dismiss for lack of personal jurisdiction (D.I.2) with respect to Count III of the complaint for breach of contract (D.I.15) is irrelevant. Similarly, the presence of forum selection clauses in both contracts is irrelevant. On April 30, 1997, the court deferred defendants' motion to dismiss on forum selection grounds (D.I.44) until all briefing on case dispositive motions was completed. (D.I.71)

*5 As long as this Agreement remains effective the DISTRIBUTOR shall have the exclusive right to use the Trademark in the advertising and sales promotion of the Products in the Territory.
The DISTRIBUTOR, however, agrees that nothing herein contained shall give it any right, title or interest in the Trademark being ... the exclusive property of SAN GIACOMO and that any use and/or registration of the Trademark by the DISTRIBUTOR shall inure to SAN GIACOMO and/or the Companies' sole benefit, as the case may be.
(D.I. 96, Ex. 3 § 8.1) Moreover, the 1993 Settlement Agreement evidences that MSG intended to retain ownership of the mark: "Upon termination of the distribution agreement ... BARGAGLI will be obligated to make sure that the SAN GIACOMO N.A. immediately modifies its trade name removing any reference to the name "SAN GIACOMO." (D.I.82, Ex. C) Defendants argue, however, that a correct interpretation of this provision would, in the absence of consummation and termination of a new Distribution Agreement, grant ownership of the "San Giacomo" mark to SGNA. (D.I. 91 at 11-12) The court does not agree with defendants' interpretation of this provision, instead finding that the provision presupposes formation of a distribution agreement. Plaintiff acknowledges that the new distribution agreement was never signed by defendants, but contends that the parties continued to do business consistent with the distribution arrangement contemplated in the 1993 Settlement Agreement. (D.I. 80 at 9-10)

Defendants contend that the agreements signed on May 9, 1989 are not controlling because there was never a "meeting of the minds" concerning the terms, pointing to the assertion of Bargagli in this lawsuit that he assumed that the references to a "trademark" in the agreements were to the Sipem mark, not the MSG mark. (D.I. 81 at 20; D.I. 82, Ex. A at ¶ 6) MSG refutes Bargagli's assertion, arguing that Bargagli was well aware that the trademark at issue was the "San Giacomo" mark, not the Sipem mark, since the context in which the agreements were formed made clear which mark was being considered. (D.I. 83 at 11) The record reflects that the parties had extensive meetings and discussions regarding the terms of the agreements and that drafts of the 1989 agreement sent to Bargagli and three drafts prepared by Bargagli's own counsel all contained uncontested trademark provisions that referred to San Giacomo, not Sipem. (D.I.98-99, Ex 1-15, 19-38) Moreover, the record indicates that prior to the signing of the agreements Bargagli and SGNA were in possession of promotional materials bearing the MSG trademark, and that on June 7, 1989 SGNA requested that more brochures be forwarded. (D.I. 92 at ¶ 7, Exs. A and B) Furthermore, a letter from counsel for Bargagli to counsel for MSG dated October 6, 1995 indicates that Bargagli was aware that MSG had been using the "San Giacomo" mark (even if only minimally) in the early 1980's. (D.I.96, Ex. 9) In fact, Bargagli admitted that he did not have to pick the font and style of the word San Giacomo in SGNA's name because "it was already available as being the--the one in use by MSG." (D.I. 84, Ex. A at 72)

*6 Alternatively, defendants argue that any agreements that were reached are not controlling because the terms were never implemented by the parties, citing MSG's failure to make the capital contribution required by the Joint Venture and Shareholding Agreement and the failure of plaintiff to purchase shares of stock in SGNA. (D.I. 81 at 22-24) Plaintiff does not dispute that it did not make the capital contribution or purchase the shares of stock in SGNA as was proposed in the agreements. (D.I. 83 at 14) However, plaintiff contends that SGNA's conduct subsequent to the signing of the 1989 agreements indicates that said agreements were, in fact, implemented. (D.I. 83 at 13) For example, SGNA submitted copies of the agreements to Banca Commerciale Italiana New York in order to obtain credit (D.I. 89, Ex. 2 Morsanutto Dep. at 53-56; D.I.

90, Ex. 5); comments on SGNA's financial statements declared that it had entered into a "sole and exclusive distributorship" agreement with MSG (D.I.90, Ex. 8); and SGNA submitted purchase orders, weekly receivable reports, and financial information to MSG as per the Distribution Agreement (D.I. 46 at ¶ 136; D.I. 96, Ex. 3). Moreover, on May 5, 1993, Bargagli, "in compliance with the agreements signed during the first few months of 1989," sent a letter informing MSG of his "decision to exercise the rescission right." (D.I.101, Ex. 13) The court finds from the balance of the evidence that the greater weight lies with the plaintiff. Defendants' affidavits, prepared for purposes of litigation, are unpersuasive in light of plaintiff's affidavits supported by contemporaneous documentation. The court, therefore, concludes that defendants are not likely to succeed on the merits of their claim that MSG abandoned the "San Giacomo" mark.

3. Equitable Considerations

Lastly, defendants invoke section 33(b)(8) of the Lanham Act. According to this section, "equitable principles, including laches, estoppel, and acquiescence, are applicable" to an infringement defense. SGNA contends that it has made a substantial investment in the "San Giacomo" mark and the goods sold thereunder and, accordingly, it is the rightful owner of the mark. (D.I. 91 at 5) SGNA also asserts that its actions conclusively demonstrate that since its inception, it has acted not as a mere distributor of MSG but instead acted as an independent manufacturer, [FN9] designing and controlling the quality of the furniture it sold, engaging MSG only to manufacture products to SGNA's specifications. (D.I. 91 at 6) Defendants' argument in this regard parallels their argument with respect to abandonment. Because the weight of the evidence favors a finding that defendants had constructive notice of MSG's ownership of the "San Giacomo" mark and that MSG did not abandon the mark, any investment defendants made in the mark was done at their own risk. Statutory and contractual rights cannot be circumvented by the application of equitable principles; therefore, defendants cannot claim ownership of the mark merely through the sale and promotion of goods bearing the mark.

> FN9. It is not disputed that neither SGNA nor Bargagli manufacture furniture or own an interest in a manufacturer of furniture. (D.I. 89, Ex. 2 Bargagli Dep. at 22, 23) Although defendants now label themselves as manufacturers of furniture, in a lawsuit filed by SGNA in the Superior Court of New Jersey on August 5, 1996 against a former SGNA president alleging *inter alia* misappropriation of proprietary information and unfair competition, SGNA described itself as engaged "in the business of the importation and wholesale distribution of furniture products" at all times relevant to the complaint (from approximately June 1994 through February 1996). (D.I. 95, Ex 1 and 2)

*7 Because the weight of the evidence demonstrates that defendants could not successfully raise one of the enumerated Lanham Act defenses, plaintiff's registration of the "San Giacomo" mark stands as conclusive evidence of MSG's ownership of the mark. The court, therefore, concludes that plaintiff has established a likelihood of success on the merits with regard to ownership of the "San Giacomo" mark. The court will analyze the remaining factors consistent with this determination.

B. Irreparable Harm to Plaintiff

The second factor the court must consider in determining whether to grant injunctive relief is the extent to which the plaintiff will suffer irreparable injury if such relief is denied. Irreparable injury may be shown by "loss of control of reputation, loss of trade, and loss of goodwill." *S & R Corp,* 968 F.2d at 378. Irreparable injury can also be based on a showing of likelihood of confusion. *Id.* A likelihood of confusion exists " 'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Fisons Horticulture,* 30 F.3d at 472 (quoting *Dranoff-Perlstein Assoc. v. Sklar,* 967 F.2d 852, 862 (3d Cir.1992)). In the case at bar, likelihood of confusion is undisputed. Both parties and the PTO have compared the two marks and found that they are confusingly similar. (D.I. 85 at 10; D.I. 80 at 20; D.I. 96, Ex. 11)

Defendants argue that MSG's delay in seeking a preliminary injunction precludes a finding of irreparable injury. (D.I. 81 at 9) Defendants contend that MSG knowingly allowed SGNA to establish goodwill in the "San Giacomo" trademark since at least 1993, when the 1989 Distribution Agreement was terminated, if not 1989, when SGNA began using the "San Giacomo" mark to identify its furniture purchased from various suppliers. (D.I. 81

at 9-10) Defendants also point to the six month delay between the time plaintiff filed this suit, in July 1996, and when it sought injunctive relief in February 1997. (D.I. 81 at 10)

While "outrageous, unreasonable, and inexcusable delay" bars all claims for relief, less egregious delay bars claims for past infringement, not for prospective injunctive relief. *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044-46 (3d Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *see W.L. Gore & Assocs., Inc. v. Totes Inc.*, 788 F.Supp. 800, 812 n. 19 (D.Del.1992). Because the court finds that since 1989, MSG and SGNA conducted business in a manner consistent with either the 1989 Distribution Agreement or the distribution agreement contemplated by the 1993 Settlement Agreement, both of which vested ownership of the "San Giacomo" mark in MSG, plaintiff did not delay in bringing its motion for injunctive relief. Moreover, under the circumstances, the six month delay between the time suit was filed and plaintiff's motion for injunctive relief is not sufficient to negate irreparable injury. The delay was in good faith-- granted to allow defendants time to discontinue use of the "San Giacomo" mark. MSG has demonstrated that it will suffer irreparable injury.

C. Irreparable Harm to Defendant

*8 In deciding whether injunctive relief is appropriate, the court must balance the hardships to the respective parties so as "to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 197 (3d Cir.1990). It is undeniable that defendants will suffer harm if they are unable to use the "San Giacomo" mark. For example, SGNA will have to change its name on advertising and packaging and adopt another name. Moreover, defendants potentially will forfeit any goodwill they have built up in the "San Giacomo" mark.

Besides the harm to the respective parties, the court must also consider other factors in the analysis, such as the conduct of the infringing party and the preservation of the status quo. *See Opticians Ass'n*, 920 F.2d at 197. Where a party has "brought any and all difficulties occasioned by the issuance of an injunction upon itself," it "can hardly claim to be harmed." *Opticians Ass'n*, 920 F.2d at 197; *see also S & R Corp.*, 968 F.2d at 379. In the case at bar, defendants proceeded to make a substantial investment in the "San Giacomo" mark and goods sold thereunder despite notice of MSG's registration of the "San Giacomo" mark and constructive knowledge of MSG's intent to retain ownership of the mark. With respect to preservation of the status quo, defendants assert that issuance of injunctive relief in the instant matter would completely upset the status quo. (D.I. 81 at 12-13) Defendants contend that MSG has had no market presence in the United States since 1989 and that MSG has other affiliated companies under whose names it could sell its products in the United States. (D.I. 81 at 12-13)

Taking into consideration all of the relevant factors, the grant of injunctive relief imposes no greater harm upon defendants than would be imposed upon plaintiff were injunctive relief to be denied.

D. Public Interest

The final consideration in the analysis is whether the issuance of a preliminary injunction is in the public interest. In a trademark case, public interest is " 'most often a synonym for the right of the public not to be deceived or confused.' " *S & R Corp.*, 968 F.2d at 379 (*quoting Opticians Ass'n*, 920 F.2d at 197). In the case at bar, it is undisputed that the marks are confusingly similar. Moreover, the parties agree that it is in the public's best interest that only one party be allowed to use the "San Giacomo" mark. The issuance of a preliminary injunction, therefore, is in the interest of the consuming public.

V. CONCLUSION

For the reasons discussed, the court concludes that plaintiff has established the elements necessary for obtaining preliminary injunctive relief. Therefore, its motion for a preliminary injunction will be granted and defendants' motion for a preliminary injunction will be denied. An appropriate order shall issue.

**Motions, Pleadings and Filings (Back to top)**

•     1:96CV00415    (Docket) (Aug. 16, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.