# EXHIBIT 2

**TO PLAINTIFF'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**Westlaw.**

Not Reported in F.Supp.
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

Page 1

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
J & M TURNER, INC., Plaintiff
v.
APPLIED BOLTING TECHNOLOGY PRODUCTS,
et al. Defendants
**No. CIV. A. 95-2179.**

Jan. 26, 1996.

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER

VANARTSDALEN.

*1 This action represents another chapter in an apparent litigation death-match between two competing small businesses that manufacture direct tension indicators, or DTIs. The plaintiff alleges that the defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by, *inter alia,* falsely advertising that the DTIs manufactured by Applied Bolting Technology Products, Inc. meet the requirements of F959-94a, an important industry standard established by the American Society for Testing and Material, or ASTM. The plaintiff seeks a preliminary injunction prohibiting the defendants from advertising that the DTIs manufactured by Applied Bolting Technology Products, Inc. satisfy the ASTM F959-94a standard. The defendants, in contrast, deny that their advertising was false and argue that the plaintiff has failed to prove that it will be irreparably harmed absent a preliminary injunction.

After a twelve-day evidentiary hearing on the merits of plaintiff's request for a preliminary injunction, and consideration of all of the accompanying briefs and evidence, I have concluded that the plaintiff has failed to satisfy any, much less all, of the four elements required to receive a preliminary injunction. Since I have determined that plaintiff has failed to satisfy its burden of proof, plaintiff's request for a preliminary injunction will be denied. The paragraphs below contain my findings of fact, legal analysis, and conclusions of law.

Findings of Fact
1. DTIs are washers with bumps or protrusions spaced around the washer surface. When used as part of a bolt assembly, the protrusions flatten as the clamping pressure increases when the bolt is tightened. By inserting a feeler gauge into the bolt assembly, construction workers are able to measure the extent to which the protrusions have flattened. Assuming that the DTI has been properly manufactured, the extent of flattening serves as a useful proxy for the tension of the bolt assembly.

2. DTIs are used with high-strength bolts and nuts to fasten structural steel on buildings, bridges, over-head highway signage and other physical structures.

3. The plaintiff, J & M Turner, Inc. ("J & M Turner"), is a Pennsylvania corporation with its main office in Southampton, Pennsylvania. Mr. F. Jonathan M. Turner serves as its President; he also owns all or the vast majority of J & M Turner's stock. Mr. David L. Sharp serves as its Director of Quality Assurance. J & M Turner has approximately seven employees.

4. Defendant Applied Bolting Technology Products, Inc. ("Applied") is a Vermont corporation with its principal place of business in Ludlow, Vermont. Defendant I. Wayne Wallace serves as President of Applied. Defendant Kenneth J. Woodward, Jr. serves as Vice President for Sales and Marketing.

5. Defendants Wallace and Woodward previously worked for J & M Turner. Up until late 1992 Wallace was employed by J & M Turner as Director, Applications Engineering and Woodward worked for J & M Turner as an independent sales representative.

*2 6. Both J & M Turner and Applied manufacture DTIs in the United States. The only other manufacturer of DTIs in the United States is Beth-Fast, Inc. Mr. F. Jonathan Turner, the President and owner of J & M Turner, also owns and controls Beth-Fast, Inc.

7. Applied Bolting distributes its DTIs primarily through North American distributors who deal specifically with bolts and nuts designed for structural use.

8. Although other firms have manufactured DTIs in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

the past, at present only Applied and J & M Turner (which holds a license to sell DTIs made by Beth-Fast, Inc.) compete for sales in the United States. J & M Turner has reduced the possibility of competition from its former licensor and principle overseas competitor by registering the trademarks of the competitor as the property of J & M Turner.

9. After registering its former licensor's trademarks, J & M Turner filed the registrations with the U.S. Customs Service. Since every manufacturer of DTIs stamps its products with a firm-specific trademark, filing the registrations with the Customs Service authorized the Customs Service to seize DTIs manufactured by that foreign competitor. This had the effect, and was presumably undertaken with the intent, of reducing competition from the former licensor, a major foreign DTI manufacturer.

10. There are several methods of assuring proper bolt tension not involving DTIs. These other methods include the use of torque wrenches, the "turn-of-nut" method for tightening bolts, "twist-off bolts" and "lock, pin and collar" fasteners. DTIs offer many advantages over these alternative methods, however, so they are not perfect substitutes.

11. The use of DTIs is generally specified by the engineer or consulting engineer on a particular construction project. When the use of DTIs is permitted or required, engineering specifications typically mandate that the DTIs be manufactured in conformance with the latest version of Standard F959 of the American Society for Testing and Materials ("ASTM").

12. Compliance with F959 is extremely important to most users of DTIs. There is little demand for DTIs which do not satisfy the standard. Compliance with F959 not only assures purchasers that they will receive high-quality DTIs, but also ensures that DTIs will properly mate with bolts governed by a similar ASTM standard.

13. Applied's advertisements, selling literature, and order acknowledgment forms all state or suggest that Applied's DTIs satisfy F959-94a. Applied's order confirmation forms specify "All DTI's Made to ASTM F959-94a." In correspondence with the fastener distributors who represent the bulk of its customer base, Applied often represents that its DTIs satisfy F959-94a.

14. In May of 1995 Applied distributed a piece of selling literature entitled "Let's Torque Tension" which listed roughly 60 customers who Applied claimed had endorsed or approved Applied's DTIs. The customers listed included various state departments of transportation, consulting engineers, contractors, and distributors of DTIs.

*3 15. The ASTM is a non-profit, voluntary organization which provides a forum for interested parties to meet and formulate standards for materials, products, systems, and services. The ASTM establishes and develops standards through a consensus process.

16. The current version of standard F959 is ASTM F959-94a which became effective on September 15, 1994. This version has been in effect during the entire period at issue in this litigation.

17. ASTM Committee F16 is responsible for standards dealing with fasteners, including DTIs. This committee adopted the present version of F959. The committee had previously adopted earlier versions of F959 in 1990 and 1993.

18. The ASTM standards are designed to speak for themselves. However, ASTM regulations set forth a specific procedure to be used in order to obtain an official interpretation from the ASTM of a standard prepared by one of its committees. In order to qualify as an official interpretation, an interpretation must be in writing, must have been approved by the executive committee of the parent committee and submitted to the ASTM Board of Directors or its President (or both), and the interpretation must be accompanied by a letter of transmittal from either the Board of Directors or President (or both).

19. Neither the ASTM nor the F16 committee (including its F16.02 subcommittee on fasteners) has yet issued an official interpretation of F959, or of any one or more of its twenty sections, or of the Annex, or of the Appendix to F959.

20. In the absence of an official interpretation from the ASTM, parties using and relying upon an ASTM standard employ their own interpretation of the standard. The ASTM is reluctant to provide official interpretations of its standards because doing so subjects it to possible legal liabilities. Therefore market participants relying upon ASTM standards typically implicitly utilize unofficial interpretations. The ASTM attempts to write its standards clearly to prevent unofficial interpretations from varying too much from the intent of the ASTM committee which drafted the standard.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

Page 3

21. ASTM Standard F959-94a outlines the chemical, mechanical, and dimensional requirements for DTIs.

22. Section 6 and Table 1 of F959-94a impose limitations on the chemical composition of DTIs. For example, the carbon composition of the steel used to produce DTIs must fall between 0.30% and 0.50% under a "heat analysis" or 0.27% and 0.53% under a "product analysis."

23. Although F959-94a specifies the chemical composition of DTIs, it does not designate a procedure for determining whether the chemical composition specifications have been satisfied.

24. Section 8 and Table 4 of F959-94a impose certain dimensional requirements on DTIs, including tolerances for thickness, outside diameter, inside diameter, and protrusion tangential diameter.

25. F959-94a does not designate a procedure for determining whether the dimensional specifications contained within the standard have been satisfied.

*4 26. F959 does not specify requirements for flatness or concentricity.

27. Section 10 of F959-94a imposes a lot integrity requirement which demands that each production lot be kept intact through various manufacturing processes and testing procedures.

28. Although F959-94a specifies chemical, mechanical and dimensional requirements for DTIs, only the mechanical (i.e. compression load) requirement is governed by a specified test to measure compliance with the standard.

29. Given that F959 does not specify a test method for evaluating compliance with the chemical and dimensional requirements of the standard, the DTI producer has discretion to select appropriate manufacturing and quality assurance procedures to ensure conformity with these requirements.

30. Applied uses calibrated "hard gauges" (also known as "go/no-go gauges") to determine whether its DTIs comply with the dimensional requirements of F959, including the specification for protrusion tangential diameter ("PTD"). PTD measures the diameter of a hypothetical circle drawn just wide enough so that the outer edges of the protrusions on a DTI are tangent to the circle. The PTD requirement specified by F959 is apparently intended to ensure that when a DTI is used as part of a bolt assembly, the bolthead makes proper contact with the full surface of all the protrusions, thus ensuring that the resulting residual gap provides an accurate measure of the bolt's clamping force.

31. Applied tests every 2,000th DTI manufactured using a hard gauge to ensure that its PTD measures within the tolerances established by F959. If the tested DTI, which Applied calls a "control part," fails to fit within the PTD hard gauge, Applied flattens the control part and retests it using the hard gauge. If the control part passes the retest, or a subsequent retest, the production lot is not rejected. J & M Turner objects to this procedure, which it characterizes as deforming the control parts. In response, Applied and its expert, Mr. Ian Park, note that the flattening of the control part merely mimics what happens when the DTIs are compressed within a bolt assembly. In short, Applied argues that its procedure does not offend F959 because the control part is measured in the same condition in which it will actually appear on the bolt assembly. Given the lack of any official interpretation of F959, Applied acted within its discretion when adopting its procedure for ensuring adherence to the PTD tolerances in F959.

32. Applied also tests every 2,000th DTI manufactured with a hard gauge to ensure compliance with the inside diameter tolerances contained in F959. As with PTD, Applied flattens and retests any control parts which initially fail Again, Applied justifies this approach by arguing that it merely measures tolerances of DTIs in the same condition in which they will actually appear on the bolt assembly. Given the lack of any official interpretation of F959, Applied acted within its discretion when adopting this procedure for ensuring adherence to the inside diameter ranges specified in F959.

*5 33. Section 10 of F959-94a establishes a sampling procedure for determining whether a given production lot of DTIs satisfies the compression load requirements of the specification. The procedure requires that a sample of 27 DTIs be taken from each production lot and tested to ensure that the lot satisfies the compression load requirements of the standard. If a single member of the sample of 27 fails, the entire production lot must be rejected.

34. Subsection 10.2.3 is reproduced below in its entirety including the extremely relevant table contained within:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10.2.3 The minimum number of tests from each production lot, shall be as follows:

| Number of Pieces In Production Lot, max | Sample Size | Acceptance Number | Rejection Number |
|---|---|---|---|
| To 25,000 | 27 | 0 | 1 |

35. Witnesses disagreed about whether the 25,000 unit maximum specified for lot size should be interpreted to define an Acceptable Quality Level ("AQL") or to prohibit the production of lots with more than 25,000 DTIs. Even some of the witnesses who believed that section 10.2.3 prohibited production lots with more than 25,000 units conceded that other interpretations of the section were plausible.

36. Section 10.2.3 defines a sampling plan. The previous two subsections, 10.2.1 and 10.2.2, define "production lot" and delineate the requirements applicable to production lots.

37. Applied argues that the sampling plan in section 10.2.3 is intended to create an AQL which, on average, limits the risk of non-conformity to approximately 4% of the production lot. Applied contends that the manufacturer must follow a sampling procedure which meets or exceeds this 4% AQL. Applied further contends that as a statistical matter, when the lot size becomes very large relative to the sample size, the lot size eventually has an insignificant influence on the statistical inference which can be drawn from the results of the sample. In fact, Applied argues that as a statistical matter a sample of 27 DTIs is sufficient to establish conformance with a 4% AQL even for production lots as large as 100,000 units.

38. Applied contends that the samples of 27 DTIs taken from each production lot to ensure compliance with the compression load requirements of F959 have a mean and standard deviation such that more than 99.73% of Applied's DTIs will perform within the compression load ranges specified by F959. Applied contends that level of quality exceeds the requirement of section 10.2.3.

39. In some instances Applied produced lots with more than 25,000 units.

40. Both J & M Turner and Applied sample-test 27 DTIs from each production lot in accordance with their respective interpretations of F959-94a section 10.2.3. Every lot of DTIs is also sample-tested again by the end-user just prior to actual installation to ensure that the DTIs perform within the acceptable range of compression load specified in F959-94a.

41. Standard F959's reliance upon a sampling plan implicitly recognizes the impossibility of manufacturing large quantities of DTIs in a manner that ensures that every unit exactly conforms with the very demanding tolerances contained in the standard. Indeed, compliance with the compression load requirements of F959 is ascertained by sampling only 27 units of each lot, which both parties concede may permissibly include up to at least 25,000 DTIs. Therefore, it is possible that a lot will be certified as complying with the standard even though several, perhaps many, individual DTIs from the lot will not satisfy the compression load requirement. The sampling plan is intended to minimize, but not eliminate, deviation from the recommended compression load ranges.

*6 42. Testimony during the preliminary injunction hearing demonstrated that a small number of DTIs manufactured and sold by Applied failed to satisfy the dimensional requirements specified in F959. Standard F959 does not, however, require that the manufacturer measure the dimensions of every DTI before releasing them to the customer.

43. Other evidence indicates that a small number of DTIs manufactured by Applied failed the compression load requirement of F959. Standard F959 does not, however, require that the manufacturer test every DTI for compression load before releasing them to the customer. Indeed, doing so would be impossible since testing for compression load necessarily destroys each DTI tested.

44. J & M Turner performs the compression load test required of F959 in house. In contrast, Applied commissions an accredited, independent testing lab, MMA Laboratories, Inc., to perform the necessary tests.

45. In the past several customers disputed J & M Turner's compression load certifications. Several customers rejected J & M Turner DTIs for failure to conform to the compression load requirements of the then-effective version of F959. In June of 1993 ASTM F959 was changed to incorporate the compression load testing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

procedures used by J & M Turner. This effectively made J & M Turner's determination of compression load dispositive and deterred challenges by customers.

46. J & M Turner contends that Applied has violated the lot integrity requirements of F959. Section 10.2.2 defines a production lot to "consist of all direct tension indicators processed essentially together through all operations to placing in the shipping container that are of the same nominal size, produced from the same mill heat of steel, and heat treated in the same heat treatment cycle." Section 10.2.1 states that: "The manufacturer shall identify and maintain the integrity of each production lot of direct tension indicators from raw material selection through all processing operations and treatments to final packing and shipping."

47. J & M Turner contends that Applied violates the lot integrity requirements by taking a sample from a lot and then forwarding a portion of the lot to the coating and finishing process while awaiting the results of compression load tests on the sample. Upon positive test results, Applied then sells both the coated and uncoated DTIs.

48. Nothing in F959 prohibits finishing or coating only part of a lot. Section 10 merely requires that a manufacturer maintain the integrity of all DTIs processed "essentially together." In the absence of an official interpretation of this provision, Applied was free to adopt its own logical interpretation of the lot integrity requirements.

49. Applied concedes that in one instance, involving the production of Lot A6, it failed to adhere to the lot integrity requirements of F959.

50. J & M Turner contends that some of Applied's DTIs fail to satisfy the workmanship, finish, and appearance requirements of section 9 of F959. That section states, in its entirety, that: "The direct tension indicators shall be commercially smooth and free of injurious material or manufacturing defects that would affect their performance." F959 does not specify any procedure for determining compliance with this section, except perhaps section 14.

*7 51. Section 14 of F959-94a specifically empowers the customers and/or end-users to reject any shipments of DTIs which fail to satisfy any part of the standard.

52. Applied's DTIs have never been rejected by a distributor or end-user for any reason, including poor performance, poor workmanship or quality, or failure to conform to any facet of ASTM F959.

53. Applied has never received even a single complaint from a distributor or end-user alleging that Applied's DTI's failed to perform as advertised or failed to meet the requirements of F959.

54. Applied has produced in excess of 3 million DTIs in approximately 70 production lots. The lots have been designated A1 to A13 and B1 through B57. The smallest lot contained about 5,000 DTIs; the largest lot exceeded 100,000 DTIs.

55. In April of 1995 Applied re-called the DTIs produced as lot A6. The lot was sold after the initial sample of 27 DTIs satisfied the compression load test specified in F959. The lot was recalled after additional samples failed the test. Applied conducted the follow-up tests after J & M Turner made allegations that Applied's DTIs failed the compression load requirements.

56. J & M Turner's sales have declined due to competition from Applied.

57. On March 24, 1995 J & M Turner transmitted a 13-page evaluation it had commissioned of Applied's DTIs to over 600 distributors, consulting engineers and end-users of DTIs. The evaluation, which was prepared with the assistance of Laboratory Testing, Inc. ("LTI"), alleged that Applied's DTIs failed to satisfy the chemical, dimensional, and compression load requirements of F959. The evaluation also claimed that DTIs that would be made by Applied in the future were likely to fail to meet various requirements of F959.

58. LTI had little or no experience with DTIs and standard F959 before undertaking the evaluation for J & M Turner. In fact, LTI did not possess a compression load testing system of the type specified in the Annex to F959, so Turner sold such a system to LTI to facilitate LTI's evaluation of Applied's DTIs.

59. During the hearing, LTI conceded that F959 does not specify a procedure for determining compliance with the chemical and dimensional specifications of the standard.

60. J & M Turner received little or no response from any of the 600 distributors, engineers, and end-users of DTIs to which it sent the LTI report.

61. On March 29, 1995 David L. Sharp, Director of Quality Assurance for J & M Turner, sent a copy of the LTI report to a consulting engineering firm which was recommending Applied DTIs for a project. Mr. Sharp offered to have the Applied DTIs evaluated by an independent laboratory at no cost to the engineering firm.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

Page 6

The engineering firm did not respond to Mr. Sharp's offer.

62. On April 10, 1995 Mr. Sharp wrote the President of Birmingham Fastener and Supply, Inc., a distributor of Applied DTIs, and asked the firm to join J & M Turner in a lawsuit against Applied for falsely advertising that Applied's DTIs were "made to ASTM F959." The president of the recipient firm never responded to Mr. Sharp's invitation.

*8 63. J & M Turner initiated the present litigation and this request for a preliminary injunction on the basis of information it acquired during a previous suit against Applied. Just days after Applied first started manufacturing DTIs in the fall of 1994, J & M Turner sued Applied and Messrs. Wallace and Woodward (both of whom formerly worked for J & M Turner) alleging patent infringement, appropriation of trade secrets, and violations of non-disclosure and non-competition agreements. On the basis of information obtained during this previous litigation, J & M Turner determined, in light of its interpretation of F959, that Applied was falsely advertising that its DTIs were "made to F959."

64. The previous litigation between the parties was settled by mutual agreement between the parties. As part of that settlement agreement, each party agreed to release the other from all claims, known and unknown, that each could possibly later assert against the other.

65. J & M Turner waited several months after it acquired the information inspiring its belief that Applied was falsely advertising before initiating this request for a preliminary injunction. However, during the interim period Applied and J & M Turner engaged in extensive negotiations to settle this unfair advertising claim.

66. In the present litigation, J & M Turner does not claim that Applied falsely compared Applied and J & M Turner DTIs. Rather, J & M Turner argues that statements contained in Applied's advertisements, sales literature, and order confirmation forms stating that Applied's DTIs conform with ASTM F959-94a are literally false. Therefore, this litigation is a "non-comparative" Lanham Act action.

67. J & M Turner contends that Applied obtains an unfair competitive price advantage by failing to meet the strict requirements of F959. J & M Turner claims to have lost approximately $1 million in gross sales revenue as a consequence of Applied's supposed unfair advantage. This loss of $1 million in sales amounts to a one-third decrease in J & M Turner's gross sales revenue.

68. J & M Turner has not offered any evidence demonstrating that distributors, consulting engineers, or end-users of DTIs were actually deceived or misled by Applied's claims that its DTIs are "made to F959." Nor has J & M Turner offered any evidence demonstrating that any distributor, consulting engineer, or end-user is likely to be deceived or misled by Applied's claims.

69. J & M Turner has not demonstrated that any customers or potential customers were influenced by the May 1995 issue of "Let's Torque Tension" which listed 60 DTI purchasers who had supposedly endorsed Applied's DTIs.

70. J & M Turner has not offered any evidence that Applied's advertisements have damaged J & M Turner's business reputation, image, or goodwill or any other value inextricably associated with J & M Turner.

71. J & M Turner argues that it has invested a great deal of time and money in increasing the general acceptance of DTIs among users of fasteners. J & M Turner contends that the goodwill created by its investments would be lost if a structure collapsed because of a faulty Applied DTI. J & M Turner did not introduce any evidence to support this naked contention. J & M Turner did not provide any evidence suggesting that Applied's DTIs were or are unsafe. Similarly, J & M Turner did not offer any evidence indicating that Applied's business practices or advertisements have caused a decline in the general acceptance of DTIs. For example, no evidence was introduced showing that DTIs are less likely to be specified for structural use because of Applied's quality control procedures.

Discussion
This motion for a preliminary injunction is just the latest installment in a continuing battle between two small businesses. This suit arose out of a previous litigation involving the same parties. The prior lawsuit was settled by mutual agreement between the parties. In the agreement settling the prior litigation, J & M Turner supposedly released Applied from all claims known and unknown. Curiously, this broad release failed to prevent the present suit.

*9 Section 43(a) of the Lanham Act provides a cause of action to businesses which have been harmed by a competitor's false or misleading description of a product. In this action, the plaintiff accuses the defendants of falsely advertising that Applied's DTIs comply with ASTM standard F959. The plaintiff seeks a preliminary injunction prohibiting the defendants from representing that Applied's DTIs comply with F959.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

As I noted at the outset of this opinion, plaintiff J & M Turner must prove four elements to be entitled to the requested preliminary injunction: (1) plaintiff is likely to succeed on the merits after a full trial; (2) plaintiff will suffer irreparable harm, which necessarily extends beyond mere monetary damages, if the requested injunction is not granted; (3) the defendants will not suffer irreparable harm if the injunction is granted; and (4) the public interest is served by granting the injunction. *See, e.g., AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied,* 115 S.Ct. 1838 (1995). Plaintiff has failed to bear its burden of proof with respect to each and every element.

Before discussing these four elements in detail, however, I should note that I am reluctant to issue a preliminary injunction in this case for two reasons. First, although the Lanham Act clearly authorizes suits by businesses against competitors who are falsely advertising, courts should be suspicious of applications of the Act which would greatly reduce competition. The Lanham Act was not intended to allow uncompetitive businesses to undermine their competitors through litigation. The American economic system is based on competition in the marketplace, not in the courtroom. This concern is particularly relevant in situations, like the present one, where granting the requested relief would permit one business to eliminate effectively its sole competitor, where the competitor has never received a single customer complaint about either its advertising or the quality of its products.

Second, I am also hesitant to grant the relief requested by the plaintiff in light of the extreme difficulty of writing and enforcing the necessary injunction. Even if the defendants were falsely advertising, I would have great difficulty crafting an appropriate injunction. Essentially, the plaintiff seeks an injunction prohibiting the defendants from advertising that their DTIs are manufactured in accordance with ASTM standard F959. Obviously an injunction merely prohibiting such advertisements until the defendants complied with the standard would be useless as a practical matter. In response to such an injunction the defendants would merely alter some minor element of Applied's production process, proclaim themselves in compliance with the standard, and resume advertising. The plaintiff would then bring a contempt hearing to enforce the injunction, arguing that the defendants were still not in compliance with F959. This process would force me to interpret every minor nuance of the standard, a task that even the ASTM has declined to undertake. In fact, the parties and their respective expert witnesses disagreed as to the proper interpretation of the F959 standard.

*10 As an alternative, I could attempt to write an extremely detailed injunction exactly specifying what the standard demands. Again, however, this would force me to detail the requirements of F959, a murky and poorly written standard which inspired more confusion than consensus among the supposed experts called to interpret it. As a third alternative, I could conceivably prohibit the defendants from advertising adherence to F959 for the rest of time. This remedy is obviously too drastic. It would greatly harm both users of DTIs, who would ultimately pay higher prices, and Applied, which would no doubt cease to do business. This would effectively provide J & M Turner with a monopoly in the sale of DTIs in the United States.

I will now address the four factors to be considered when ruling upon a request for a preliminary injunction. I will consider them in the opposite order in which they were mentioned above.

1. The Public Interest

The evidence introduced at the hearing reveals that granting the requested preliminary injunction would be contrary to the public interest. Both sides concede that Applied's presence in the market has introduced a great deal of price competition. The evidence indicates that purchasers of DTIs often demand compliance with F959 as a condition of purchase. Therefore, prohibiting Applied from stating that its DTIs complied with F959 would leave customers with only one source of goods--the plaintiff. Although DTIs do compete with other types of fasteners, they occupy a special niche. As such, other fastener products are at best imperfect substitutes. As the sole supplier of DTIs, the plaintiff would effectively become a monopoly. It would no doubt charge a monopoly price, to the detriment of the public.

The public also has an interest in safety. If Applied's DTIs were defective, structures in which they are used might conceivably collapse. Obviously, this would put the public at great risk. The ASTM F959 standard was clearly intended to reduce or eliminate the risk of such structural failure. Major deviations from the standard could endanger the public.

Even if Applied's DTIs vary from the standard to the extent that the plaintiff alleges, a conclusion I reject, I do not believe that these minor deviations pose an actual risk to the public. Some of the alleged deviations from the standard were down right picayune. In the LTI report,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

for example, the evaluation of Applied's DTIs concluded that they exceeded the standard's specification for carbon content by testing them to three decimal places rather than the two decimal places specified in the standard. Certainly, a carbon content of 0.532% exceeds a specified upper limit of 0.53%, but there is no evidence that this minor discrepancy endangers the public. This is particularly true given that the standard does not mandate the testing of every individual DTI to ensure compliance with the carbon content requirement.

Similarly, the alleged deviations from the dimensional requirements of F959 were relatively minor. The LTI report's conclusion that Applied's DTIs did not comply with the specifications for protrusion tangential diameter ("PTD") was largely a product of the measurement technique used by LTI. Essentially, LTI used a computer video measuring machine to measure the distance between each protrusion and a hypothetical center point. The largest such radius was doubled to calculate PTD. The defendants argue, I feel convincingly, that had LTI averaged the radii and then doubled this average (rather than using the highest radius), the Applied DTIs would conform with F959's PTD specifications. Furthermore, Applied uses a go/no-go gauge to test its DTIs for compliance with the PTD requirements. This is an acceptable approach for ensuring compliance with the standard.

*11 In any case, there was no evidence that even the alleged deviation from the PTD standard actually presented a danger. At worst, the alleged deviation might cause some "stepping," that is, use of the DTI might result in the partial, rather than total, flattening of some protrusions. Plaintiff's own correspondence, however, states that stepping is immaterial to the load-bearing ability of DTIs.

During the hearing, the plaintiff placed great emphasis on the defendants' sampling procedure used to test compression load. The plaintiff argues that section 10.2.3 of F959 requires manufactures to sample 27 DTIs from each lot of up to 25,000. If all 27 fall within the specified range for compression load, the lot is to be accepted. If even one fails, the entire lot is to be rejected. The defendants, in contrast, believe that section 10.2.3 should be interpreted to define an average quality level ("AQL"). The defendants sample only 27 DTIs even if the lot size exceeds 25,000. The defendants' testing technique, however, considers more than just whether the 27 sampled DTIs fall within the specified range. The defendants' approach also considers the mean and standard deviation of the sample. This information is then used to estimate the compression load capabilities of the entire production lot.

Even assuming that the plaintiff's interpretation of section 10.2.3 is dispositive, which it is not, in some situations the defendants' method for testing compression load will clearly be more accurate than the plaintiff's. Consider the situation where the compression load measurements of each of the 27 sampled DTIs fall very close to one limit of the specified range. Since the sample mean is therefore very close to the boundary, this suggests that much of the underlying lot population would have compression load measurements beyond the specified limits. The plaintiff would accept the lot in this situation since the 27 DTIs sampled passed the test. The defendants' AQL approach, however, might reject the lot given the inference that the underlying population of DTIs within the lot might vary from the specified range. Therefore, I cannot conclude that the defendants' interpretation of section 10.2.3 places the public in any greater danger than the plaintiff's interpretation.

In short, even assuming that the plaintiff's view of F959 is dispositive, a proposition I reject, I do not believe that the defendants' production techniques threaten the public's interest in safety. On the other hand, granting the requested injunction would almost certainly create a monopoly in the production of DTIs. The public would be worse off due to the concomitant decrease in competition. This concern disfavors the issuing of the requested injunction.

2. Harm to the Defendants

Evidence introduced at the hearing indicates that purchasers of DTIs often insist upon buying DTIs which the manufacturer certifies as complying with F959. Therefore, granting the requested preliminary injunction would almost certainly have a material and irreparable impact on defendant Applied. This is particularly true since granting the injunction would provide J & M Turner with the opportunity to advertise that Applied's DTIs do not conform to F959. This would destroy much of Applied's goodwill with its customers. Restoring this lost goodwill would be difficult, if not impossible, even if the injunction was later lifted if Applied prevailed at trial.

3. Irreparable Harm

In order to be entitled to the requested equitable relief, J & M Turner must
show that the failure to issue the injunction would cause it irreparable harm.
Generally, to be considered "irreparable" the harm must extend beyond mere
money damages, which could be repaid after trial *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-803 (3d Cir.1989); *A.L.K.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00346-SLR   Document 7-3   Filed 07/05/2005   Page 10 of 12

Not Reported in F.Supp.                                                                                   Page 9
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

*Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 764 (3d Cir.1971). The
plaintiff argues that under the Lanham Act irreparable harm is presumed once
the plaintiff has demonstrated a likelihood of succeeding on the merits. In
addition, the plaintiff argues that it has carried its burden of showing
irreparable harm even without the benefit of the presumption. I disagree on
both counts.

*12 First, the Lanham Act does not provide this plaintiff with a presumption of irreparable harm. In certain situations involving false comparative advertising (i.e. where one firm makes a direct but false comparison with a competing product) some courts have held that the plaintiff is entitled to such a presumption. *See, e.g., Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir.1992); *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988). The presumption is provided because courts assume that a false direct comparison necessarily harms the goodwill of the victimized firm, and therefore constitutes irreparable harm. All of the cases cited by plaintiff supposedly supporting its view that it is entitled to a presumption of irreparable harm involve either comparative false advertising or trademark infringement, where the policy favoring the presumption of lost goodwill applies.

This policy is not applicable to the present action. Here, J & M Turner alleges that Applied's statement that its DTIs are "made to F959" constitutes false advertising. The statement, however, is clearly non-comparative advertising. No mention is made of J & M Turner or any of its products. Therefore, there is no reason to assume that the statement necessarily damaged J & M Turner's goodwill. As an aside, I should note that even if this was deemed a comparative false advertising case, I would still deny the plaintiff the benefit of the presumption since I have concluded that it has not demonstrated a likelihood of succeeding on the merits.

Second, the plaintiff has failed to present any evidence showing irreparable harm. J & M Turner argues that during the preliminary injunction hearing it introduced evidence showing lost revenue of more than $1,000,000 and lost profits in excess of $400,000. The plaintiff contends that such "substantial actual damages" constitute irreparable harm. The law, however, is to the contrary. Mere loss of money, no matter how substantial, does not constitute irreparable harm. *See, e.g., Instant Air Freight Co. v. C.F. Air Freight, Inc.* 882 F.2d 797, 801-03 (3d Cir.1989) (reviewing and quoting various cases on point; "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of

[injunctive relief] are not enough"); *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1145-46 (3d Cir.1982) ("the requisite feared injury or harm must be irreparable--not merely serious or substantial").

The plaintiff also alleges that it has demonstrated irreparable harm because Applied's advertising risks damaging the general reputation of DTIs. Essentially, J & M Turner argues that a user of DTIs might rely upon Applied's assertions that its DTIs comply with F959, install such DTIs, and then have its structure collapse because of non-compliance with F959. The plaintiff contends that a structural collapse attributable to faulty Applied DTIs would erode consumer confidence in DTIs and lead users to substitute other methods of assuring proper bolt tension.

*13 In my mind, such hypothetical events are too speculative to constitute irreparable harm. First, as I noted earlier, there is no evidence suggesting that Applied's DTIs actually endanger the public. Second, although a structural collapse caused by a defective Applied DTI might damage the general reputation of DTIs, it would also provide J & M Turner with an excellent marketing opportunity. Since each DTI is stamped with the mark of its manufacturer, there would be little doubt that the defective DTI was produced by Applied. J & M Turner could seize upon this fact to attract the entire remaining DTI market. And Third, Applied's entry into the market has apparently decreased prices and increased the volume of DTIs sold each year.

In summary, the plaintiff has failed to demonstrate that it would be irreparably harmed by the failure to issue an injunction. It has only demonstrated possible monetary damages, which could be awarded if J & M Turner succeeds at a trial on the merits.

    4. Likelihood of Success on the Merits
To prevail on its claim of false advertising under Section 43(a) of the Lanham Act, the plaintiff has the burden of proving the following by preponderance of the evidence:
1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.
*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922-23 (3d Cir.1990) (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982)), *cert. denied,* 498

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

Page 10

U.S. 816 (1990). I believe that the plaintiff has not demonstrated the first element, so I will not reach the other four.

After weighing all of the evidence introduced during the preliminary injunction hearing, I am not convinced that Applied's claims that its DTIs were "made to F959" were false. Instead, Applied clearly manufactured and tested its DTIs in compliance with its interpretation of F959. Generally, I believe that the Lanham Act must be interpreted in an objective manner. That is, the defendants should be liable if their advertisements were objectively false even though they subjectively believed them to be true.

Applying this approach to this case, however, presents great difficulty. Contrary to the plaintiff's assertions, ASTM standard F959 is not clearly written and susceptible to only one interpretation. In fact, much of the standard is ambiguous. To a certain extent, this ambiguity is understandable. The standard must be flexible given the impossibility of mass producing parts to minute tolerances. The standard seems to be written and interpreted in a manner that provides each manufacturer with a limited amount of discretion to ensure adherence to the standard. The extent of this discretion is limited by several factors. First, parts of the standard are clearly written. Obviously a manufacturer is not at liberty to adopt an interpretation which is directly at odds with the unambiguous portions of the standard. Second, questionable interpretations can be countered by seeking an official interpretation of the standard from the appropriate committee of the ASTM. Significantly, the ASTM has not provided an official interpretation of any of the sections at issue here. Third, and most importantly, each manufacturer's ability to take liberties with its interpretation of F959 is checked by section 14 of the standard, which specifically empowers end-users to return DTIs which fail to conform to the requirements of the specification. This section implicitly recognizes the possibility that a manufacturer might have one interpretation of F959 while the end user might have a different view of the standard. Furthermore, this provision would seem particularly effective given that each lot of DTIs is field-tested for compression load by the end-user just before installation. I am impressed that no end-user has ever rejected any of Applied's DTIs for non-compliance with F959. Adherence to the standard is clearly important to many users; they specify compliance with F959 in their purchase orders. Their failure to reject any of Applied's DTIs, despite their field-tests and exposure to potentially enormous liability should they use defective DTIs, suggests that the end-users tacitly concur with my view that the defendants' DTIs comply with F959.

*14 The plaintiff attempted to prove that Applied's claims were false by demonstrating that some of Applied's DTIs failed to satisfy either the chemical composition or dimensional requirements of F959. Such illustrations were unconvincing, however, because the standard does not specify a method for testing compliance with these requirements. Instead, the standard seems to grant each manufacturer discretion to develop a production process which satisfies the standard. In addition, the plaintiff insists that section 10.2.3 of the standard must be interpreted to limit the maximum lot size to 25,000 units. I disagree. The defendants argue convincingly that any limitation on lot size would logically be placed in either section 10.2.1 or section 10.2.2, which define and discuss the requirements applicable to production lots, not section 10.2.3, which establishes a sampling plan. It is possible that some members of the committee which adopted the standard intended the table contained in section 10.2.3 to limit production lots to 25,000 units, but this is not the only reasonable interpretation. The defendants' view that section 10.2.3 defines an average quality level is consistent with the policy underlying the test for compression load set forth in the section. Given the lack of customer rejections, it apparently also comports with the views of end-users. In fact, evidence introduced at the hearing indicates that some users prefer lots in excess of 25,000 DTIs, since large lots are easier to field test in combination with their matching bolts.

Of all of the allegations leveled by the plaintiff, only the concerns relating to lot integrity seem legitimate. These are implicated with respect to only one lot. Applied concedes that it separately heat treated two portions of lot A6 in September, 1994. The lot integrity requirements of F959 are vague. Section 10.2.2 defines a lot as "all direct tension indicators processed essentially together through all operations to placing in the shipping container that are of the same nominal size, produced from the same mill heat of steel, and heat treated in the same heat treatment cycle." J & M Turner contends, and Applied admits, that this definition requires all of the DTIs in each lot to be heat treated together. Therefore, lot A6 deviated from this requirement. The defendants eventually voluntarily recalled all of the DTIs in the lot.

I do not believe, however, that this lone violation of F959 warrants the issuance of the requested injunction. In fact, since the plaintiff has not demonstrated irreparable harm, I am not permitted to issue the requested injunction. Furthermore, injunctions are a form of proscriptive relief. Applied's one-time error seems unlikely of repetition, particularly in light of the expensive recall it helped inspire.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 11
1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737
**(Cite as: 1996 WL 32114 (E.D.Pa.))**

To the extent that the "Discussion" section of this memorandum contains any findings of fact or conclusions of law which are not specifically enumerated as such, they shall be deemed additional findings of fact or conclusions of law.

### Conclusions of Law

*15 1. This court has jurisdiction over the parties and subject matter of this proceeding pursuant to 15 U.S.C. § 1121.

2. Venue is proper in this judicial district.

3. Plaintiff has failed to demonstrate a likelihood of succeeding on the merits of its claim that the defendants' advertisements stating that Applied's DTIs were "made to F959" were false.

4. Applied's statements that its DTIs were "made to F959" constitute non-comparative advertising. As such, the plaintiff is not entitled to the presumption of irreparable harm which might be applicable to a comparative false advertising situation.

5. Plaintiff has failed to demonstrate that it would be irreparably harmed by the refusal to issue the requested preliminary injunction.

6. Applied would be irreparably harmed were it enjoined from advertising that it's DTIs complied with ASTM standard F959.

7. The public interest would not be served by granting the requested injunction.

### ORDER

Upon consideration of all the testimony and other evidence introduced at the hearing held on this matter, and after evaluating the legal arguments contained in the various legal briefs submitted by the parties, plaintiff's motion for a preliminary injunction prohibiting the defendants from representing that Applied Bolting Technology Products, Inc.'s direct tension indicators are made to ASTM standard F959 is DENIED.

1996 WL 32114 (E.D.Pa.), 1996-1 Trade Cases P 71,290, 37 U.S.P.Q.2d 1737

**Motions, Pleadings and Filings (Back to top)**

• 2:95CV02179 (Docket) (Apr. 13, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.