# EXHIBIT B

TO THE MEMORANDUM OF PLAINTIFF
MOBIUS MANAGEMENT SYSTEMS IN OPPOSITION
TO DEFENDANT ACARTUS' MOTION TO DISMISS AND FOR A STAY

Westlaw.

Not Reported in A.2d  
Not Reported in A.2d, 2002 WL 1288732 (Del.Super.)  
**(Cite as: 2002 WL 1288732 (Del.Super.))**

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.  
SANIRAB CORPORATION, A Delaware Corporation Plaintiff,  
v.  
SUNROC CORPORATION, A Foreign Corporation Defendant.  
No. CIV.A. 00C-02-191SCD.

Submitted: April 1, 2002.  
Decided: April 29, 2002.

OPINION

DEL PESCO, J.

*1 This claim arises from the development and production of a machine used to clean and sanitize bottled water machinery, a "cooler cleaner." Sanirab Corporation ("Sanirab") has sued Sunroc Corporation ("Sunroc") claiming that information provided by Sanirab to Sunroc pursuant to a Confidentiality Agreement and a Licensing Agreement was used in the development of the product that Sunroc is now selling without compensation to Sanirab.

*Statement of the Case*

Sanirab has asserted multiple alternate causes of action: misappropriation of trade secrets, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, conversion, quantum meruit and promissory estoppel. Sunroc seeks summary judgment as to all issues. Because I find there are questions of fact, summary judgment is denied as to all claims except conversion.

The facts can be briefly summarized. Sanirab is owned and operated by Joseph P. Barinas ("Barinas"). In the early 1990's Barinas began the design and development of a machine that utilized ozonated water to clean and sanitize bottled water machinery and equipment (the "unit"). The essential process utilized by the unit was described in a patent that Barinas obtained through his company, Sanirab. An article about the unit was published in 1994, and another in 1995. Prior to the development of the unit, the method for cleaning bottled water coolers depended on a chlorine flushing process that was cumbersome and performed infrequently.

In early 1996 a representative of Sunroc contacted Barinas regarding the unit. That inquiry was followed by one from Adam Levinson, The International Sales Manager of Sunroc and also by a call from Ronald Greenwald the Director of Engineering at Sunroc. A meeting occurred on February 22, 1996. Sunroc's representatives had a great interest in a portable product in order to meet the requirements of the bottled water industry in Europe. Barinas took the unit to a meeting with Sunroc at which time there was discussion of Sunroc's desire to manufacture a product. Sunroc's representatives requested that Barinas give them the unit. That request resulted in the execution of a Confidentiality/Non-Disclosure Agreement.

The Agreement included the following:
Whereas, Sunroc contemplates entering into a business relationship in which Sunroc will redesign and/or manufacture an ozone generating water cooler cleaning system; and whereas, in conjunction with said business relationship, Sanirab will allow Sunroc and representatives of Sunroc access to certain confidential designs and other proprietary information; and whereas, it is the intent of the parties hereto that the exchange of information, designs and ideas remain confidential; ... the parties do hereby agree as follows: ... Sunroc and its duly authorized representatives, employees and agents do hereby expressly agree, promise and convent at no time to divulge to others or use for its own personal benefit any confidential or proprietary information or designs obtained from Sanirab or its duly authorized representative or employees during the course of this business relationship without first obtaining the written consent of Sanirab. Sunroc will undertake all measures to prevent disclosure of designs and other proprietary information to others. [FN1]

FN1. Appendix to Sunroc's Opening Brief at Exhibit D.

*2 Barinas left the unit with Sunroc. Shortly after the February 22 meeting, Dave Minnach of Sunroc contacted Barinas and requested that he provide Sunroc with a list of the parts in the unit and an

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 2002 WL 1288732 (Del.Super.)
**(Cite as: 2002 WL 1288732 (Del.Super.))**

explanation of how it worked. Barinas agreed to comply with the request only after a Licensing Agreement was executed. Levinson then contacted Barinas and promised that a contract setting up a royalty arrangement would be provided if Barinas provided the information requested by Minnach. Barinas then provided a list of parts and a detailed explanation about how the unit worked. On March 14, 1996, Levinson sent a letter to Barinas setting forth a proposed payment schedule. The proposal was modified and accepted by both Barinas and Levinson. [FN2]

> FN2. Appendix to Sanirab's Response at Exhibit 6.

Sunroc analyzed and tested the unit. There were multiple additional communications between Sunroc and Barinas. In May of 1996 Barinas became concerned about a diminution in contact from Levinson, and requested the return of the unit. Levinson responded that they were still working on the project. Thereafter, Sunroc requested and Barinas provided some additional information regarding proper operation and testing of the unit. Throughout 1996, Sunroc analyzed and tested the Sanirab unit with a view to developing a cooler cleaner.

By early 1997, Barinas again contacted Sunroc regarding the development of the Sunroc cooler cleaner, and Levinson again provided Barinas with assurances that development was still ongoing. But in 1998 Sunroc told Barinas that the project was over. Barinas requested the return of the unit, which was done in October 1998.

Sunroc has commenced production and sale of a cooler cleaner. Sanirab contends that the Sunroc unit is based on Sanirab's confidential and proprietary design and the technical information supplied by Barinas. Barinas, testifying as an expert for Sanirab, has identified multiple similarities in the design and operating system of his unit and the Sunroc product. As of May 2001 Sunroc had produced between 500 and 600 cooler cleaners. Sanirab has not been paid any royalties.

*Standard of Review*
A grant of summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. [FN3] This Court must consider all facts in the light most favorable to the non-moving party. [FN4]

> FN3. *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 744-45 (Del.1997).

> FN4. *National Union Fire Ins. Co. v. Fisher*, 692 A.2d 892, 895 (Del.1997).

*Discussion*
I. *Misappropriation of Trade Secrets*
The Delaware Uniform Trade Secrets Act, Title 6 of the Delaware Code, Chapter 20, creates a right of action for misappropriation of trade secrets. Under that statute a claimant can seek injunctive relief and damages, both compensatory and exemplary. The statute specifies that it "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." [FN5] It further provides that it does not affect contractual remedies, whether or not based on misappropriation of a trade secret or other civil remedies not based on misappropriation of a trade secret. [FN6]

> FN5. Del.Code Ann. tit. 6, § 2007(a) (1999).

> FN6. Del.Code Ann. tit. 6, § 2007(b) (1999).

*3 A trade secret is defined as:
(4) ... information, including a formula, pattern, compilation, program, device, method, technique or process, that:
a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [FN7]

> FN7. Del.Code Ann. tit. 6, § 2001(4) (1999). See also *Smithkline Beecham Pharmaceuticals Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del.2000); *Merck & Co., Inc. v. Smithkline Beecham Pharmaceuticals Co.*, 1999 WL 669354, at *15 (Del. Ch. Aug. 5, 1999); *Miles, Inc. v. Cookson America, Inc.*, 1994 WL 676761, at *8-*13 (Del. Ch. Nov. 15, 1994).

Misappropriation is defined as:
a. Acquisition of a trade secret of another by a person who know or has reason to know that the trade secret was acquired by improper means; or
b. Disclosure or use of a trade secret of another without express or implied consent by a person

Not Reported in A.2d                                                                                                          Page 3
Not Reported in A.2d, 2002 WL 1288732 (Del.Super.)
**(Cite as: 2002 WL 1288732 (Del.Super.))**

who:

\* \* \*

2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:

\* \* \*

B. Acquired under circumstances giving rise to a duty to maintain secrecy or limit its use; or .... [FN8]

>    FN8. Del.Code Ann. tit. 6, § 2001(2) (1999).

"A plaintiff alleging misappropriation of a trade secret has the burden of proving the existence of a trade secret." [FN9] The relevant inquiry to determine if a *prima facie* misappropriation of a trade secret claim exists is: (1) have the statutory elements, commercial utility arising from secrecy and reasonable steps to maintain secrecy, been shown; (2) has the secret been communicated from plaintiff to defendant; (3) was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) has the secret information been improperly used or disclosed by the defendant to the injury of the plaintiff? [FN10]

>    FN9. *ID Biomedical Corp. v. TM Technologies, Inc.*, 1995 WL 130743, at \*14 (Del. Ch. Mar. 16, 1995).

>    FN10. *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at \*3 (Del.Super.Ct. Apr. 24, 2001).

*Trade secrets* should be given an expansive meaning and interpretation. [FN11] "The mere fact that aspects of a trade secret process can be found in publications does not mean that the process is not a trade secret." [FN12]

>    FN11. *American Totalisator Co., Inc. v. Autotote, Ltd.*, 1983 WL 21374, at \*4 (Del. Ch. Aug. 18, 1983) (strategic planning and bidding studies were considered trade secrets).

>    FN12. *Merck*, 1999 WL 669354, at \*16.

A product built from entirely generally known elements is protectable as a trade secret. The value of a trade secret would be lost if a defendant could obtain the information, learn thereby the important choices made by the trade secret owner at various points in development, use the information gained for its benefit, and avoid liability by then saying that the particular information used is published. [FN13] While a defendant's product can be different, the use of trade secret know-how provides a guide, charting the way through the many problems and decisions and a springboard to the solution of the problems. [FN14] Courts are skeptical of an independent derivation defense where, after being exposed to the trade secret, the defendant has a purportedly epiphanic episode. [FN15] Whether trade secrets were generally known or readily ascertainable and whether a plaintiff took reasonable precautions to protect their secrecy is a question of fact. [FN16]

>    FN13. *Id.* at 17.

>    FN14. *Id.* at 21.

>    FN15. *Id.*

>    FN16. *Smithkline Beecham Pharmaceuticals Co.*, 766 A.2d at 448.

There is a significant factual issue here as to whether the information derived from Sanirab was a trade secret. That determination depends on applying the facts and circumstances of the exchange between the parties to the definition of a trade secret as provided by the statute. There are questions as to whether the device and the associated technical information provided by Sanirab has independent economic value from not being generally known or readily ascertainable by persons who can obtain economic value from its use. There are a myriad of factors which must be examined to make that determination. Likewise, there is evidence that prior to its contact with Sunroc, Sanirab made its product available to consumers who could have reverse engineered the device to see how it operated. If Sunroc had received the device only, and had not secured additional intelligence from Sanirab, there may have been a basis to secure summary judgment as Sunroc would have been in the same position as other consumers of the Sanirab product. However, the evidence here is sufficient to create a factual issue as to the nature and value of the additional information provided by Barinas in the course of his communications with Sunroc.

\*4 Viewing the evidence in a light most favorable to Sanirab, the motion for summary judgment as to Sanirab's claim for misappropriation of trade secrets must be denied. All the other causes of action

Not Reported in A.2d    Page 4
Not Reported in A.2d, 2002 WL 1288732 (Del.Super.)
**(Cite as: 2002 WL 1288732 (Del.Super.))**

likewise depend on the plaintiff's ability to prove its claims, all of which are supported by the affidavit of Barinas. The only exception to that is the cause of action for conversion.

## II. *Conversion*

"Under Delaware law, conversion is the 'wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it." ' [FN17] Following the modern trend, Delaware courts have expanded the doctrine at times to encompass some intangible goods where the intangible property relations are merged into a document. [FN18] A "[p]laintiff has property interests in its proprietary information, which includes among others plans, technology, designs, and specifications, and has a right to possession of such information." [FN19] A claim for conversion does not apply when the Trade Secrets Chapter of the Delaware code can be invoked.

> FN17. *Resource Ventures, Inc. v. Resources Management International, Inc.,* 42 F.Supp.2d 423, 438 (D.Del.1999) (*quoting Carlton Investments v. TLC Beatrice International Holdings, Inc. et. al.,* 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995))

> FN18. *Id.* at 438-39.

> FN19. *Id.*

Title 6, Section 2007 of the Delaware Code states:
(a) Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret.
(b) This chapter does not effect:
(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;
(2) Other civil remedies that are not based upon misappropriation of a trade secret; or
(3) Criminal remedies, whether or not based upon misappropriation of a trade secret. [FN20]

> FN20. *Del.Code Ann.* tit. 6, § 2007 (1999).

Title 6, Section 2007 serves to preserve a single tort cause of action under state law for misappropriation as defined in Title 6, Section 2001(2) [FN21] and to eliminate other tort causes of action founded on allegations of trade secret misappropriation. [FN22] A plaintiff's claim of theft of proprietary information is displaced by a claim of misappropriation of a trade secret. [FN23] The conversion claim is dismissed as a matter of law.

> FN21. *Del.Code Ann.* tit. 6, § 2001(2) (1999).

> FN22. *Leucadia, Inc. v. Applied Extrusion Techs., Inc.,* 755 F.Supp. 635, 637 (D.Del.1991).

> FN23. *Total Care Physicians v. O'Hara,* 2001 WL 541488, at *11 (Del.Super.Ct. Mar. 23, 2001).

## *Conclusion*

For the above reasons, Sunroc's motion for summary judgment regarding Sanirab's conversion claim is GRANTED. Sunroc's motion for summary judgment regarding all of Sanirab's other claims is DENIED.

IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 1288732 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.