IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MOBIUS MANAGEMENT SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05-346 SLR |
| v. | ) | |
| | ) | **REDACTED** |
| ACARTUS, INC. and EMC CORPORATION, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
302.658.9200

*Attorneys for Defendants Acartus, Inc.
and EMC Corporation*

OF COUNSEL:

Robert S. Frank Jr.
Paul D. Popeo
G. Mark Edgarton
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
617.248.5000

Original Filing Date: April 5, 2007
Redacted Filing Date: April 12, 2007

# TABLE OF CONTENTS

**Page(s)**

NATURE AND STAGE OF THE PROCEEDINGS ....................................................1

SUMMARY OF ARGUMENT .................................................................................1

STATEMENT OF RELEVANT FACTS .....................................................................3

    I.      THE PARTIES...........................................................................................3

    II.     THE MOBIUS DATA STORAGE FORMAT. .......................................4

    III.    THE DEFENDANTS' ARCHIVAL SOFTWARE AND THE EXPORT UTILITY..................................................................................5

    IV.   MOBIUS' ALLEGED TRADE SECRETS. ...........................................9

          A.     Mobius' Original Allegation That Defendants Misappropriated Mobius Software Code. ..................................................9

          B.     Mobius' New Trade Secret Theory..........................................10

          C.     The Mobius License Agreement. ..............................................10

          D.    Mobius' Standard Practice Of Labeling Confidential Materials. ..............12

          E.     Mobius Claim Regarding DAF Files And Topic Indices. .........................13

    V.     MOBIUS HAS NOT TAKEN REASONABLE STEPS TO PROTECT THE CUSTOMER DAF FILES AS SECRET. ...................................13

    VI.   THE SALES DOCUMENTS...................................................................16

ARGUMENT..........................................................................................................17

    I.      THE RELEVANT STANDARD. ...........................................................17

    II.     THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING MOBIUS' MISAPPROPRIATION OF TRADE SECRETS CLAIM. (COUNT VI)..................................................18

          A.     Mobius Failed To Take Reasonable Steps To Protect Its Alleged Trade Secrets....................................................18

                1.     The Mobius License Agreement Does Not Clearly Identify Customer DAF Files And Topic Index Files As Mobius Trade Secrets................................................19

## TABLE OF CONTENTS
### (Cont'd)

Page(s)

2.    Mobius Failed To Take Steps To Preserve The Secrecy Of The DAF Files and Topic Index Files After Learning That Daksoft Provided These Files To Real Vision.................................23

B.    Acartus Did Not Know, Or Have Reason To Know, That DAF Files Were Mobius Trade Secrets. ..............................................24

C.    Acartus Did Not Use Information Contained In Mobius Sales Documents. ...............................................................................26

III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS BECAUSE THERE WAS NO UNDERLYING BREACH OF CONTRACT  (COUNT V). ................................28

A.    There Was No Tortious Interference Regarding DAF Files Or Topic Indices.............................................................................28

B.    Acartus' Use Of Customer Data On A Customer Printout Did Not Violate The License Agreement. ...........................................29

C.    Acartus' Original Computer Program That Allowed Its Customer To Use Mobius Software Did Not Violate The License Agreement. .........31

D.    Mobius "Reverse Engineering" Argument Is Unavailing. ........................32

IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' FALSE ADVERTISING CLAIM BECAUSE THE ALLEGEDLY FALSE STATEMENTS ARE NOT ACTIONABLE. (COUNT III ). .............................................................................33

V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' COMMON LAW UNFAIR COMPETITION CLAIM (COUNT VII)..........................................................................38

CONCLUSION................................................................................40

ii

## TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Acorn USA Holdings LLC v. Premark Int'l, Inc.,*
    2003 WL 22861168 (Del. Super. Ct. July 16, 2003) ..............................28

*Alamar BioSciences, Inc. v. Difco Lab.,*
    1995 WL 912345 (E.D. Cal. Oct. 13, 1995) ...........................................24

*Allen Organ Co. v. Galanti Organ,*
    798 F. Supp. 1162 (E.D. Pa. 1992), aff'd 995 F.2d 215 ......................37

*Am. Homepatient, Inc. v. Collier,*
    2006 WL 1134170 (Del. Ch. Apr. 19, 2006) .......................................27

*Am. Italian Pasta Co. v. New World Pasta Co.,*
    371 F.3d 387 (8th Cir. 2004) .......................................................34, 36

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).......................................................................17

*Cabot Corp. v. Thai Tantalum, Inc.,*
    1992 Del. Ch. LEXIS 150 (Del. Ch. July 22, 1992) .............................25

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
    173 F.3d 725 (9th Cir. 1999) .....................................................34-36

*Coca-Cola Co. v. Nehi Corp.,*
    36 A.2d 156, 165 (Del. 1944) ........................................................38

*Cook, Perkiss & Liehe, Inc., v. N. Cal. Collection Serv., Inc.,*
    911 F.2d 242 (9th Cir. 1990) .........................................................34

*Electro-Craft Corp. v. Controlled Motion, Inc.,*
    332 N.W.2d 890 (Minn. 1983).....................................................20-22

*First Fed. Sav. Bank v. CPM Energy Sys. Corp.,*
    1993 WL 138986 (Del. Super. Ct. Apr. 22, 1993)................................18

*First Health Group Corp. v. United Payors & United Providers, Inc.,*
    95 F. Supp. 2d 845 (N.D. Ill. 2000), aff'd sub nom. *First Health Group Corp. v. BCE*
    *Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001)...................................37

*Hirel Connectors, Inc. v. United States,*
    2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) ..................................19, 23

*Hoffman-LA Roche Inc. v. Yoder,*
    950 F. Supp. 1348 (S.D. Ohio 1997) ................................................24

**TABLE OF AUTHORITIES**
(Cont'd)

CASES                                                                    PAGE(S)

*Hursey Porter & Assocs. v. Bounds,*
  1994 WL 762670 (Del. Super. Ct. Dec. 2, 1994) .............................................. 29-32

*Intermedics, Inc. v. Ventrix, Inc.,*
  822 F. Supp. 634, 654 (N.D. Cal. 1993) ...................................................... 24

*Johnson & Johnson-Merck Consumer Pharms Co. v. Rhone-Poulenc Rorer Pharms, Inc.,*
  19 F.3d 125 (3d Cir. 1994) ............................................................... 34, 37

*Kline v. W. Gov't Sec.,*
  24 F.3d 480, 485 (3d Cir. 1994) ........................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ..................................................................... 17

*Monsanto Co. v. Syngenta Seeds Inc.,*
  443 F. Supp. 2d 648 (D. Del. 2006) ....................................................... 38

*Olson v. Gen. Elec. Astrospace,*
  101 F.3d 947 (3d Cir. 1996) .............................................................. 17

*On-Line Techs. v. Perkin Elmer Corp.,*
  141 F. Supp. 2d 246 (D. Conn. 2001) ............................................... 25-26, 28

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.,*
  311 F.3d 226 (3d Cir. 2002) .............................................................. 17

*Rypac Packaging Mach. Inc. v. Coakely,*
  2000 WL 567895 (Del. Ch. May 1, 2000) ................................................... 38

*Savor, Inc. v. FMR Corp.,*
  812 A.2d 894 (Del. 2002) ................................................................. 39

*S.E.C. v. Hughes Capital Corp.,*
  124 F.3d 449 (3d Cir. 1997) .............................................................. 17

*Small v. United States,*
  333 F.2d 702 (3d Cir. 1964) .............................................................. 28

*Southland Sod Farms v. Stover Seed Co.,*
  108 F.3d 1134 (9th Cir. 1997) ............................................................ 34

*State v. Wellington Homes, Inc.,*
  2003 WL 22048231 (Del. Super. Ct. Aug. 20, 2003) ......................................... 38

## TABLE OF AUTHORITIES
### (Cont'd)

**CASES**                                                                                      PAGE(S)

*Steinberg Moorad & Dunn, Inc. v. Dunn,*
    2002 WL 31968234 (C.D. Cal. Dec. 26, 2002) ..................................................25

*Stiffel Co. v. Westwood Lighting Group,*
    658 F. Supp. 1103 (D.N.J. 1987) ...........................................................................35

*Summit Tech. Inc., v. Highline Med. Instruments, Co.,*
    933 F. Supp. 918 (9th Cir. 1996) ..........................................................................35

*Tubos de Acero de Mexico v. Am. Int'l Inv. Corp.,*
    292 F.3d 471 (5th Cir. 2002) ...........................................................................18, 21

*Tyson Foods, Inc. v. ConAgra, Inc.,*
    79 S.W.3d 326 (Ark. 2002) ............................................................................20, 22

*W.L. Gore Assocs. v. Totes Inc.,*
    788 F. Supp. 800 (D. Del 1992) ............................................................................37

**STATUTES**

15 U.S.C. § 1125(a) ...........................................................................................................34

15 U.S.C. § 1125(a)(1) ......................................................................................................34

DEL. CODE ANN. tit. 6, § 2001(2)(b)(C) (2007) ...............................................................25

DEL. CODE ANN. tit. 6, § 2001(4) (2007) .........................................................................18

DEL. CODE ANN. tit. 6, § 2007 (2007) ..............................................................................39

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ...............................................................................................................17

Fed. R. Civ. P. 56(c) ..........................................................................................................17

MCCARTHY ON TRADEMARKS § 27:56 ...............................................................................35

MILGRIM ON TRADE SECRETS, §5.02 (2006) .....................................................................21

RESTATEMENT (SECOND) OF TORTS § 767 ........................................................................29

## NATURE AND STAGE OF THE PROCEEDINGS

This is an action by Mobius Management Systems, Inc. ("Mobius") against Acartus, Inc. ("Acartus") and EMC Corporation ("EMC") alleging misappropriation of trade secrets, tortious interference with contractual relations, false advertising, and other related claims.[1] Each of Mobius' claims arises from Acartus' development, licensing and advertising of a computer program (as later defined, the "Export Utility"). The program is intended to permit Mobius customers to retrieve the customers' documents and data, stored electronically in a Mobius data storage format, so that the customer may store those documents and data using document archival software licensed by defendants. ████████████████

██████████████████████████████████████████

████████████████████ The defendants are no longer marketing the program. As will be demonstrated below, summary judgment should be granted dismissing each of Mobius' claims.

## SUMMARY OF ARGUMENT

Mobius is in the business of licensing software that is used by its customers to store and later retrieve customer documents and other data. When a customer uses Mobius software to archive a document or other data, that document or other data is stored in a "DAF." DAF (Document Archive File) is the name used by Mobius for data files generated by use of the Mobius software. The DAF file is essentially a container that holds an electronic copy of the customer's document or other content. Mobius customers provided to Acartus (EMC's

---

[1] Mobius also alleges violations of Delaware's Uniform Deceptive Trade Practices Act and the common law of unfair competition. These claims are based on the same alleged conduct that underlies Mobius' other claims. The Court previously dismissed, with prejudice, Mobius' claims for trademark infringement (Count I) and false designation of origin (Count II) in violation of the Lanham Act. *See* Stipulation and Order (D.I. 94), approved December 21, 2006.

predecessor-in-interest) copies of customer documents in their original format (e.g., on paper) and copies of the same customer documents stored electronically in DAF containers. Acartus used a standard, commercially-available software tool to read the DAF files. It identified the portion of the files that corresponded to the original customer documents (as distinguished from the framework that held the documents) and used that information to create a utility (a software program) that extracts only the original customer documents so that they may then be stored in a different format of the customer's selection.

DAF files are created by the customer, owned by the customer, and maintained on the customer's computer systems. ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ Mobius did not inform its customers (or others) that the customer's DAF files or the related indices were, in Mobius' opinion, Mobius trade secrets.

In these circumstances, Mobius' misappropriation of trade secrets and interference with contractual relations claims should be dismissed. DAF files cannot be Mobius trade secrets because, among other things, Mobius did not take reasonable steps to protect them as secret. If Mobius' trade secrets were allegedly embedded in the customer-owned DAF file, Mobius failed to inform customers of that claim and failed to obtain agreements to protect what it now alleges to be trade secrets. Further, Acartus did not misappropriate a Mobius trade secret, or tortiously interfere with Mobius' contracts with its customers, because Acartus did not know,

and had no reason to know, that DAF files and information relating to customer documents were, or were claimed by Mobius to be, trade secrets.

Defendants also seek summary judgment dismissing Mobius' false advertising claim. Mobius' claim fails because (a) Acartus' statements regarding its software utility were non-actionable puffing, and (b) Mobius cannot establish that any statement made by Acartus regarding Acartus' or Mobius' software influenced the purchasing decision of any customer.

## STATEMENT OF RELEVANT FACTS[2]

### I.    THE PARTIES.

Acartus was a Delaware corporation. Answer to Second Amended Complaint ("Answer"), ¶ 8 (D.I. 81). It licensed and sold computer software and services that enabled clients to archive -- to capture, process, store in electronic form, index and retrieve -- documents and data. *Id.*, ¶ 5. Acartus also licensed ███████████ the export utility that is at issue in this case. EMC is a Massachusetts corporation that, among other things, develops, sells and licenses products that store and manage very large quantities of electronic data. *Id.*, ¶ 6. This action was initiated by Mobius against Acartus on May 31, 2005. EMC acquired Acartus in October 2005, and was thereafter added as a party to this case. *Id.*; Exh E[3], Florin at 16:12-13.

Mobius is a Delaware corporation that licenses computer software that is designed to archive customer documents and data. Second Amended Complaint ("Sec. Am. Compl."), ¶ 4 (D.I. 77). In certain situations, Mobius and EMC/Acartus have been competitors. Exh. E, Florin at 9:19-22, 24:7-11.

---

[2]    Pursuant to the Court's Order dated December 5, 2006, defendants will serve on Mobius a separate statement of proposed stipulated facts.

[3]    All Exhibits referred to herein are contained in the Appendix of Exhibits to Memorandum in Support of Defendants' Motion for Summary Judgment.

## II.     THE MOBIUS DATA STORAGE FORMAT.

Mobius licenses document archival software called ViewDirect.  Exh. F, Gross at 13:8-12.



---

[4]     The topic index is analogous to the index contained in a book.  For example, if an insurance company customer decides to capture policy numbers in the index, the index will identify all documents stored in the system that have a particular policy number and it will identify the relative storage location of each of those documents.  Exh. O, Tonchen



Mobius does not publish the specification for the DAF format. Exh. E, Florin at 82:13-21.

### III.    THE DEFENDANTS' ARCHIVAL SOFTWARE AND THE EXPORT UTILITY.

at 43:10-44:15, 47:12-23.

[5]



---

[6]  Run-length encoding ("RLE") is a well-understood compression technique used since the 1960's. RLE compresses a document by deleting repeating characters (or repeating white spaces) and replaces them with a number or other symbol. Exh. I, Raicer at 142:6-144:10. Thus, for example, the word "little" might be encoded as "lit2le." In this simple example, space is not saved, but all of the white space on this page may also be treated as a repeating character. Data with respect to repeating characters may be stored either "in stream" or in a separate table that identifies the location of particular repeating characters and the number of repeats of that location.



There is no dispute that the sole purpose of the Export Utility was to extract the customer's content from its DAF container, to restore that content to its original format (before it was stored in the DAF) so that, together with the customer's related indexing data, it could be archived using defendants' software when the customer chose to move away from Mobius. Exh. O, Tonchen at 198:8-19, 199:12-22; Exh. E, Florin at 71:5-10; Exh. K, Sorich at 33:9-12; Exh. I, Raicer at 18-19, 64:11-15. "All [Acartus] cared about was customer content." Exh. I, Raicer at 50:6-7. Acartus "only tried to understand the format of the DAF as it pertained to the customers' content." Acartus ignored the other elements of the DAF because it "was not necessary to understand" elements that did not relate to extracting the customer content. *Id.* at 29:2-20, 32:6-12; Exh. E, Florin at 169:8-9. Similarly, Acartus' sole purpose in accessing the topic index files was "to be able to know which relative records in the DAF [the] topic index entry referred to. That's all [Acartus] cared about." Exh. I, Raicer at 103:19-22; 60:17-21, 65:8-11.



For a period of approximately three months, ending in June 2005, Acartus published information about the Export Utility on its website.  Exh. S; Exh. II.  The website contained the following statements:

> Due to proprietary storage models such as Mobius' DAF format, continued access of this content has posed some difficult decisions for enterprises.  Companies have had to either perform a manual transformation of content, or continued to support their deep archive storage . . . Continuing to support a legacy archival system such as Mobius perpetuates a series of unnecessary licensing, services and maintenance costs . . . Our proven technology ensures migrations run smoothly and rapidly . . . .

Exh. R.

Mobius alleges that this text constitutes false advertising.  Sec. Am. Compl., ¶¶ 22, 24.  In an attempt to resolve an unnecessary dispute over these statements, Acartus removed them from its website almost immediately after this action was filed (on May 31, 2005), even though it believed the statements to be true.  Exh. E, Florin at 81:14-17, Exh. S; Exh. II.[7] Acartus also entered into a Stipulation and Order, approved by the Court on July 22, 2005, pursuant to which Acartus agreed to refrain from communicating in advertising in words or

---

[7]

substance that (a) Mobius ViewDirect requires a "manual transformation of content," or (b) that "continuing to support a legacy archival system such as Mobius perpetuates a series of unnecessary licensing, services and maintenance costs."  *See* Stipulation and Order dated July 22, 2005 (D.I. 12).  It is undisputed that ███ is the only customer that licensed the Export Utility during (or close in time to) the period when these statements appeared on Acartus' website.  Exh. Q at A 00001.  It is similarly undisputed that these statements had no influence whatsoever on ███ decision to purchase software from Acartus.  Exh. M, Stigall at 81:9-23.

## IV.    MOBIUS' ALLEGED TRADE SECRETS.

### A.    Mobius' Original Allegation That Defendants Misappropriated Mobius Software Code.

Mobius originally based its trade secrets claim on the allegation that "upon information and belief," in order to develop the Export Utility, "it was necessary for Acartus to have had inappropriate access to Mobius' software containing Mobius trade secrets and to have improperly reverse engineered and copied portions of Mobius unique software code into its export utility."[8]  (First) Amended Complaint, ¶ 24 (D.I. 22).

---

[8]    Mobius confirmed this theory at the Court's hearing concerning the parties' exchange of the relevant source code.  It told the Court that it claimed Acartus' software was using code that is contained in Mobius' trade secret computer programs.

> *The Court:* All right.  A couple of things.  Number one, I want to make sure that these trade secrets are all really -- we're talking about code.  We're talking about software.  We're talking about software programs; is that right?

> *Mr. Wagner* (Counsel for Mobius): Yes.

Exh. P, Transcript of March 27, 2006 hearing, at 24:11-16.

Discovery has proved this assertion to be completely groundless. Mobius has reviewed more than thirty-five thousand pages of documents relating to the development of the Export Utility. It deposed all of the Acartus employees who worked on the project. Mobius' expert conducted a detailed examination of the entire source code for the Export Utility and the relevant sections of Mobius ViewDirect. He found no evidence that defendants accessed, copied or incorporated into the Export Utility any Mobius software code, or the substance of any Mobius software code. Exh. T, Report of Mobius' Expert, Stephen Tonchen ("Tonchen Report"), at 24; Exh. O, Tonchen at 220:2-222:5, 321:7-322:24. There was nothing to Mobius' original claim.

**B.    Mobius' New Trade Secret Theory.**

Not surprisingly, Mobius has changed course. It now concedes that Acartus never saw or possessed the source or object code for ViewDirect. Instead, it asserts that Acartus obtained Mobius trade secrets by making a "data comparison" between (a) the customer's original data (its document) before it was stored in a DAF file, and (b) the customer's data (the same document) after it was stored electronically in a DAF file. Exh. T, Tonchen Report, pp. 25-26. Mobius claims that this same conduct tortiously interfered with Mobius' contracts -- its License Agreements -- with its customers. Sec. Am. Compl., ¶ 65.

**C.    The Mobius License Agreement.**

Mobius licenses its ViewDirect software to customers under a standard form License Agreement. Mobius asserts that three provisions in this agreement are relevant to this case, Sections 4, 5 and 6.





### D.    Mobius' Standard Practice Of Labeling Confidential Materials.

Mobius concedes that not all of the information that it supplies to customers is confidential to Mobius and subject to the terms of the License Agreement.  Exh. G, Gross at 306:8-308:22.  Mitchell Gross, Mobius' CEO and the employee designated by Mobius to testify on topics concerning Mobius' trade secrets or confidential or proprietary information, testified that it is Mobius' practice to label as "CONFIDENTIAL" information that Mobius deems to be confidential or proprietary to Mobius.  He stated that Mobius does not label as "CONFIDENTIAL" information that it does not deem confidential or proprietary to Mobius.  *Id.* It is undisputed that this is how Mobius expects that its customers will identify Mobius materials that Mobius deems confidential and subject to the confidentiality provisions of the License Agreement.  *Id.*  DAF files and related indices are not labeled as "CONFIDENTIAL."  Exh. O, Tonchen at 195:8-196:7.



---

9

<div style="margin-left:2em;"></div>

<div style="text-align:center;">12</div>



**E.**     <u>Mobius Claim Regarding DAF Files And Topic Indices.</u>

## V.     MOBIUS HAS NOT TAKEN REASONABLE STEPS TO PROTECT THE CUSTOMER DAF FILES AS SECRET.

Shortly after Mobius served the original Complaint in this action, Acartus informed Mobius that it had accessed two DAF files on the Internet at www.rentacoder.com ("Rentacoder"). Sec. Am. Compl., ¶ 37. Rentacoder is an Internet website where individuals or companies post advertisements seeking the assistance of a computer programmer to perform an identified task. Exh. J, Rogers at 48:1-49:2. The DAF files accessed by Acartus were posted on Rentacoder in February 2004 by ████████, a contract computer programmer working for Real Vision Software, Inc. ("Real Vision"). *Id.* at 48:22-24; Exh. W. The DAF files remained

posted on the public Internet until at least June 29, 2005, *some sixteen months later*. Exh. X. They were viewed by third parties on more than 240 occasions. Exh. J, Rogers at 53:21-24; Exh. W.

Real Vision provides products and services that allow its customers to image and archive documents. Exh. CC. Real Vision had been hired by Daksoft, Inc. ("Daksoft"), a Mobius licensee. Exh. BB. Daksoft had "decided to utilize alternative document control software when the Mobius software became inadequate to serve [its] purposes." Exh. AA at 000430; Exh. G, Gross (Day 2) at 325:16-326:2. "Daksoft wanted a way to move their images to an industry standard platform," like PDF. Exh. J, Rogers at 8:21-9:3. Real Vision posted the DAF files on Rentacoder for the purpose of finding a computer programmer who could write a program that would separate and remove Daksoft's data (its documents) from Daksoft's DAF files. *Id.* at 48:22-50:5. Real Vision succeeded in hiring a programmer who helped Real Vision write such a program for a fee of $500. *Id.* at 51:2-4.

On June 29, 2005, Mobius' counsel sent a letter to Daksoft alleging that DAF files contain Mobius proprietary information, and asserting that the posting of the DAF files on the Internet constituted a violation of Daksoft's license agreement with Mobius. Exh. X. Daksoft responded (by letter dated July 18, 2005) asserting, among other things, that no Mobius program or proprietary information had been posted on the Rentacoder. Exh. AA. Daksoft enclosed a copy of a letter from Real Vision that stated (a) that Daksoft had provided to Real Vision DAF files for the purpose of allowing Real Vision to extract Daksoft's data from Daksoft's DAF files, and (b) that Daksoft had provided to Real Vision Daksoft's topic index files (in the form of a

14

Microsoft SQL database).[10]  Exh. BB.  Mobius did not respond to Daksoft's letter.  It took no

further action.  Exh. G, Gross (Day 2) at 326:19-327:17.

Real Vision sent its own letter (dated July 21, 2005) to Mobius' counsel stating

that it had done nothing improper, and, in particular, that it was "never provided with Mobius

programs, documentation manuals or other written material."  Exh. CC.  It informed Mobius'

counsel:

> Just as with our [document archival] system, the images are the
> property of the customer to do with as they please, they do not
> belong to us.  Should they decide to move to another system, and
> we hope they don't, they are free to have anyone they chose
> convert the data.  We have had some [Real Vision] customers
> convert from our system to other systems or platforms and as we
> see it, that is a common event in the industry.

*Id.*  Mobius did not respond.  Mobius did not take further action.  Exh. G, Gross at 352:6-8.

It is undisputed that Real Vision wrote several hundred computer programs and

extracted data from approximately 3.5 million DAF files that were provided by Daksoft.  Exh. J,

Rogers at 15:9-13, 20:6-9, 31:8-13, 34:17-35:5.  Real Vision's computer programs (and the

process used to develop those programs) were remarkably similar to Acartus' Export Utility.

Exh. BB.  The Real Vision programs extracted only Daksoft's data and left everything else

behind (because it was of no use to Real Vision or Daksoft). Exh. J, Rogers at 78:9-14, 22:13-

24:4; 50:2-5; 53:2-7.

Mobius states that Real Vision's actions involved the use of Mobius trade secrets.

Exh. G, Gross (Day 2) at 334:16-22, 336:4-22, 339:3-7.  However, Mobius has not requested or

demanded that Real Vision return or destroy any of the approximately 3.5 million DAF files it

---

[10]  As discussed on page 5 n.5, *supra*, the database format in which DAF files and topic
index files are stored depends on the customer's operating system.  Daksoft's topic index
files were stored in a Microsoft SQL database because Daksoft utilized a Microsoft
operating system.

received from Daksoft, did not request that Real Vision return or destroy the topic index files that it received from Daksoft, and did not demand that Real Vision discontinue the use of the hundreds of DAF export programs that Real Vision developed. Exh. G, Gross at 340:7-15, 341:12-16, 342:23-343:4. Except as described above, Mobius did nothing at all to protect its alleged trade secrets.

## VI.    THE SALES DOCUMENTS.



It is undisputed that the Sales Documents are not marked confidential or proprietary to Mobius. Exh. DD; Exh. Y; ████████ at 124:17-125:12, 133:9-12, 151:22-152:5.[11] It is further undisputed that Mobius sales personnel presented documents of this same type (and information contained in the Sales Documents) to customers and prospective customers without confidentiality restrictions of any kind. ████████ at 52:21:53:12, 125:14-21.

---

[11]    Mobius states that the documents were originally recorded on a CD labeled "Not for distribution. Internal use only."

Mobius calls these documents confidential "market strategy" documents and alleges, "upon information and belief," that Acartus used them to develop (unspecified) strategies to compete with Mobius. Sec. Am. Compl., ¶ 44. There is no evidence that the Sales Documents were ever used by (or were of any practical use to) Acartus. ███████ at 126:15-127:3. In particular, there is no evidence that the Sales Documents were used in any way by Acartus or EMC to obtain business from any of the ██ customers that Mobius alleges were improperly obtained by the defendants.

## ARGUMENT

### I.     THE RELEVANT STANDARD.

Summary judgment should be granted where "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of fact exists only if, on the evidence presented, a reasonable jury could return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant may not rest upon allegations in the pleadings to avoid summary judgment. Fed. R. Civ. P. 56; *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996). It must present evidence that is more than "merely colorable," and that, "when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 452 (3d Cir. 1997) (quoting *Kline v. W. Gov't Sec.*, 24 F.3d 480, 485 (3d Cir. 1994); *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 232-33 (3d Cir. 2002) (quoting *Anderson*, 477 U.S. at 249-50).

## II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING MOBIUS' MISAPPROPRIATION OF TRADE SECRETS CLAIM (COUNT VI).

The Second Amended Complaint alleges that Acartus (now part of EMC) misappropriated Mobius' trade secrets in violation of the Delaware Uniform Trade Secrets Act (the "Act"). *See* Sec. Am. Compl., ¶ 69. Mobius has identified three potential trade secrets: (1) the schema (layout) of the customer-owned DAF files; (2) the structure (organization) of records in customer-owned topic index files; and (3) unidentified information in the Sales Documents. To prevail on a misappropriation of trade secrets claim, Mobius must establish (a) that this information constitutes a trade secret within the meaning of the Act, and (b) that it was "misappropriated" by Acartus. DEL. CODE ANN. tit. 6, § 2001(4) (2007).

### A.    Mobius Failed To Take Reasonable Steps To Protect Its Alleged Trade Secrets.

A trade secret is defined as "information" that:

a.  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b.  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* Summary judgment may be granted where the plaintiff has failed to demonstrate that it has taken reasonable steps to maintain the secrecy of the alleged trade secret. *See, e.g., First Fed. Sav. Bank v. CPM Energy Sys. Corp.*, 1993 WL 138986, at *8 (Del. Super. Ct. Apr. 22, 1993) (granting summary judgment where party failed to establish that it took reasonable steps to safeguard secrecy of information); *Tubos de Acero de Mexico v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 483 (5th Cir. 2002) (reversing lower court and entering summary judgment where counterclaim-plaintiff failed to prove it took reasonable steps to preserve the secrecy of its

alleged trade secrets); *Hirel Connectors, Inc. v. United States*, 2005 WL 4958547, at *4, *6 (C.D. Cal. Jan. 4, 2005).

　　　　　Mobius' trade secrets claim fails as a matter of law. Assuming, *arguendo*, that something in the customer DAF files and/or the customer topic index files were a Mobius' trade secret at one time, that information lost its trade secret character because it was not the subject of efforts, that were reasonable in the circumstances, to maintain its secrecy. The relevant facts are undisputed. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

　　　　　Further, Mobius failed to take reasonable steps to preserve the "secrecy" of the DAF files and topic index files after learning that a customer provided millions of those files to a third party (Real Vision), which accessed them and used them to create its own export utility.

　　　　　**1.    The Mobius License Agreement Does Not Clearly Identify Customer DAF Files And Topic Index Files As Mobius Trade Secrets.**

　　　　　Customer DAF files and topic indices were created by customers and remained in the possession of Mobius' customers, not Mobius itself. Therefore, unless Mobius can demonstrate that it clearly identified these files as (or as containing) Mobius trade secrets, and obtained the customer's agreement not to disclose those files to third parties, the data files lost any trade secret character that they may have had, because they were not the subject of

reasonable efforts to maintain their secrecy. *Tyson Foods, Inc. v. ConAgra, Inc.*, 79 S.W.3d 326, 334 (Ark. 2002) (Uniform Trade Secrets Act requires plaintiff to "clearly identify what information it consider[s] to be a trade secret, as that is a legal status fixed by statute"); *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 903 (Minn. 1983) (confidentiality agreement was "too vague" to satisfy plaintiff's burden under Uniform Trade Secrets Act to clearly identify trade secrets). The purpose of this requirement is to ensure that Mobius' customers know exactly what information is claimed as a secret and must not be disclosed. *See Electro-Craft Corp.*, 332 N.W.2d at 902.



---

[12]   This lack of express notification is fatal to Mobius' trade secret claim. It is also entirely unsurprising. No business, behaving rationally, would sign a license with Mobius which granted to Mobius trade secret rights in the customer's own business records and documents, stored by the customer in the customer's computer systems.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Mobius is the author of its own (standard form) License Agreements. It could easily have stated in the License Agreements that the DAF files and indices were Mobius secrets and were not to be disclosed to third persons. It did not do so. *See Tubos de Acero de Mexico*, 292 F.3d at 485 (reversing lower court and entering summary judgment because document "is silent as to what information American considered to be a trade secret and contains no restrictions on [counterclaim-defendant's] use of the information or its disclosure to other parties"). Similarly, Mobius could have sent a communication to its customers referencing its License Agreement and informing them that Mobius claims that DAF files and related indices somehow fall within the scope of the confidentiality provisions in the License Agreement. It has never done so. It could have revised its License Agreement to state that DAF files and indices contain Mobius secrets and may not be disclosed to third parties. It did not.

The nature of the DAF files and indices made it particularly important for Mobius to inform its customers clearly and conspicuously that the customer's own files contain Mobius trade secrets. A customer would not ordinarily understand that files created and owned by the customer that contain customer documents and the related customer data contain Mobius' trade secrets. In these circumstances, it was Mobius' obligation to inform customers, in clear and express terms, of Mobius' trade secret claims regarding the customer's property. No such statement has ever been made by Mobius. *See Electro-Craft Corp.*, 332 N.W.2d at 902-03 (measures taken by plaintiff to identify its trade secrets were particularly lax where materials were "not trade secrets in the obvious way as a 'secret formula' might be"); *see also* MILGRIM ON

21

TRADE SECRETS, §5.02 (2006) (party must take all reasonable steps to identify matter that "cannot be deemed to be intuitively known to be a trade secret or risk the loss of protection").



*See Tyson Foods*, 79 S.W.3d at 483 (plaintiff did not take reasonable steps where document failed to mention the alleged trade secrets); *Electro-Craft Corp.*, 332 N.W.2d at 902.  Whatever trade secret character the customer

DAF files and indices may once have had, it was lost when millions of DAF files and thousands of indices were created by hundreds of Mobius customers without any assertion by Mobius that anything about the customer's DAF files or indices was a Mobius trade secret.

2.    **Mobius Failed To Take Steps To Preserve The Secrecy Of The DAF Files and Topic Index Files After Learning That Daksoft Provided These Files To Real Vision.**

Mobius' trade secret claim fails for a different, but related, reason.    The undisputed evidence establishes that Mobius failed to take even the most rudimentary steps to preserve the secrecy of Daksoft's DAF files and topic index files after it learned that they had been disclosed to Real Vision.  Mobius (a) failed to demand that Real Vision return or destroy the DAF files and topic index files, or the hundreds of computer programs that Real Vision wrote to export Daksoft's data from its DAF files, (b) failed to demand that Real Vision refrain from using its programs to assist other Mobius customers, and (c) failed to request that Real Vision maintain the confidentiality of the DAF files and topic index files.  Exh. G, Gross at 340:7-343:4; 351:11-352:8.  Indeed, when Daksoft and Real Vision asserted to Mobius that Daksoft's DAF files and topic index files were not subject to the Mobius License Agreement, Mobius did not even respond.  Exh. AA; Exh. BB; Exh. CC; Exh. G, Gross (Day 2) at 326:19-327:17, 340:7-343:4, 351:11-352:8.  Finally, Mobius allowed DAF files to remain posted on the public Internet at a site frequented by software professionals for at least sixteen months, where they were viewed by third parties on more than 240 occasions.

These undisputed facts demonstrate that Mobius failed adequately to protect its alleged trade secrets.  As a result, the "information" that is alleged to be secret has lost its secret character.  *Hirel Connectors*, 2005 WL 498547, at *4, *6 (granting summary judgment on Uniform Trade Secrets Act claim because plaintiff failed to take action against defendant; "plaintiffs have a 'responsibility to take prompt and assertive corrective action with respect to all

of [their] interests whenever [they] detect a fracture in a once confidential relationship'") (quoting *Intermedics, Inc. v. Ventrix, Inc.*, 822 F. Supp. 634, 654 (N.D. Cal. 1993)); *Alamar BioSciences, Inc. v. Difco Lab.*, 1995 WL 912345, at *6-7 (E.D. Cal. Oct. 13, 1995) (granting summary judgment under the Uniform Trade Secrets Act because plaintiff "strongly suspected [a third party] of misappropriating its trade secrets, but did nothing"); *Hoffman-LA Roche Inc. v. Yoder*, 950 F. Supp. 1348, 1363-64 (S.D. Ohio 1997) (plaintiff failed to use reasonable efforts to protect its secrets, as required by the Uniform Trade Secrets Act, because it (a) had no "policy of trying to retrieve" alleged trade secrets that had been disseminated and (b) failed to take timely action to stop defendant from disclosing alleged trade secrets).

**B.**   **Acartus Did Not Know, Or Have Reason To Know, That DAF Files Were Mobius Trade Secrets.**

██████████████████████████████████ Del. Code

Ann. tit. 6, § 2001(2)(b)(C) (2007) ("'Misappropriation' shall mean . . . [u]se of a trade secret of

another by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know

that his or her knowledge of the trade secret was . . . [d]erived from or through a person who

owed a duty to the [owner of the trade secret] to maintain its secrecy or limit its use"); *see also*

*Steinberg Moorad & Dunn, Inc. v. Dunn*, 2002 WL 31968234, at *24 (C.D. Cal. Dec. 26, 2002)

(granting summary judgment on misappropriation claim because investor "did not know or have

reason to know that any information it received from Athletes First was trade secret or that

Athletes First did not have the authority to disclose it"); *Cabot Corp. v. Thai Tantalum, Inc.*,

1992 Del. Ch. LEXIS 150, at *4 (Del. Ch. July 22, 1992) (finding plaintiff's misappropriation

claim unconvincing because "defendants did not know that the equipment, technology and

training it was to acquire . . . were claimed to be the trade secrets of [the plaintiff] which [a third-

party] allegedly had stolen"); *On-Line Techs. v. Perkin Elmer Corp.*, 141 F. Supp. 2d 246, 257

(D. Conn. 2001) (dismissing misappropriation claim as against a defendant because plaintiff

presented insufficient evidence that defendant "had reason to know that some of the value of the

business it was purchasing stemmed from the alleged acquisition of confidential information by

improper means").

     Acartus did not have a copy of the Mobius License Agreement and it did not

know that Mobius would (or could) claim that ████████ own DAF files contained Mobius' trade

secrets. It relied on its customer to comply with any obligation that the customer had to Mobius.

It developed an export utility. Export utilities are widely used in the industry. Mobius itself

provides similar services to customers who want to convert to ViewDirect from document

archival systems of other vendors. Exh. D, Dugas at 9:8-13, 17:19-24, 121:7-13, 151:19-152:7,

168:2-5; Exh. FF at 2596; Exh. GG. Mobius' own expert, a software consultant and former Mobius employee, conceded at deposition that when he performs services for his customers with respect to software licensed by the customer from a software vendor, he does not ask to see the License Agreement between his customer and his customer's software vendor. Exh. O, Tonchen at 91:7-19, 114:8-115:21. Instead, Mobius' expert testified, he relies on the customer to understand its obligations under its software license agreement, to comply with that agreement, and to refrain from disclosing whatever the customer is not permitted to disclose. *Id.*

Acartus did nothing more. It acted as Mobius' expert testified he would have acted in the same situation. There is no evidence that ██████ believed that it was not allowed to show its own property -- its DAF files -- to Acartus; and there is also no evidence that Acartus knew, or had reason to know, that ██████ could not properly disclose ██████ own property to Acartus.

For each of the reasons set forth above, Mobius' trade secrets claims relating to DAF file or topic indices should be dismissed.

**C.     Acartus Did Not Use Information Contained In Mobius Sales Documents.**

One trade secret claim remains. Once a year, Mobius holds a meeting of its worldwide sales organization. In excess of 100 people attend. Exh. G, Gross at 378:16-18. In mid-2004, Mobius held such a meeting. Mobius distributed to everyone who was present copies of PowerPoint slides that were used at the meeting to motivate the sales force. The slides listed customers that Mobius had gained over the past year, identified new Mobius products and their features, and included examples of Mobius "success stories." ███████████ at 52:21:53:12; Exh. DD; Exh. Y.

Late in 2004, a Mobius salesman named ████████ left Mobius and joined Acartus. He brought copies of the slides with him. ████████████████████████████



The slides did not contain technical information. They are unrelated to the development of the DAF Export Utility. There is, moreover, no evidence that these slides contain any Mobius trade secret. They are, in general, information given to the Mobius sales force so that sales personnel could sell more effectively. They were widely disseminated within Mobius. There is no evidence that Mobius sales personnel were told that the capabilities of new Mobius products or the identity of recent new Mobius customers were something that the sales force should keep secret. To the contrary, the salesmen were being given information that they could use when attempting to sell Mobius software to prospective customers who would be under no obligation of confidentiality to Mobius. ███████ at 52:21:53:12, 125:14-21.

In any event, Mobius alleges that Acartus/EMC obtained business from ██████ ███████████████████████████████████████████████████████████████████ ████████████████ There is no evidence whatsoever that any information on the Mobius slides was used in any way to obtain business from any of these customers. EMC has not used, and has represented that it will not use, the Mobius Sales Documents. ███████ at 126:15-127:3. And, the information in those documents is now grossly obsolete. Mobius does not assert otherwise. Mobius' trade secret claim relating to these Sales Documents should, therefore, be dismissed.

III.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS BECAUSE THERE WAS NO UNDERLYING BREACH OF CONTRACT (COUNT V).**

Mobius contends that Acartus tortiously interfered with Mobius' contracts with its customers by causing them to disclose Mobius' confidential information in violation of the non-disclosure provisions in their respective License Agreements.  "The elements of a claim of tortious interference with contract are:  (i) the existence of a valid contract; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages."  *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170. at *4 (Del. Ch. Apr. 19, 2006).  Mobius cannot prevail on this claim because, *inter alia*, the customers did not violate their contracts with Mobius.  *See id.* at *4 ("Without a breach of contract, there can be no tortious interference."); *Acorn USA Holdings LLC v. Premark Int'l, Inc.,* 2003 WL 22861168, at *7 (Del. Super. Ct. July 16, 2003) (same).

A.    <u>There Was No Tortious Interference Regarding DAF Files Or Topic Indices.</u>

For the reasons stated above, the Mobius License Agreement did not preclude Mobius' customers from disclosing to Acartus the customer's DAF files and topic index files. Mobius' inducement to breach claim fails because the disclosure of those customer materials did not breach the Mobius License Agreement.  *Acorn USA Holdings LLC,* 2003 WL 22861168, *7 (granting summary judgment because there was no underlying breach of contract).

Further, in order to sustain its inducement claim, Mobius must establish that Acartus knew or had reason to believe that the Mobius License Agreement precluded customers from giving the customer's own property -- its DAF files and original documents -- to Acartus. *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) ("The gravaman of the cause of action [of tortious interference] is the intentional or willful misconduct of the tortfeasor"); *see also*

RESTATEMENT (SECOND) OF TORTS § 767[13] cmt. d (1979) ("Since interference with contractual relations is an intentional tort . . . the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct"). There is no evidence that Acartus had information that would, or should, have warned Acartus that customer DAF files were the subject of a customer contractual obligation to Mobius. Indeed, Mobius' own former employee (now employed by Mobius' customer, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇) testified that he did not understand that Mobius licensees were precluded from giving their DAF files or indices to third parties. *See* p. 22 *supra*; *see also Hursey Porter & Assoc.*, 1994 WL 762670, at *16 (granting summary judgment for defendant finding conduct not to be improper as a matter of law).[14]

Mobius points to two related types of conduct that, Mobius alleges, did not involve trade secrets, but nevertheless breached the Mobius License Agreement. As will be demonstrated, there was no violation of the Mobius License Agreement.

**B.    Acartus' Use Of Customer Data On A Customer Printout Did Not Violate The License Agreement.**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[13]    "In evaluating allegations of tortious interference with contractual relations, Delaware courts have applied the rule set forth in the Restatement (Second) of Torts § 767." *Hursey Porter & Assocs. v. Bounds*, 1994 WL 762670, at *13 (Del. Super. Ct. Dec. 2, 1994).

[14]    Mobius' inducement claims regarding the Mobius Sales Documents retained by ▇▇▇▇▇▇▇ fail for a different reason. Assuming that a Sales Document contained a Mobius trade secret, there is no evidence that Acartus induced ▇▇▇▇▇ to retain those documents and no evidence that any information in any Sales Document is causally linked to any injury to Mobius, or any benefit to Acartus.





**C.**     **Acartus' Original Computer Program That Allowed Its Customer To Use Mobius Software Did Not Violate The License Agreement.**

This conduct involves neither the misappropriation of a Mobius trade secret nor a violation of the Mobius License Agreement. Acartus did nothing more than facilitate its customer's use of software that the customer was licensed to use.

31



**D.     Mobius "Reverse Engineering" Argument Is Unavailing.**

In a last ditch attempt, Mobius asserted for the first time in its expert report that by comparing ████ DAF files to ████ pre-DAF documents, Acartus "reverse engineered" Mobius software in a way that violates the Mobius License Agreement. This freshly-minted argument fails.

DAF files are data files. Acartus generated a computer program that attempts to restore customer data in the DAF file (the electronically encoded version of the customer document) to its original form (the data as it appeared on a piece of paper). There is no suggestion that Acartus developed programming that contains Mobius code (source or object), or looks anything like Mobius source or object code. Exh. O, Tonchen at 220:2-222:5, 321:7-322:24. Instead, Mobius asserts that the Acartus utility would, if it performed properly, perform a function that is similar to a function that is provided by a Mobius utility that is part of ViewDirect. Exh. T, Tonchen Report at 26. ████████

████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████    Moreover, Acartus' program

attempts to perform the alleged common function in Acartus' own way.  Acartus' way differs

profoundly from the way that Mobius performs the same function.  Exh. O, Tonchen at 321:7-

322:24.

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████    Source code is a set of human readable instructions to a computer.  Object

code is compiled from source code.  It is the set of instructions -- the 1s and 0s -- that directly

instruct a computer's actions.

Mobius concedes that there is no evidence that Acartus was given Mobius object

code by anyone and no sign that Acartus used Mobius object code in any way, for any purpose.

Acartus took customer data in electronic form and attempted (rather unsuccessfully) to turn those

data back into a document in the form in which it previously existed using its own to attempt to

achieve that task.  Its conduct cannot plausibly be said to be the reverse engineering of

ViewDirect source code from ViewDirect object code.  Mobius' reverse engineering claim is

frivolous.

IV.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' FALSE
       ADVERTISING CLAIM BECAUSE THE ALLEGEDLY FALSE STATEMENTS
       ARE NOT ACTIONABLE  (COUNT III ).**

Mobius contends that statements made by Acartus on its website were false and

likely to mislead consumers and affect their purchasing decisions.  The statements are set forth at

page 8, *supra*.  They are alleged to violate the Lanham Act.  Sec. Am. Compl., ¶¶ 1, 55.  These

statements last appeared on Acartus' website in June, 2005. Exh. II; Exh. S; *see also* Stipulation and Order dated July 22, 2005. Mobius' claim fails (a) because Acartus' statements concerning its Export Utility constitute non-actionable puffing, and (b) Mobius cannot establish that the statements were likely to, or did, mislead any customer.

In order to prevail on its false advertising claim, Mobius must establish (1) that Acartus made false or misleading statements concerning its products, or Mobius products; (2) that there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception was material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to Mobius. *See* 15 U.S.C. § 1125(a); *Johnson & Johnson-Merck Consumer Pharms Co. v. Rhone-Poulenc Rorer Pharms, Inc.*, 19 F.3d 125, 129 (3d Cir. 1994).

Section 43(a) of the Lanham Act applies only to false statements of fact. 15 U.S.C. § 1125(a)(1). Statements that constitute mere "puffery" are not actionable. *See Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390-91 (8th Cir. 2004); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 730 (9th Cir. 1999) ("Liability under the Lanham Act requires, among other things, a "false or misleading representation of *fact*") (quoting 15 U.S.C. § 1125(a)(1) (emphasis added). Courts routinely grant summary judgment dismissing false advertising claims because they determine that a statement is non-actionable puffery. *See Am. Italian Pasta Co.*, 371 F.3d at 389-91 (granting defendant's summary judgment on false advertising claim because a vague or subjective claim of product superiority is mere puffery); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (granting summary judgment because statements were "precisely the type of generalized boasting upon which no reasonable buyer would rely"); *cf. Cook, Perkiss & Liehe,*

34

*Inc., v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (a determination that a statement is puffery may properly be made on a motion to dismiss).

Acartus' statement that "[o]ur proven technology ensures migrations run smoothly and rapidly," falls squarely within the category of non-actionable puffery. It was nothing more than a statement of opinion by Acartus that Acartus' product was good. *Stiffel Co. v. Westwood Lighting Group*, 658 F. Supp. 1103, 1115 (D.N.J. 1987) ("[A]dvertising the advantages of a product . . . constitutes puffing and is not actionable as false advertising"); *see also Summit Tech. Inc., v. Highline Med. Instruments, Co.*, 933 F. Supp. 918, 931-32 (9th Cir. 1996) (a statement implying that engineers are "'competent . . .' is far too vague, subjective, and incapable of verification to be actionable under the Lanham Act").

The evidence establishes that, at most, Acartus boasted to customers indicating that the Export Utility functioned properly -- at a time when Acartus believed these statements to be true. General statements of that type are mere puffery. *See Summit Tech.*, 933 F. Supp. at 931 ("perfectly reliable" was mere puffery because it is "meant to convey simply that the machine functions"); *Coastal Abstract Serv.*, 173 F.3d at 731 (statements that Defendant was "large enough to handle [a prospective customer's] business, was exactly the kind of 'puffery' that does not qualify as a statement of fact capable of being proved false"); *see also* MCCARTHY ON TRADEMARKS § 27:56 ("[A] statement of *opinion* about the nature and quality of one's own goods or services is not within § 43(a)") (emphasis in original).

Of the two remaining statements alleged in the Second Amended Complaint to violate the Lanham Act, one is demonstrably true. The use of Mobius' ViewDirect does perpetuate the payment of fees to Mobius. Mobius' expert witness conceded that "the customer takes a risk" when it archives its content in ViewDirect because "[t]he customer has to continue

to license Mobius software if the customer hopes to access his or her data in the DAF files."
Exh. O, Tonchen at 332:15-334:16; *see also* Exh. E, Florin at 84:6-85:9.

Acartus' other statement was that Mobius customers must either perform a
manual transformation of data or continue to use, and pay for, Mobius software. This statement
is not actionable because it is not sufficiently specific or measurable to be considered a statement
of fact. *See Am. Italian Pasta Co.*, 371 F.3d at 391 ("To be actionable, the statement must be a
'specific and measurable claim, capable of being proved false or of being reasonably interpreted
as a statement of objective fact'") (quoting *Coastal Abstract Serv.*, 173 F.3d at 731). It is merely
Acartus' opinion regarding the disadvantages of licensing Mobius' software. Acartus believed it
to be true. Exh. E, Florin at 82:3-84:5. In any event, the intended audience were existing
Mobius licensees. Those licensees were highly sophisticated. They knew the capabilities and
limitations of Mobius software. They could not possibly be misled by a statement on Acartus'
website.

More generally, there is no evidence that *any of* Acartus' website statements
influenced the purchasing decision of any customer. The "sales cycle" for the expensive
software licensed by the parties is very long. The customers are major corporations who employ
sophisticated information technology professionals. They do not license software based upon
promotional statements on a website; and they do not select document archiving software until
they have first tested and evaluated that software in detail. Exh. HH, at A015005 ("Before a
final decision can be made, ███████████████ has requested a Proof of Concept (PoC)
to demonstrate the full lifecycle of how data would be moved from Mobius to the new
EMC/Acartus solution."). These "proof of concept" tests unfold over the course of weeks and
months. Exh. I, Racier at 83:10-84-17, 87:6-88-14.

A plaintiff "must persuade the court either through market research, consumer studies, or other evidence, that the persons receiving the message will be left with a false impression . . . *likely to influence the purchasing decision.*" *W.L. Gore Assocs. v. Totes Inc.*, 788 F. Supp. 800, 805-06 (D. Del 1992) (emphasis added); *see also Johnson & Johnson-Merck*, 19 F.3d at 129. There is no such evidence in this case. The accused statement appeared on Acartus' website for only a short time. The only customer that licensed the Export Utility during that period of time was ███████ Mobius deposed a ███████ employee. He testified unequivocally that the statements on Acartus' website did not influence ███████ purchasing decision in any way. Exh. M, Stigall at 81:19-23 ("**Q:** Did the appearance of any such statement on the Acartus website result in ███████████ purchasing that migration product from Acartus? **A:** No"). There is no evidence that *any* of the other relevant customers even saw this statement, much less were confused or misled by it. This is fatal to Mobius' false advertising claim. *See First Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 848-49 (N.D. Ill. 2000), *aff'd sub nom. First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) (granting summary judgment on Lanham Act claims because plaintiff failed to put forth sufficient evidence of consumer deception); *Johnson & Johnson-Merck*, 19 F.3d at 129, 136 (finding for defendant because plaintiff failed prove that defendant's statements were deceptive or misleading to consumers); *Allen Organ Co. v. Galanti Organ*, 798 F. Supp. 1162, 1168-70 (E.D. Pa. 1992), *aff'd* 995 F.2d 215 (statement was not likely to deceive the intended audience where product was a large financial investment, "not an impulse purchase" and the sales process takes weeks or months).

For each of these reasons, the Court should grant summary judgment dismissing Mobius' false advertising claim.[16]

## V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' COMMON LAW UNFAIR COMPETITION CLAIM (COUNT VII).

Count VII of the Second Amended Complaint alleges violations of the common law of unfair competition. "The essence of unfair competition is the fraudulently seeking to sell one's goods for those of another, and the true test is whether the defendant's acts are reasonably calculated to deceive the average buyer under the ordinary conditions prevailing in the particular trade." *State v. Wellington Homes, Inc.*, 2003 WL 22048231, at *2 (Del. Super. Ct. Aug. 20, 2003) (quoting *Coca-Cola Co. v. Nehi Corp.*, 36 A.2d 156, 165 (Del. 1944)); *see also Rypac Packaging Mach. Inc. v. Coakely*, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000) ("The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm."). Mobius' trademark infringement and false designation of origin claims have been dismissed by the Court. *See* Stipulation and Order dated December 21, 2006. There is no allegation (remaining) in the case that any customer anywhere was, or could have been, confused as to the origin or designation of the parties' products. And, there is no evidence whatsoever that any actual or prospective customer believed, or rationally could have believed, that Acartus was selling Mobius products.

---

[16]    The Court should dismiss Mobius' Deceptive Trade Practices claim (Count VII for the same reasons. The only allegations remaining in the case that, if true, could constitute a violation of the Delaware Uniform Deceptive Trade Practices Act are the same allegations that underlie Mobius' false advertising claim. "The Deceptive Trade Practices Act affords no greater protection than the Lanham Act." *See Monsanto Co. v. Syngenta Seeds Inc.*, 443 F. Supp. 2d 648, 653 (D. Del. 2006).

There is also no evidence that Acartus' conduct constitutes a "wrongful interference" that defeated Mobius' legitimate expectancy of entering into any business relationship. To the extent that this claim is based on factual allegations underlying Mobius' misappropriation of trade secrets claims (*see* Sec. Am. Compl., ¶ 45), Mobius' common law unfair competition is preempted by the Delaware Uniform Trade Secrets Act. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002); *see also* DEL. CODE ANN. tit. 6, § 2007 (2007). To the extent that Mobius' unfair competition claim is based upon its false advertising or tortious interference with contractual relations claims, it fails for the same reasons that those claims fail. Therefore, the Court should grant summary judgment dismissing Mobius' common law unfair competition claim.

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment dismissing each of Mobius' claims in this case.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr. (#4292)*
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
302.658.9200

*Attorneys for Defendants Acartus, Inc.*
*and EMC Corporation*

OF COUNSEL:

Robert S. Frank Jr.
Paul D. Popeo
G. Mark Edgarton
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
617.248.5000

April 5, 2007

787659

40

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2007, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Kurt Michael Heyman
> PROCTOR HEYMAN LLP
> 1116 West Street
> Wilmington, DE  19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on April 12, 2007 upon the following individuals in the manner indicated:

### BY E-MAIL AND HAND DELIVERY:

> Kurt Michael Heyman
> PROCTOR HEYMAN LLP
> 1116 West Street
> Wilmington, DE  19801

### BY E-MAIL:

> Jonathan M. Wagner
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 1177 Avenue of the Americas
> New York, NY  10036

/s/ James W. Parrett, Jr.
_____
James W. Parrett (#4292)

479187