IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MOBIUS MANAGEMENT SYSTEMS, INC., :
                                  :
                    Plaintiff,    :
                                  :
        v.                        :    C.A. No. 05-346 SLR
                                  :
ACARTUS, INC.,                    :    **REDACTED**
                                  :    **PUBLIC VERSION**
                    Defendant.    :

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PROCTOR HEYMAN LLP
Kurt M. Heyman (#3054)
E-mail:  kheyman@proctorheyman.com
Patricia L. Enerio (#3728)
E-mail:  penerio@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300

Attorneys for Plaintiff
Mobius Management Systems, Inc.

OF COUNSEL:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Jonathan M. Wagner
Marjorie E. Sheldon
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100

Dated:  May 3, 2007

**Confidential Version Filed:  May 3, 2007**
**Redacted Public Version Filed:  May 10, 2007**

<u>Table of Contents</u>

Page

Nature and Stage of the Proceedings .................................................................................... 1

Summary of Argument ........................................................................................................... 2

Counterstatement of Facts ...................................................................................................... 3

A.     Background: Mobius, ViewDirect, and "DAFs" ........................................................ 3

B.     Mobius license agreements ......................................................................................... 5

C.     Defendants' theft of Mobius trade secrets concerning ViewDirect ............................ 6

D.     Defendants' theft of Mobius market strategy documents and related
materials ................................................................................................................... 10

E.     Defendants' false promotional statements ............................................................... 13

Argument .............................................................................................................................. 14

I.     DISPUTED QUESTIONS OF FACT PRECLUDE SUMMARY
DISMISSAL OF MOBIUS' MISAPPROPRIATION CLAIM ................................. 15

    A.     Mobius took reasonable steps to protect its trade secrets ................................ 15

        1.     Mobius gave more than sufficient notice that the Mobius
DAF format and related materials are proprietary trade
secrets ...................................................................................................... 16

        2.     Mobius did not lose its proprietary interest in the DAF
format ...................................................................................................... 21

    B.     Defendants knew or had reason to know that the Mobius
materials were trade secrets ............................................................................. 24

    C.     Defendants' remaining factual arguments are meritless .................................. 26

    D.     There is no basis for summary dismissal of the trade secret claim
with respect to the Mobius market strategy documents ................................... 32

II.     QUESTIONS OF MATERIAL FACT PRECLUDE PRE-TRIAL
DISMISSAL OF MOBIUS' TORTIOUS INTERFERENCE CLAIM ..................... 35

III.     THERE IS NO FACTUAL OR LEGAL BASIS FOR DISMISSING
MOBIUS' FALSE ADVERTISING CLAIM .......................................................... 37

    A.     The challenged claims constitute actionable misstatements of
fact, not "puffing" ........................................................................................... 37

i

Table of Contents

(continued)

|  |  | Page |
| --- | --- | --- |
| B. | Defendants' materiality argument misstates the governing law and is factually incorrect | 38 |
| Conclusion | | 40 |

KL3 2591738.1

Table Of Authorities

Cases

Page

*AMC Tech., L.L.C. v. SAP AG,*
    2005 WL 3008894 (E.D. Pa. Nov. 3, 2005) ........................................................................20

*Alamar Biosciences, Inc. v. Difco Labs., Inc.,*
    1995 WL 912345 (E.D. Cal. Oct. 13, 1995)...................................................................24 n.4

*American Italian Pasta Co. v. New World Pasta Co.,*
    371 F.3d 387 (8th Cir. 2004) ........................................................................................38 n.10

*Anacomp, Inc. v. Shell Knob Servs., Inc.,*
    1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ...........................................................................16

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................................14

*Architectronics, Inc. v. Control Sys., Inc.,*
    935 F. Supp. 425 (S.D.N.Y. 1996) .....................................................................................28

*Business Intelligence Servs., Inc. v. Hudson,*
    580 F. Supp. 1068 (S.D.N.Y. 1984) ...................................................................................15

*CMax/Cleveland, Inc. v. UCR, Inc.,*
    804 F. Supp. 337 (M.D. Ga. 1992) ...............................................................................18, 29

*Cabot Corp. v. Thai Tantalum Inc.,*
    1992 Del. Ch. LEXIS 150 (Del. Ch. July 22, 1992)......................................................26 n.5

*Castrol Inc. v. Quaker State Corp.,*
    977 F.2d 57 (2d Cir. 1992) .................................................................................................37

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
    173 F.3d 725 (9th Cir. 1999) .....................................................................................37, 38 n.10

*Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv. Inc.,*
    911 F.2d 242 (9th Cir. 1990) ..............................................................................................37

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.,*
    430 F. Supp. 2d 346 (D. Del. 2006)...............................................................................36, 37

*Data General Corp. v. Digital Computer Controls, Inc.*,
    297 A.2d 437 (Del. 1972) ...................................................................................14

*DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*,
    170 F.3d 1354 (Fed. Cir. 1999) .........................................................................29

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
    307 F.3d 197 (3d Cir. 2002) ..............................................................................14

*DVD Copy Control Ass'n v. Bunner*,
    10 Cal. Rptr. 3d 185 (Ct. App. 2004) ................................................................22

*Electro-Craft Corp. v. Controlled Motion, Inc.*,
    332 N.W.2d 890 (Minn. 1983) ......................................................................16 n.1

*First Federal Sav. Bank v. CPM Energy Sys. Corp.*,
    1993 WL 138986 (Del. Super. Apr. 22, 1993) ...........................................11, 32 n.7

*HiRel Connectors v. United States*,
    2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) .......................................24 n.4, 32 n.7

*Hoffmann-La Roche Inc. v. Yoder*,
    950 F. Supp. 1348 (S.D. Ohio 1997) ...........................................................24 n.4

*Hudson Hotels Corp. v. Choice Hotels, Int'l*,
    995 F.2d 1173 (2d Cir. 1993) ............................................................................28

*Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions*,
    920 F.2d 171 (2d Cir. 1990) .........................................................................30, 31

*Intel Corp. v. Broadcom Corp.*,
    172 F. Supp. 2d 515 (D. Del. 2001)...................................................................20

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
    348 F. Supp. 2d 165 (S.D.N.Y. 2004) ...............................................................39

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
    104 F. Supp. 2d 390 (D. Del. 2000).....................................................................32

*McNeilab, Inc. v. American Home Prods. Corp.,*
    501 F. Supp. 517 (S.D.N.Y. 1980) ................................................................34, 39

*Mediware Info. Sys. v. McKesson Info. Solutions, LLC,*
    2007 U.S. Dist. LEXIS 22087 (D. Kan. Mar. 26, 2007) ........................................36

*Merckle GMBH v. Johnson & Johnson,*
    961 F. Supp. 721 (D.N.J. 1997)................................................................................17

*Mobius Mgmt. Sys., Inc. v. Acartus, Inc.,*
    2006 U.S. Dist. LEXIS 44341 (D. Del. June 28, 2006).............................................1

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.,*
    880 F. Supp. 1005 (S.D.N.Y. 1994) ...................................................................12, 38

*On-Line Techs. v. Perkin Elmer Corp.,*
    141 F. Supp. 2d 246 (D. Conn. 2001)................................................................26 n.5

*Philadelphia Gear Corp. v. Power Transmission Servs., Inc.,*
    1991 WL 29957 (Del. Ch. Mar. 6, 1991) ..............................................................33

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,*
    1997 U.S. Dist. LEXIS 23572 (N.D. Cal. Jan. 6, 1997)........................................22

*Rhone-Poulenc Rhorer Pharms., Inc. v. Marion Merrell Dow, Inc.,*
    1994 U.S. Dist. LEXIS 20782 (W.D. Mo. Sept. 30, 1994),
    *aff'd in part, vacated in part on other grounds,* 93 F.3d 511 (8th Cir. 1996) ......................37

*Sanirab Corp. v. Sunroc Corp.,*
    2002 WL 1288732 (Del. Super. Apr. 29, 2002) ....................................................14

*Southland Sod Farms v. Stover Seed Co.,*
    108 F.3d at 1134 (9th Cir. 1997) .......................................................................38 n.10

*Steinberg Moorad & Dunn, Inc. v. Dunn,*
    2002 WL 31968234 (C.D. Cal. Dec. 26, 2002)................................................26 n.5

*Stiffel Co. v. Westwood Lighting Group,*
    658 F. Supp. 1103 (D.N.J. 1987)....................................................................38, 39 n.11

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting Ltd.,*
    2006 U.S. Dist. LEXIS 43690 (D. Mass. June 28, 2006).........................17, 21, 22

*Strata Mktg., Inc. v. Murphy,*
    740 N.E.2d 1166 (Ill. App. Ct. 2000) ..............................................................33, 34

KL3 2591738.1

*Summit Tech., Inc. v. High-Line Med. Instruments Co.*,
    933 F. Supp. 918 (C.D. Cal. 1996) ...................................................................38 n.10

*Technicon Data Sys. Corp. v. Curtis 1000, Inc.*,
    1984 WL 8268 (Del. Ch. Aug. 21, 1984) ..................................8, 18, 19, 20, 28

*Tubos de Acero de Mexico, S.A. v. American Int'l Inv. Corp.*,
    292 F.3d 471 (5th Cir. 2002) ...........................................................................32 n.7

*Tyson Foods, Inc. v. ConAgra, Inc.*,
    79 S.W.3d 326 (Ark. 2002) ...............................................................................16 n.1

*USM Corp. v. Marson Fastener Corp.*,
    393 N.E.2d 895 (Mass. 1979) ................................................................................16

*Vermont Microsystems, Inc. v. Autodesk, Inc.*,
    88 F.3d 142 (2d Cir. 1996) ..............................................................................16, 20

*W.L. Gore & Assocs. v. Totes, Inc.*,
    788 F. Supp. 800 (D. Del. 1992)...........................................................................38

## Statutes

15 U.S.C. § 1114............................................................................................................1

15 U.S.C. § 1125(a) .......................................................................................................1

Fed. R. Civ. P. 56(c) ...................................................................................................14

*6 Del. C.* § 2001 ..........................................................................................1, 15, 26, 35

*6 Del. C.* § 2004 ..........................................................................................................35

*6 Del. C.* § 2532 ............................................................................................................1

<u>Nature and Stage of the Proceedings</u>

Plaintiff Mobius Management Systems has brought this action against defendant Acartus and its successor, defendant EMC Corp., for (i) violations of the Uniform Trade Secrets Act, 6 *Del. C.* § 2001, the Uniform Deceptive Trade Practices Act, 6 *Del. C.* § 2532, and the common law of unfair competition, (ii) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), (iii) tortious interference with contractual relations, and (iv) trademark infringement, 15 U.S.C. §§ 1114 & 1125(a). Mobius and defendants compete in the business of developing and marketing computer software systems for the management and archiving of electronically-stored information such as records, documents, images, print data-streams, computer reports and data in any electronic format.

REDACTED

This campaign consisted of among other things: (i) infringement of Mobius' trademark, (ii) dissemination of false and misleading promotional statements concerning Acartus and Mobius software, and (iii) theft and misuse of Mobius trade secrets, including Mobius market strategy documents and confidential information concerning ViewDirect – materials defendants admit are proprietary.

On July 5, 2005, Mobius moved for a preliminary injunction with respect to its trademark and false advertising claims. (D.I. 6). Shortly thereafter, Acartus agreed to a stipulated order entering a preliminary injunction with respect to the trademark and some of the false advertising claims. (D.I. 12).

In September 2005, defendants moved to dismiss Mobius' amended complaint, raising many of the same arguments they raise on this motion. (D.I. 19). On June 28, 2006, the Court denied defendants' motion in its entirety. *See Mobius Mgmt. Sys., Inc. v. Acartus, Inc.*, 2006 U.S. Dist. LEXIS 44341 (D. Del. June 28, 2006) (D.I. 62). Mobius amended its complaint again in August 2006, to add Acartus' successor EMC as a party and flesh out its trade secrets claim based on discovery. (D.I. 71). In December 2006, the parties settled Mobius' trademark claim, making permanent the preliminary injunction entered by the Court in July 2005 with respect to that claim. (D.I. 94).

The parties have now completed discovery and defendants have moved for summary judgment on Mobius' remaining claims. As we show below, the record, when fairly read, overwhelmingly supports Mobius' claims. At worst for Mobius, substantial factual issues remain in dispute, thereby precluding summary judgment.

<u>Summary of Argument</u>

1. According to defendants, there are no disputed factual issues with respect to Mobius' claim of misappropriation of Mobius trade secrets embedded in the format of its proprietary ViewDirect data archive or "DAF" containers and related materials, because (i) Mobius did not undertake reasonable efforts to maintain the secrecy of its DAF container format, and (ii) defendant did not know or have reason to know the DAF format was a trade secret. Defendants principally argue that Mobius did not specifically reference DAFs in its license agreements as a trade secret as it purportedly was required to do. Defendants are wrong on the law and wrong on the facts. On the law, there is no requirement that the license agreement specifically reference the DAF format as a trade secret. On the facts, the license agreement, which warns that the Mobius system and its components are trade secrets, is broad enough to encompass the DAF format, because those containers are internal and integral to the Mobius system and have no purpose or use beyond that system. In addition to the license agreement, Mobius provided notice concerning the proprietary nature of Mobius DAF format in a filing with the organization responsible for assigning internet protocol addresses. Finally defendants' own internal documents repeatedly reference the Mobius' DAF container structure as "proprietary," a term of art in the software field connoting trade secret status.

2. Defendants also say that Mobius lost any trade secret status with respect to DAFs when a third party improperly posted (and later immediately removed upon Mobius' request) a low level DAF on the internet. The law is clear that mere publication on the internet does not eliminate secret status especially when, as Mobius did here, the owner acts promptly to have the material removed once it learns of the posting.

KL3 2591738.1

3.     Factual issues likewise preclude dismissal of Mobius' trade secret claims addressed to defendants' improper possession and use of internal Mobius confidential market strategy documents.  Defendants maintain that these materials are not Mobius trade secrets and that, alternatively, defendants' possession of these materials did not damage Mobius.  But the record, including defendants' own internal documents and deposition testimony, is overwhelmingly to the contrary.

4.     Defendants predicate their summary judgment motion addressed to Mobius' tortious interference claims on these same mistaken factual arguments.

5.     There is no factual or legal basis for dismissing Mobius' false advertising claim, brought under Section 43(a) of the Lanham Act.  If anything, the existing record confirms that Mobius is highly likely to prevail on the merits of this claim.  Contrary to what defendants contend, the challenged advertising claims – including the establishment claim of "proven" technology – constitute actionable misstatements of fact, not puffing, and

**REDACTED**

Since these claims are literally false, defendants' materiality argument fails as well; materiality is presumed as a matter of law.  The record evidence supports that presumption:  Mobius licensees testified that they *were* influenced by Acartus' false claims.

<u>Counterstatement of Facts</u>

A.     <u>Background:  Mobius, ViewDirect, and "DAFs"</u>

Mobius develops, licenses and supports a software system called ViewDirect designed to optimize the storage, retrieval, presentation, delivery and disposition of electronically-stored information such as records, documents, images, print datastreams, computer reports, transactions, video, audio and data in any electronic format.  Founded in 1981, Mobius has grown to become one of the leaders in its field.  It took the efforts of many dedicated software engineers and millions of dollars in research and development over many years for Mobius to bring the ViewDirect system to market.  Mobius continues to devote significant resources to keeping the product competitive.  Mobius licenses ViewDirect to customers in a wide range of industries.  (Gross decl., ¶¶ 3-4).

Mobius' ViewDirect system compresses, consolidates and stores customer data in what are called document archive files or "DAFs," a nonpublished and proprietary container for archived electronically-stored information.  Defendants themselves have recognized that the format of the DAF container is proprietary to Mobius.  (*E.g.,* Exh. 15).

REDACTED

REDACTED

KL3 2594758 1

REDACTED

REDACTED

**B.**   <u>Mobius license agreements</u>

Mobius goes to great lengths to protect its trade secrets and other proprietary information. Mobius' procedures include maintaining the material in a safe and secure place, restricting access, labeling the software itself as a trade secret, and prohibiting both present and former Mobius employees and licensees from reproducing or disclosing any such information without Mobius' express authorization or consent. (Gross decl., ¶ 10). All customers who use Mobius' ViewDirect archival software are required to enter into an extensive license agreement that among other things (i) makes clear that the software, documentation, data, and other material supplied by Mobius are proprietary to Mobius, (ii) requires that such materials be maintained in a safe and secure place, and (iii) prohibits the licensee from

reproducing such materials or disclosing them to others, or reverse engineering any aspect of the software. (Defendants' Exh. U).

**REDACTED**

**REDACTED**

These provisions are commonplace in the software industry. (Gross decl., ¶ 11). Acartus has executed agreements with similar restrictions. (Exh. 16).

C.     Defendants' theft of Mobius trade secrets concerning ViewDirect

In 2003 or 2004, Acartus began marketing a product called "ApertureOne," designed to compete with Mobius' ViewDirect. (Florin Tr. 9-10, 23-24).



Acartus used these materi als to develop a product called the "Mobius DAF Export Utility" (Exh. 18) – although Acartus dropped the use of "Mobius" after Acartus agreed to a preliminary injunction with respect to its improper use of the Mobius mark. The product was supposed to enable Mobius licensees to migrate or move customer content and associated metadata out of Mobius' ViewDirect system into a format that could be stored in the ApertureOne repository. (*Id.*). Acartus executives believed that the availability of such a product would help Acartus as well as its then-business partner (and now owner) EMC sell competitive archival software. (Florin Tr. 22, 30-33).

**REDACTED**

(*Id.* at 31-33). If potential customers did not have to worry about gaining access through ViewDirect to their "legacy" data archived in ViewDirect, then they might be more inclined to switch to Acartus or EMC. (*Id. See also id.* at 44-45; Exh. 19, noting that "the concept of legacy migration has been a cornerstone of messaging around our product").

**REDACTED**

**REDACTED**

KL3 29 4738 1

# REDACTED

KL3 2591758 1

REDACTED

D.    Defendants' theft of Mobius
      market strategy documents and related materials

       All Mobius employees are bound by and required to adhere to a Code of Ethics that is intended among other things to preserve the confidentiality of Mobius' proprietary information.  (Exh. 25).  The Code states:  "Our Company considers its 'intellectual property' – including its inventions, processes, patents, trademarks, licenses, customers lists and trade secrets – to be valuable assets."  In addition, the Code states that "Employees shall not, without prior authority, give or release to anyone not employed by the Company, or to another employee who has no need for the information, data or information of a confidential nature concerning the Company or its clients. . . ."  (*Id.* at M 445, 447).



RLF1-2591738-1

**REDACTED**

KL3 25-17381

**REDACTED**

KL3 25-4738 1

E.      Defendants' false promotional statements

Acartus compounded its theft of trade secrets by making several false statements concerning both the DAF export utility and Mobius software in promotional material aimed at Mobius licensees.

For example, in promotional materials posted on its website, Acartus declared: "Our proven technology ensures migrations run smoothly and rapidly, without considerable investment of questionable reliability of custom, one-off solutions." (Exh. 18).

REDACTED

Acartus also stated on its web-site that "Due to proprietary storage models such as Mobius' DAF format, continued access of this content has posed some difficult decisions for enterprises. Companies have had to either perform a manual transformation of content, or continued to support their deep archive storage. Manually transforming legacy content, whether performed internally or outsourced to a services group, poses a tremendous cost of time and resources." (Exh. 18). Acartus also declared that "continuing to support a legacy archival system such as Mobius perpetrates a series of unnecessary licensing, services and maintenance costs." As set forth in Mr. Gross' declaration, these claims are also false on their face. (Gross decl., ¶¶ 21-22).

* * *

REDACTED

# REDACTED

## Argument

Summary judgment is appropriate only if the moving party demonstrates that there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In evaluating defendants' motion, the Court must view the evidence in the light most favorable to Mobius, draw all inferences in Mobius' favor, and resolve any doubt as to the existence of a genuine issue of material fact against defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Summary judgment is particularly disfavored in a trade secrets case because the dispositive issues are inherently factual and usually in dispute. *See, e.g., Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 219 (3d Cir. 2002) (reversing grant of summary judgment on misappropriation claim because there were disputed issues of material fact, including whether plaintiff made "reasonable efforts" to retain the trade secrecy of its customer lists); *Data General Corp. v. Digital Computer Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) (summary judgment "inappropriate" because "the degree of dissemination of the [computer engineer's drawings] and the sufficiency of [plaintiff's] efforts to protect the [drawings]" posed a factual issue requiring a hearing); *Sanirab Corp. v. Sunroc Corp.*, 2002 WL 1288732, at *3 (Del. Super. Apr. 29, 2002) (summary judgment difficult to obtain in trade secret context because "[w]hether trade secrets were generally known or readily ascertainable and whether a plaintiff took reasonable precautions to protect their secrecy is a

- 14 -

question of fact"). As set forth below, defendants have not come remotely close to meeting the summary judgment standard.

I.    DISPUTED QUESTIONS OF FACT PRECLUDE SUMMARY
      DISMISSAL OF MOBIUS' MISAPPROPRIATION CLAIM

        The Delaware trade secret statute defines a "trade secret" as "information, including a formula, pattern, compilation, program, compilation method, technique or process" that "derives independent economic value. . . from not being generally known" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 6 *Del. C.* § 2001. "Misappropriation" of trade secrets includes (i) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," (ii) "disclosure or use of a trade secret by another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret," or "at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret]" was "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Defendants contend that summary judgment should be granted on two separate grounds: (i) Mobius supposedly "failed to take reasonable steps to protect its alleged trade secrets" (Defendants' Br. at 18), and (ii) "Acartus did not know, or have reason to know, that DAF files were Mobius trade secrets." (*Id.* at 24). As to both issues, however, defendants offer no legal impediment to Mobius' claim, only factual assertions -- belied by a fair reading of the record -- which cannot be resolved on a motion for summary judgment.

        A.    Mobius took reasonable steps to protect its trade secrets

        There is no dispute that "[c]omputer software has received judicial recognition as a trade secret." *Business Intelligence Servs., Inc. v. Hudson,* 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984). In addition, defendants acknowledge that the sequence, structure and organization of a data file could be a trade secret in appropriate circumstances. (Zimmerman Tr. 122). Defendants nevertheless contend that Mobius did not take reasonable steps to protect the secrecy of its DAF technology because "The Mobius license agreement does not clearly identify customer DAF files and Topic index files as Mobius trade

- 15 -

secrets." (Defendants' Br. at 19). Defendants are wrong on the law and the facts. On the law, defendants mischaracterize the specificity required to maintain the secrecy of Mobius proprietary information. On the facts, Mobius has done more than enough to maintain the secrecy of its materials.

1.    Mobius gave more than sufficient notice that the Mobius DAF
      format and related materials are proprietary trade secrets

A confidentiality provision like the one contained in Mobius' license agreement need not itemize each and every trade secret to which it applies, as long as its terms are sufficiently broad to encompass the information at issue. Defendants accused of misappropriating confidential information frequently raise the same argument offered by defendants, and courts consistently reject it. *See, e.g.,* *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 150 (2d Cir. 1996) (rejecting as "unpersuasive" defendant's contention that plaintiff "should have provided him with a list of the specific component trade secrets it considered proprietary upon his resignation," and holding that plaintiff "took reasonable steps to protect its trade secrets"); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at *12 (S.D.N.Y. Jan. 10, 1994) (rejecting defendant's argument that the confidentiality agreement "did not describe with particularity the information that he was obligated to keep secret" and noting that "[s]imilar nondisclosure agreements have been held to be enforceable even when the agreement did not list the particular information considered secret"); *USM Corp. v. Marson Fastener Corp.*, 393 N.E.2d 895, 901, 903 (Mass. 1979) (reversing summary dismissal because plaintiff "took sufficient reasonable steps to preserve the secrecy of" its trade secrets: "While the nondisclosure agreements did not list the particular information which [plaintiff] considered secret, such specificity is not required" to sustain a misappropriation claim).[1]

---

[1] Defendants cite no Delaware authority to the contrary – in fact, they cite no Delaware authority on this point at all. The two cases they do cite – neither of which involves disclosure of software in alleged breach of a written license agreement - do not resemble our facts. In *Tyson Foods, Inc. v. ConAgra, Inc.*, 79 S.W.3d 326 (Ark. 2002) (Defendants' Br. at 22), Tyson alleged that its "nutrient profile" was misappropriated by a former employee. The court rejected Tyson's claim (granting a post-trial judgment for defendant) because "Tyson failed to take *any* precautionary measures to protect its nutrient profile." 79 S.W.3d at 333 (emphasis added). There was no written nondisclosure or confidentiality agreement at all, and virtually no other protective measures prohibiting employees from obtaining and using this

As these cases confirm, that the Mobius License Agreement does not mention "DAF files or topic indices" (Defendants' Br. at 19) is not legally dispositive and by no means precludes the Court from holding that Mobius took "reasonable steps" to protect the confidentiality of this information. Whether Mobius did so presents a question of fact, because "the test is one of reasonable, not absolute, precautions" and the Mobius license agreement is sufficiently broad to encompass DAF containers and their related components. *Merckle GMBH v. Johnson & Johnson*, 961 F. Supp. 721, 732 (D.N.J. 1997) (denying trade secret defendant's motion for summary judgment, which was predicated on plaintiff's alleged failure to maintain secrecy of its material; "the test is one of reasonable, not absolute, precautions"); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting Ltd.*, 2006 U.S. Dist. LEXIS 43690, at *31 (D. Mass. June 28, 2006) (denying trade secret defendant's motion for summary judgment; reasonableness of plaintiff's efforts to guard trade secret status "is fact-specific and depends largely on the circumstances").



---

information, leading to the inevitable conclusion that Tyson did not take "reasonable efforts to guard the secrecy" of this information. *Id.* at 332. Similarly, in *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890 (Minn. 1983) (Defendants' Br. at 22), the court denied injunctive relief on plaintiff's misappropriation claim, reversing the court below, because plaintiff "did not demonstrate *any* effort to maintain secrecy." 332 N.W.2d at 902 (emphasis added). The court noted that "trade secret law does not require maintenance of absolute secrecy," *id.* at 901, but in the absence of any protective measures at all, it had no choice but to dismiss the claim.

# REDACTED

The case law confirms that data storage files or containers internal to the operation of the software are an integral part of the software "system." In *CMax/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 348 (M.D. Ga. 1992), a software developer licensed software designed to input, store, process and retrieve information for companies in the business of renting household appliances and products. The software licensee "copied the designs of the existing [licensed software] files, screens and reports" and using that material developed its own software system. The court found that defendant had misappropriated the licensor's secrets by, among other things, accessing and copying files and file layouts --- just as Acartus has done -- because those files and file layouts were part of the software "system" licensed to defendant; "by copying files, screens and reports from the [plaintiff's software] system, [defendants] copied the design of that system." *Id.* at 346. The Court also elaborated on the nature of data files internal to the software:

> Files are designated areas for storing information on a computer system. There are no standards for determining which files are needed to accomplish a particular task. The determination of how to store data in files is a crucial element in the design process of a computer software system. *This layout or blueprint for data storage is the foundation upon which a computer system is built,* and is the result of a creative thought process. For example, when creating a file, a system designer must make numerous decisions concerning the material to be included in the file, the order of that material and how that material can be accessed and used by the system.

*Id.* at 344 n.3 (emphasis added). Thus, defendants cannot pretend that the structure of Mobius' data storage files are not part of the software system and components and not encompassed within the Mobius license agreement.

Our case is also like *Technicon Data Systems Corp. v. Curtis 1000, Inc.,* 1984 WL 8268, at *8 where the Court of Chancery found a violation of the Delaware Trade Secret Act by a defendant who -- like Acartus -- engaged in black box reverse engineering of plaintiff's software. Plaintiff Technicon had developed a Medical Information System (MIS), a computerized system for the storage,

transmittal and display of hospital data.  MIS consisted of a mainframe computer and video matrix terminals ("VMTs") which were connected to the mainframe computer.  The terminals used a particularized communication protocol to communicate with the mainframe computer.  Plaintiff alleged that this communication protocol was a trade secret.

Defendant used indirect black-box reverse engineering to learn plaintiff's communication protocol and develop a communications circuit board and related software.  "By sending a known instruction through the VMT and studying the electronic impulses transmitted by the VMT for the particular function chosen, [defendant] claimed to have discovered the function codes and other alleged *Technicon* trade secrets necessary to create" a software product designed to perform the same functions as plaintiff's software.  As described above, Acartus undertook the same type of exercise.

Like defendants here, defendants in *Technicon* alleged that the communication protocol they reverse engineered had "not been the subject of reasonable efforts to maintain [its] secrecy," *id.* at *5, because the "confidentiality provisions [of plaintiff's license agreements] are too vague and overbroad to be meaningful" and because the screen displays do not "warn the user of any confidentiality requirement."  *Id.* at *6.  The court rejected this argument, noting that the license agreement "included confidentiality provisions" and "the law does not require every conceivable security device be installed to protect a trade secret."  *Id.*  The court also rejected defendant's claim that it had engaged in permissible reverse engineering; the court noted among other things that plaintiff "licensed its software and technical data to the customer for the customer's use subject to confidentiality provisions contained in the contracts."  *Id. at* *8.[2]

Even apart from the language of the license agreement, Mobius provided substantial notification to the public that DAF containers and related materials embody Mobius trade secrets.  In June 1999, Mobius filed with the Internet Assigned Numbers Authority (IANA) – the organization responsible



KL3 2591738 1

for assigning internet protocol addresses – a registration for the denomination ".DAF." (Exh. 38). The filing required Mobius to explain the purpose of DAF containers and disclose information concerning the published specifications for such files. Mobius stated, "Published specification:    None.    The specifications for this content type are proprietary to Mobius Management Systems, Inc." (*Id.*). (Gross decl., ¶ 13). Acartus' own expert Dr. Zimmerman agreed that the Mobius IANA filing is "also a way of communicating to the public, the relevant public, what the characteristics of that file are." (Zimmerman Tr. 145. *See also id.* at 151). He elaborated:

> The thing that is occurring when you do a public registration is you are effectively announcing to the public the DAF file exists and what its purpose is. Now you could put other restrictions on that if you notified people that there was trade secret in there.

*Id.* at 150. But Mobius announced to the public precisely those restrictions. Rather than state that the DAF container format was open source, Mobius declared that the specifications of the DAF container are "proprietary." The word "proprietary" is a term of art in the software field, connoting trade secret status. One prominent software dictionary, published by Microsoft, defines "proprietary" as

> Of, pertaining to, or characteristic of something that is privately owned. Generally, the term refers to technology that has been developed by a particular corporation or entity, with specifications that are considered by the owner to be trade secrets.   Proprietary technology may be legally used only by a person or entity purchasing an explicit license.

(Exh. 39).    Dr. Zimmerman acknowledged that this is an accepted definition of "proprietary" (Zimmerman Tr. at 170-71), and that dictionaries like Microsoft's often reflect the software industry's custom and usage with respect to terms defined therein. (*Id.* at 26-27). *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d at 145, 146 n.1 (citing "Computer Professional's Dictionary" to define software industry terms in trade secret dispute). *See also AMC Tech., L.L.C. v. SAP AG*, 2005 WL 3008894, at *6 (E.D. Pa. Nov. 3, 2005) (citing *Microsoft Computer Dictionary* to define common understanding of term in patent dispute); *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 515, 527-28 (D. Del. 2001) ("courts may consider [dictionaries] . . . as part of determining a claim term's ordinary meaning," and citing to *Microsoft Computer Dictionary* repeatedly to define commonly understood meanings of various terms).

Finally, defendants' claim that Mobius did not take reasonable steps to protect its DAF trade secrets is severely undercut by Acartus' pre-litigation admissions to the contrary. Acartus at that time acknowledged that the Mobius DAF container format is a Mobius trade secret. Acartus' internal documents repeatedly referenced the DAF format as "proprietary" – and hence, under the general custom and usage of that term in the software field, a trade secret.

**REDACTED**

### 2.    Mobius did not lose its proprietary interest in the DAF format

Defendants maintain that Mobius did not undertake reasonable efforts to protect its trade secrets as well because Mobius allegedly failed to take corrective action after a Mobius "licensee," Daksoft, provided DAF files to Real Vision Imaging ("RVI") for the purpose of performing a one-time conversion, and allowed DAF files to remain on an internet website where they had been posted by the independent contractor hired by Real Vision to assist with the conversion. (Defendants' Br. at 23). This argument does not eliminate triable issues.

Whether information "loses" its trade secret status and enters the public domain is a fact-specific inquiry, typically unsuited to summary disposition. *Storage Technology*, 2006 U.S. Dist LEXIS 43690, at *32-33. Here, the underlying facts are far from undisputed, defendants' version of the story is far from complete, and the relevant facts -- notably omitted from defendants' brief -- decisively favor Mobius.



---

[3] Mr. Florin specifically testified that whether the layout of a file is a trade secret depends on whether the owner does not publish the layout of the file. He acknowledged that Mobius does not publish the layout of its DAF files. (Florin Tr. 204-05).

**REDACTED**

Because the file proved too complex for him to decode, Mr. Rogers then posted a DAF file on a website called rentacoder.com to find a computer programmer to help him create the necessary software. (Rogers Tr. 51). Publication of trade secrets on the internet does not automatically result in loss of trade secret status, as defendants erroneously suggest and as they also argued in their failed motion to dismiss. *See, e.g., DVD Copy Control Ass'n v. Bunner*, 10 Cal. Rptr. 3d 185, 192, 194 (Ct. App. 2004) (reversing grant of preliminary injunction on misappropriation claim: "It is important to point out that we do not assume that the alleged trade secrets . . . became part of the public domain simply by having been published on the Internet"); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 1997 U.S. Dist. LEXIS 23572, at *42 (N.D. Cal. Jan. 6, 1997) (granting motion for preliminary injunction, notwithstanding publication of alleged trade secret on the internet; "sufficiently serious questions exist as to the secret status of the specific processes and instructions in question").



KL3 2591738 1

REDACTED

In short, the suggestion that Mobius knew of but failed to police prior infringements, thereby waiving its claim to trade secret protection, is not borne out by the record.  The evidence suggests that the disclosure by Daksoft was an isolated event, in the nature of a work-for-hire (*see* pages 27-28 below), and that Mobius *did* take prompt and reasonable corrective action as soon as the company became

- 23 -

aware of the disclosure – all that is required under the very cases cited by defendants. *See HiRel Connectors v. United States*, 2005 WL 4958547, at *4 (C.D. Cal. Jan. 4, 2005) (Defendants' Br. at 23-24) (a plaintiff has a responsibility to take "prompt and assertive corrective action" only "whenever [it] detect[s] a fracture in a once confidential relationship"). At a minimum, the record gives rise to questions of material fact that cannot be decided on this motion.[4]

B.   Defendants knew or had reason to know that
     the Mobius materials were trade secrets

As a second basis for their motion, Defendants contend that they "did not know, or have reason to know, that DAF files were Mobius trade secrets" because Acartus "did not have a copy of the Mobius License Agreement and it did not know that Mobius would (or could) claim that customer's own DAF files contain Mobius trade secrets." (Defendants Br. at 25). This argument, entirely factual, could not be more misguided. The record establishes that on multiple grounds, Acartus knew or had reason to know of the trade secret status of Mobius' material.

First, it is well known in the software field that source code is a trade secret; Acartus considers source code to be a trade secret. (*E.g.*, Florin Tr. 108-09). But as set forth above, Acartus indirectly gained access to Mobius source code in reverse engineering the DAF format.

---

[4] The cases on which defendants rely do not support their argument that the DAFs "lost" their "secret character" through alleged inaction on Mobius' part. (Defendants' Br. at 23-24). In *Hirel*, the plaintiff took no preventive measures and did nothing at all, short of filing suit in the wake of an infringement, to ensure the confidentiality of its alleged trade secrets. 2005 WL 4958547, at *5-6. In *Alamar Biosciences, Inc. v. Difco Laboratories, Inc.*, 1995 WL 912345 (E.D. Cal. Oct. 13, 1995), the trade secret holder had "strong circumstantial evidence" that the alleged infringer had previously misappropriated its trade secrets "but did nothing" at the time, thereby waiving its right to sue that party for subsequent acts of infringement. *Id.* at *6. Here, there is no suggestion that Acartus or EMC had misappropriated Mobius trade secrets in the past or that Mobius sat on its rights by overlooking known acts of infringement by the defendants or anyone else. Similarly, in *Hoffmann-La Roche Inc. v. Yoder*, 950 F. Supp. 1348 (S.D. Ohio 1997), the court granted summary judgment dismissing Roche's trade secret claim – filed in 1996 – because "prior to 1983," defendants "wrote and published at least two articles" disclosing the alleged trade secrets "without hearing a word from Roche regarding the propriety of publishing such 'confidential' information." 950 F. Supp. at 1364. In addition, "the absence of a formal, written, confidentiality agreement," while "not determinative," factored into the court's analysis. *Id.* at 1361. For both reasons, the court concluded that Roche failed to take reasonable steps to secure the secrecy of this information. Quite obviously, these circumstances are a far cry from our facts.

- 24 -

# REDACTED

Third, and also as noted above, Mobius' IANA filing gave ample notice that Mobius DAF containers are a trade secret, and it is undisputed that Acartus had in its possession a copy of that filing when developing the DAF export utility. (Exh. 38). And there is also no dispute that, despite their proprietary status as described in the IANA filing, Acartus learned the specifications of the Mobius DAF layout. (Zimmerman Tr. 158).

Fourth, Acartus' files are replete with admissions that the Mobius DAF format is proprietary and thus a trade secret. (*See* page 21 above).

# REDACTED

And sixth, even if defendants somehow buried their heads and did not know prior the commencement of this action that Mobius considered the DAF format and related material to be a trade secret, defendants certainly knew that information once Mobius filed its complaint. Defendants

- 25 -

nevertheless continued to market the DAF export utility and continue to work on the product to this day.

In sum, there is substantial, if not overwhelming evidence that Acartus knew or had reason to know that the DAF container format was a Mobius trade secret. *6 Del. C.* § 2001. Although defendants are free to contest this evidence, it is folly to assert that the issue may be disposed of against Mobius prior to trial.[5]

### C.   Defendants' remaining factual arguments are meritless

Defendants raise a series of additional arguments as to why the Court should grant summary judgment on Mobius' trade secret claim. All are factual -- and factually incorrect.

• According to defendants, DAF containers are like Adobe PDF files or WinZip files, which are freely exchanged among users, and thus there was nothing wrong with defendants gaining access those files to develop a competing product. (Defendants' Br. at 4). Defendants, however, could not be more mistaken. As set out in Mr. Gross' declaration and Mr. Tonchen's report (Defendants' Exh. T at 16-23), DAF containers are strictly internal to the Mobius software system and have no use to anyone except the Mobius licensee in question. As defendants' expert Dr. Zimmerman was constrained to admit, other than the conduct at issue in this case he knows of no situation in which DAFs have been used for transport among users or systems. (Zimmerman Tr. 50-51. *See also id.* at 141-43 in which Dr. Zimmerman admitted that DAF files are not exchanged among users, in comparison to WinZip or PDF

---

[5] The cases on which defendants rely (Defendants' Br. at 25) do not support or even address this argument. *Cabot Corp. v. Thai Tantalum Inc.*, 1992 Del. Ch. LEXIS 150 (Del. Ch. July 22, 1992) and *On-Line Technologies v. Perkin Elmer Corp.*, 141 F. Supp. 2d 246 (D. Conn. 2001) involve an entirely different issue – whether knowledge of the misappropriation can be imputed to a successor-in-interest to the original infringer. Similarly, in *Steinberg Moorad & Dunn, Inc. v. Dunn*, 2002 WL 31968234, at *26 (C.D. Cal. Dec. 26, 2002), the issue was whether a company that invested in and then acquired the entity accused of stealing trade secrets could be held indirectly liable for misappropriation on the theory that it knew or should have known the information had been wrongfully acquired. These cases do not address the question at hand – namely whether Acartus knew or had reason to know, when it obtained DAFs from Mobius' customers, that DAFs were proprietary to Mobius. Defendants do not dispute that if Mobius can demonstrate misappropriation by Acartus, Mobius is entitled to relief against both Acartus and EMC, making these cases entirely beside the point.

files).  That sharply contrasts with PDF and Winzip files, which are specifically designed to be freely exchanged among users.

 • Defendants maintain that there has been no trade secret violation because they (i) have done "nothing more" than the type of work that Mobius' expert Mr. Tonchen performs for customers, and (ii) received from customers that same type of information Mr. Tonchen receives from customers. (Defendants' Br. at 26 & 30 n.15).  This factual argument seriously misstates Mr. Tonchen's testimony, and ignores the critical distinction between a "work for hire" -- the type of "repair" work performed for licensees by Mr. Tonchen and others -- and what took place here:  the development of a competing software product through access to and use of information learned about a competitor's system.  Mr. Tonchen explained:

> In my professional experience, the Non-Disclosure provisions of software license agreements may not always be absolute.  In general, they may allow the licensee to disclose a software vendor's "licensed materials and information" to contractors who (a) render professional services to the licensee on a work-for-hire basis, and (b) have agreed, in writing, not to disclose or utilize, for purposes outside the scope of professional services being rendered to the licensee, proprietary information of the licensee and/or the software vendors whose software products the licensee is using.  My clients, for example, have on occasion provided me with licensed information regarding third party software products, when I needed such information to perform the tasks I was contracted to undertake . . . .

> However, the DAF export utility is not a professional service or work for hire rendered by a contractor, but a commercial software product (or more precisely, a separately priced option of a commercial software product) being developed by a Mobius competitor.  Thus, the disclosure of "Mobius-licensed materials and information", by a Mobius licensee to Acartus, does not appear to be compatible with the Non-Disclosure provision (Paragraph 5) of the Mobius License Agreement.

(Defendants' Exh. T at 8).

 Defendants' Dr. Zimmerman corroborated this critical distinction.  He testified that "third party work for hire consultants, if you will, can be engaged by the licensee to perform work that would be looking at and, in fact, could involve even operating the software on behalf of the [licensee]." (Zimmerman Tr. 92).  That is the type of repair work Mr. Tonchen performs for his customers.  Here, by

contrast, Acartus did not function in a work-for-hire fashion. Rather, Acartus marketed its DAF export utility as a competing software product. (Florin Tr. 195-96). And unlike in a work-for-hire situation, when Acartus licensed the software, the title and rights to the DAF export utility remained with Acartus. (*Id.* at 197).

- Defendants suggest that the DAF format is too simple to qualify for trade secret status. (Defendants' Br. at 4). But "trade secret protection requires only a minimal level of novelty." *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 438 (S.D.N.Y. 1996). In fact, as set forth in Mr. Tonchen's report (Defendants' Exh. T. at 18-19) and Mr. Gross' declaration (at ¶¶ 7-8), the sequence, structure and organization of Mobius DAF files is highly complex.



# REDACTED

This distinction between the data owned by the customer and the data file wrapper is well recognized in software trade secret law, and courts have rejected arguments just like defendants' on this issue. *See CMax/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. at 350, where the court found a theft of trade secrets because defendants among other things copied the layout of data storage files created by plaintiff's software; "there is a distinct difference between the data contained in the computer program file, which is the property of the program user, and the structure or layout of the file that contains the data, which is the property of the program owner."

Moreover, the Mobius license agreement specifically provides that "title to the SYSTEM and all property rights therein and all material supplied to licensee under this agreement shall remain the sole property of Mobius." (Defendants' Exh. U). As set forth above, this language is clearly broad enough to encompass the DAF file format, and defendants themselves recognized that the DAF format was proprietary Mobius property. *Cf. DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.,* 170 F.3d 1354, 1362 (Fed. Cir. 1999) (purchaser of software, though the owner, does not have unlimited rights if the software "is heavily encumbered by other restrictions that are inconsistent with the status of owner").

Defendants' expert Dr. Zimmerman acknowledged the relevant intellectual property rights. He agreed that even though a customer may "own" a software disk – for example, a Norton Anti-

KL3 2591738 1

Virus CD he or she may have purchased – the software developer still maintains rights in the software contained on the disk owned by the customer. (Zimmerman Tr. 133-35).[6]

• Defendants claim that the compression scheme used by Mobius is not a trade secret. (Defendants' Br. at 6). Yet Acartus boasted to potential customers that "we have decoded the *proprietary* Mobius compression sc██████████████████hasis added).

REDACTED

And even if the compression scheme itself was not a trade secret, the fact that Mobius uses that particular compression scheme is. *See Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions*, 920 F.2d 171, 174 (2d Cir. 1990) ("a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret").

REDACTED

• Defendants assert that Mobius does not label the DAF containers as proprietary, as is supposedly Mobius' practice with respect to its trade secrets. (Defendants Br. at 12). That is false.

---

[6] Defendants similarly assert that Mobius' Vice President of Professional Services, Skip Dugas, admitted that a DAF consists only of customer data and, as such, is not proprietary to Mobius. (Defendants' Br. at 12 n.9). But that is not what Mr. Dugas said. To the contrary, he testified that the DAF is "a proprietary file format of Mobius" and while the data itself is owned by the customer, the format in which that data is stored remains proprietary to Mobius. (Dugas Tr. 60-61, 73-74).

The Mobius software is so labeled (Gross decl., ¶¶ 10-11) and as noted above, the provisions of the Mobius license agreement and IANA filing provide ample notice concerning the trade secret status of the Mobius materials.



KL3 2591738 1

In short, given the many factual issues, this is not a case in which summary judgment is even arguably appropriate. Indeed, defendants' own software expert Dr. Zimmerman acknowledged the point. He testified that while he and Mobius' expert Mr. Tonchen reached different conclusions on the trade secret issues presented here, reasonable minds could differ; "Clearly I believe Mr. Tonchen is reasonable and we do differ." (Zimmerman Tr. 34).[7]

> **D.    There is no basis for summary dismissal of the trade secret claim with respect to the Mobius market strategy documents**

Defendants fare no better in arguing that summary judgment should be granted as to Mobius' misappropriation claim with respect to the stolen market strategy documents.

# REDACTED

This type of information is routinely considered to embody trade secrets. *See e.g., Joint Stock Soc'y v. UDV N. Am., Inc.,* 104 F. Supp. 2d 390, 396 (D. Del. 2000) (based on in camera review of sealed documents including consumer research studies, strategic plans, potential advertising and marketing campaigns and financial information, Court affirms conclusion of special master that the materials

---

[7] The few cases defendants cite in which misappropriation claims were dismissed at the summary judgment stage did not involve computer software or written licensing agreements and are in any event distinguishable on other grounds. In *First Federal Savings Bank v. CPM Energy Systems Corp.,* 1993 WL 138986 (Del. Super. Apr. 22, 1993) (Defendants' Br. at 18), the court granted summary judgment not only because plaintiff "failed to show that reasonable steps were taken to safeguard" the secrecy of its waste recovery plan, but because it also "has not alleged, nor does the record support, a finding that the waste recovery process was secret and/or that financial gain could be obtained as a result of its disclosure." 1993 WL 138986, at *8. In *Tubos de Acero de Mexico, S.A. v. American Int'l Inv. Corp.,* 292 F.3d 471 (5th Cir. 2002) (Defendants' Br. at 18), the written leasing agreement on which plaintiff relied "was silent as to the confidentiality or proprietary nature of any alleged trade secrets." 292 F.3d at 475. The agreement required that the terms of the lease itself be kept confidential but "not any information pertaining to the design" of the allegedly proprietary equipment that was being leased. *Id.* at 484. The facts in *Hirel Connectors, Inc. v. United States,* 2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) (Defendants' Br. at 19), are even more extreme. While noting that the reasonableness of plaintiff's efforts "ordinarily would be an issue for the trier of fact," *id.* at *4, the court granted summary judgment because the only protective step plaintiff took was filing suit against the alleged misappropriator after the fact, and "merely filing suit against the alleged wrongdoer does not constitute 'reasonable efforts' to protect the trade secrets *against others* who might be interested in obtaining those secrets." *Id.* at *5-6.

constitute trade secrets, noting that "federal courts have consistently held that this type of sensitive commercial information is entitled to confidential protection"); *Philadelphia Gear Corp. v. Power Transmission Servs., Inc.*, 1991 WL 29957, at *3 (Del. Ch. Mar. 6, 1991) ("The identity of customers has long been recognized to be a trade secret"); *Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1169 (Ill. App. Ct. 2000) (reversing dismissal of trade secret claim asserting theft of information concerning plaintiff's "new software development . . . existing customer lists . . . plans for product upgrades . . . lists of prospective customers . . . [and] techniques for servicing customers").

Defendants resort to far-fetched and factual arguments in asserting that Mobius has not made out a trade secret claim with respect to these materials. For example, defendants maintain that Acartus was free to use the market strategy documents because, according to defendants, "It is undisputed that the Sales Documents are not marked confidential or proprietary to Mobius." (Defendants' Br. 16). The exact opposite is true: it is undisputed that the materials *were* marked confidential.

**REDACTED**    The disk

stated, in clear and unambiguous language, "NOT FOR DISTRIBUTION.  INTERNAL USE ONLY." (Exh. 47).

**REDACTED**

Next, defendants insinuate that Mobius widely shared these materials and thus they were not trade secrets.  (Defendants' Br. at 16, 17, 27)



**REDACTED**

KL3 2591738 1

**REDACTED**

Fourth, defendants state that "[t]here is no evidence" that any information from these documents was used "to obtain business from any of these customers," and that "EMC has not used, and has represented that it will not use," the market strategy documents. (Defendants' Br. at 27). Even if true, that would not moot Mobius' claim for permanent injunctive relief. *See McNeilab, Inc. v. American Home Prods. Corp.*, 501 F. Supp. 517, 523 (S.D.N.Y. 1980) (sworn statement in affidavit by high-ranking officer of defendant that it would refrain from future misconduct did not moot plaintiff's request for a preliminary injunction; representation did not provide "adequate assurance that [defendant] will not resume the 'offending conduct'" because, among other reasons, it was "doubtful that the affidavit creates an enforceable commitment"). Defendants overlook that there is sufficient evidence Acartus used these

---

[8] Mobius acknowledges that the names ~~of~~ ~~certain~~ customers are public. But the entire customer list, including many of the names ~~that were improperly~~ passed to others at Acartus, is not. (Gross decl., ¶ 19).

materials to take business away from Mobius.  *See* pages 11-12 above.  And if the Mobius materials were useless as defendants now belatedly claim after being caught, why did they widely circulate those materials in the first place?  Mobius is also entitled to attorneys' fees under the trade secret statute on account of defendants' willful violation. *6 Del. C.* § 2004.

II.    QUESTIONS OF MATERIAL FACT PRECLUDE PRE-TRIAL
       DISMISSAL OF MOBIUS' TORTIOUS INTERFERENCE CLAIM

       Mobius' tortious interference claim is twofold.  The amended complaint alleges interference with (i) the confidentiality agreements between Mobius and its employees,



(Defendants' Br. at 29 n.14.)

These arguments mischaracterize the record.



- 35 -

REDACTED

As for defendants' alleged interference with Mobius' customer relationships, this claim is derivative of Mobius' misappropriation claim. Therefore, the same material questions of fact discussed above preclude dismissal. Defendants argue that there was no underlying breach and therefore no tortious interference, because disclosure of the DAF format and related material "did not breach the Mobius License Agreement." (Defendants' Br. at 28). As demonstrated above, there is substantial evidence that provisions of the Mobius license agreements were breached, including but not limited to the trade secret and reverse engineering provisions. *See Mediware Info. Sys. v. McKesson Info. Solutions, LLC*, 2007 U.S. Dist. LEXIS 22087, at *3 (D. Kan. Mar. 26, 2007) (denying motion to dismiss tortious interference claim alleging that defendant "offered to provide data extraction services to [plaintiff's licensees], thus enabling those customers to switch to [defendant's] blood management software," where plaintiff alleged that "customers who accepted [defendant's] offer breached their contract with [plaintiff] by providing [defendant] access to the software in order to extract the underlying information").[9]

Defendants also contend that the claim fails because even if there was an underlying breach, Acartus did not know of this contractual prohibition and therefore did not act with the requisite intent. (Defendants' Br. at 28). This too is a disputed question of fact. *See Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 361 (D. Del. 2006) (denying summary judgment with respect to tortious interference claim, where there was a "genuine issue of material fact as to whether [defendant] knew about the alleged contract" in question).

---



KL3 2591738.1

III.    THERE IS NO FACTUAL OR LEGAL BASIS FOR
        DISMISSING MOBIUS' FALSE ADVERTISING CLAIM

        Defendants maintain that they are entitled to summary dismissal of Mobius' Lanham Act

false advertising claim on two separate grounds.  First, they assert that "Acartus' statements regarding its

software utility were non-actionable puffing." (Defendants' Br. at 3).  Second, they contend that "Mobius

cannot establish that any statement made by Acartus regarding Acartus or Mobius software influenced the

purchasing decision of any customer." (*Id.*)  These arguments are meritless.

        A.    The challenged claims constitute actionable
              misstatements of fact, not "puffing"

        Non-actionable puffing generally consists of promotional statements that cannot be

objectively verified, or exaggerated claims upon which no customer would rely.  *Coastal Abstract Serv.,*

*Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir. 1999); *Cook, Perkiss & Liehe, Inc. v. Northern*

*Cal. Collection Serv. Inc.,* 911 F.2d 242, 246 (9th Cir. 1990).  In sharp contrast, defendants' promotional

statements – for example, the declaration on Acartus' website that "Our proven technology ensures

migrations run smoothly and rapidly, without considerable investment of questionable reliability of

custom, one-off solutions" (Exh. 18) – are objectively false.



                                                                                                    Far from being a

generalized statement of opinion or superiority, this is a specific and verifiable claim of "proven"

efficacy, known in Lanham Act jurisprudence as an establishment claim.  *See Castrol Inc. v. Quaker State*

*Corp.,* 977 F.2d 57, 63 (2d Cir. 1992).  "Establishment claims receive special treatment under the law

because, to the modern consumer, information labeled as 'scientifically proven' often assumes a posture

of mystic infallibility.'" *Rhone-Poulenc Rhorer Pharms., Inc. v. Marion Merrell Dow, Inc.,* 1994 U.S.

Dist. LEXIS 20782, at *10 (W.D. Mo. Sept. 30, 1994) (citation omitted), *aff'd in part, vacated in part on*

*other grounds,* 93 F.3d 511 (8th Cir. 1996).

KL3 2591738.1

REDACTED

*See Stiffel*

*Co. v. Westwood Lighting Group*, 658 F. Supp. 1103, 1115 (D.N.J. 1987) ("misdescriptions of specific or

absolute characteristics of a product are actionable"); *W.L. Gore & Assocs. v. Totes, Inc.*, 788 F. Supp.

800, 807 (D. Del. 1992) (defendant fabric manufacturer's claims that its product was waterproof was

literally false, and therefore not defensible as "a general claim of superiority or mere puffery").[10]

Defendants' own admissions belie their puffing defense.


REDACTED


*See Mobius Mgmt. Sys., Inc. v. Fourth*

*Dimension Software, Inc.*, 880 F. Supp. 1005, 1021 (S.D.N.Y. 1994) (false statements contained in letter

sent by software firm to large customer actionable under and a violation of the Lanham Act). And as set

forth in Mr. Gross' declaration, (at ¶¶ 20-22) the other claims made by defendants on the Acartus website

are also objectively false.

> B.  Defendants' materiality argument misstates the
> governing law and is factually incorrect

Defendants' argument that their false statements did not influence the purchasing

decisions of any customer fares no better. To begin with, when, as here, a promotional statement is false

on its face, courts will presume that the statement deceives or tends to deceive its intended audience.

---

[10] Acartus' claim of "proven" efficacy is hardly comparable to (i) the "less is more" tagline found to be puffing in *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d at 1134, 1145 (9th Cir. 1997), (ii) the phrase "America's Favorite Pasta" at issue in *American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004), (iii) defendants' claim that a competitor is "too small" to handle a particular type of business, *see Coastal Abstract Serv.*, 173 F.3d at 731, or (iv) defendant's boast that its product is "perfectly reliable," *see Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 933 F. Supp. 918, 931 (C.D. Cal. 1996). (*See* Defendants' Br. at 34-35).

*McNeilab, Inc. v. American. Home Prods. Corp.*, 501 F. Supp. 517, 524 (S.D.N.Y. 1980).  In addition, "[o]nce it is determined that a statement is false, it is presumed to be material."  *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 180 (S.D.N.Y. 2004) (citation omitted).



---

[11] Defendants suggest that the challenged statements cannot violate the Lanham Act claim because at the time Acartus "believed these statements to be true." (Defendants' Br. at 35-36).  That is false, but in any event intent is not a necessary element of a Lanham Act false advertising claim.  *Stiffel Co. v. Westwood Lighting Group*, 658 F. Supp. at 1110-11.

Defendants concede that if they did engage in false advertising, their misconduct is actionable both under the Deceptive Trade Practices Act and the common law of unfair competition.  (Defendants' Br. at 38-39 & n.16).  Thus, the Court should deny defendants' motion with respect to these claims as well.

KL3 2591738 1

Conclusion

For these reasons, the Court should deny defendants' motion.

PROCTOR HEYMAN LLP

_Patricia Enerio_

Kurt M. Heyman (#3054)
E-mail: kheyman@proctorheyman.com
Patricia L. Enerio (#3728)
E-mail: penerio@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300

Attorneys for Plaintiff
Mobius Management Systems, Inc.

OF COUNSEL:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Jonathan M. Wagner
Marjorie E. Sheldon
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Dated:  May 3, 2007

- 40 -