IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MOBIUS MANAGEMENT SYSTEMS, INC.,   )
         )
    Plaintiff,         )
         )
    v.              )      C.A. No. 05-346 (SLR)
         )
ACARTUS, INC. and EMC CORPORATION,   )    **REDACTED**
         )    **PUBLIC VERSION**
    Defendants.      )
         )

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
302.658.9200

*Attorneys for Acartus, Inc. and EMC Corporation*

OF COUNSEL:

Robert S. Frank Jr.
Paul D. Popeo
G. Mark Edgarton
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
617.248.5000

Original Filing Date:  May 15, 2007
Redacted Filing Date: May 29, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................... ii

PLELIMINARY STATEMENT .................................................... 1

I.  A REASONABLE JURY COULD NOT FIND THAT ACARTUS MISAPPROPRIATED A MOBIUS TRADE SECRET WHEN IT CREATED A UTILITY WHOSE SOLE PURPOSE WAS TO EXTRACT CUSTOMER DOCUMENTS FROM THAT CUSTOMER'S DAF FILES. .................................................... 1

    A.  The Undisputed Facts. ............................................ 1

    B.  Mobius Failed Adequately To Protect DAF Files As Trade Secrets. .... 4

        1.  The Mobius License Agreement. ............................. 4

        2.  Mobius Did Not Otherwise Inform Its Customers That Their Files Contained Mobius Trade Secrets. ............... 8

        3.  Mobius Failed to Take Corrective Action Against Real Vision to Preserve the Secrecy of Daksoft's DAF Files and Topic Index Files. .......................................... 10

    C.  There Is No Evidence That Acartus Knew Or Had Reason To Know That Customer DAF Files Contained (Alleged) Mobius Trade Secrets. .................................................. 13

II.  THE MOBIUS SALES DOCUMENTS ARE NOT CAUSALLY LINKED TO ANY INJURY TO MOBIUS OR BENEFIT TO DEFENDANTS. ...... 15

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS. ........................................ 17

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' FALSE ADVERTISING CLAIM. .......................... 17

CONCLUSION .................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen Organ Co. v. Galanti Organ Builders, Inc.*,
    798 F. Supp. 1162 (E.D. Pa. 1992), aff'd 995 F.2d 215 (3d Cir. 1993) ........................... 19-20

*Am. Homepatient, Inc. v. Collier*,
    2006 WL 1134170 (Del. Ch. Apr. 19, 2006) ........................................................17

*Castrol, Inc. v. Quaker State Corp.*,
    977 F.2d 57 (2d Cir. 1992)........................................................................18

*CMAX/Cleveland, Inc. v. UCR, Inc.*,
    804 F. Supp. 337 (M.D. Ga. 1992) ...................................................................7

*Dynamics Research Corp. v. Analytic Scis. Corp.*,
    400 N.E.2d 1274 (Mass. App. Ct. 1980) ..........................................................10

*Gemisys Corp. v. Phoenix Am. Inc.*,
    186 F.R.D. 551 (N.D. Cal. 1999)..................................................................9

*Hammock v. Hoffman-LaRoche, Inc.*,
    662 A.2d 546 (N.J. 1995)..........................................................................10

*Int'l Endoscope Mfrs. Inc. v. Harrington*,
    1986 WL 11613 (E.D. Pa. Oct. 14, 1986)...........................................................10

*J.I. Hass Co., Inc. v. Gilbane Building Co.*,
    881 F.2d 89 (3d Cir. 1989).........................................................................4

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
    299 F.3d 1242 (11th Cir. 2002) ............................................................... 19-20

*Religious Tech. Ctr. v. Lerma*,
    908 F. Supp. 1362 (E.D. Va. 1995) ...............................................................12

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    1997 U.S. Dist. LEXIS 23572 (N.D. Cal. Jan. 6, 1997) .............................................12

*Rhone-Poulenc Rorer Pharms. v. Merrell Dow, Inc.*,
    1994 U.S. Dist. Lexis 20782 (W.D. Mo. Sept. 30, 1994), aff'd in part, vacated in part
    on other grounds, 93 F.3d 511 (8th Cir. 1996) ................................................ 18-19

*Rosenthall Collins Group, LLC v. Trading Techs. Int'l, Inc.*,
    2005 U.S. Dist. Lexis 37504 (N.D. Ill. Dec. 26, 2005) ..............................................19

*Small v. United States*,
    333 F.2d 702 (3d Cir. 1964)........................................................................17

*Technicon Data Sys. Corp. v. Curtis 1000, Inc.*,
    1984 WL 8268 (Del. Ch. Aug. 21, 1984) ................................................................................7

*W.L. Gore Assocs. v. Totes Inc.*,
    788 F. Supp. 800 (D. Del. 1992)...........................................................................................18

## Statutes

DEL. CODE ANN. tit. 6, § 2001(4) (2007) .............................................................................4, 15

### PRELIMINARY STATEMENT

This memorandum replies to Mobius' Opposition to Acartus'/EMC's Motion For Summary Judgment. As will be demonstrated below, the undisputed facts establish that Mobius has failed to protect customer DAF files as Mobius trade secrets. Moreover, Mobius' DAF-related claims are a dispute over nothing. Acartus' Export Utility is not being marketed, and it has never been used successfully, to allow a customer to remove its documents from a Mobius document archive. The remainder of Mobius' claims should be dismissed because they are legally insufficient and there is no evidence that Mobius has been harmed by the conduct about which it complains.

### ARGUMENT

I. **A REASONABLE JURY COULD NOT FIND THAT ACARTUS MISAPPROPRIATED A MOBIUS TRADE SECRET WHEN IT CREATED A UTILITY WHOSE SOLE PURPOSE WAS TO EXTRACT CUSTOMER DOCUMENTS FROM THAT CUSTOMER'S DAF FILES.**

A. **The Undisputed Facts.**

The following facts are undisputed and provide the basis upon which summary judgment should be granted.

1. Mobius licenses ViewDirect software. Sec. Am. Coml., ¶ 17. DAF files are containers that hold customer documents (stored in electronic form). Mob. Mem. at 4; Exh. I,[1] Raicer at 104:23-24; 108:8-11. They are created by customers using ViewDirect software. Exh. O, Tonchen at 165:21-166:10; Exh. H, Perkins at 80:21-24.

---

[1] Unless otherwise indicated, all citations to "Exh." refer to the Appendix (Volumes I and II) that was filed contemporaneously with the Memorandum In Support of Defendants' Motion for Summary Judgment.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

      3.      Certain customers gave Acartus copies of their own documents (*e.g.*, in paper format) prior to storage in DAF files, as well as copies of the same documents stored in DAF files. Exh. H, Perkins at 83:14-84:9; Exh. E, Florin at 198:6-11. Using a widely-available software tool, Acartus compared the original (paper) documents to the corresponding customer data in their DAF containers. Exh. O, Tonchen at 191:25-192:16, 310:11-312:9; Exh. H, Perkins at 92:5- 93:9. Acartus then developed an Export Utility, whose sole purpose was to separate and remove the customer's document from its DAF container so that the document, together with the customer's related index data, could be stored in a different archival system.[2] Exh. O, Tonchen at 198:4-199:22; Exh. K, Sorich at 33:9-12; Exh. E, Florin at 71:5-10; Exh. I, Raicer at 18:15-19:3, 64:11-15. The Export Utility is not alleged to have been copied or derived from any Mobius computer program.

      4.      Acartus was not given access to Mobius source code or object code. Exh. O, Tonchen 218:8-222:5, 321:7-322:24; Exh. T at 24. Acartus did not copy Mobius source code or object code, and did not create a computer program that works in the same way as Mobius source code or object code. *Id.*

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████▐

████████████████████████████████████████████████████

---

[2]    The only information that Acartus used relating to indices was obtained by examining computer printouts that Mobius acknowledges are not Mobius trade secrets. Exh. O, Tonchen at 66:25-68:8, 106:10-108:2; Exh. I, Raicer at 74:23-75:21.

[REDACTED]

7.    The Export Utility has been licensed to a total of five customers.  Exh. Q. The last license was granted in June 2006, almost a full year ago.  Exh. Q at A 020865.  The Export Utility is not being marketed by EMC.  It has never worked well enough to permit any Acartus customer to extract its documents from a Mobius document archive consistently.  Exh. E, Florin at 65:5-66:9, 78:11-16.  Mobius' expert testified that it is surprising that the Export Utility displays any functionality at all, because it reflects "serious misunderstandings of the DAF file format."  Exh. O, Tonchen at 219:17-222:5, 227:7-19.

[REDACTED]

---

[3]    Daksoft is a subsidiary of Black Hills Corporation.  Exh. CC.

**B.** **Mobius Failed Adequately To Protect DAF Files As Trade Secrets.**

**1.** **The Mobius License Agreement.**

Information cannot be a trade secret unless it is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." DEL. CODE ANN. tit. 6, § 2001(4) (2007). Where the alleged secret is in the possession of third parties (here, Mobius' many customers) those reasonable efforts must include an undertaking by each third party to hold the relevant information in confidence. Mobius does not contest this principle or its applicability to this case.

Mobius alleges that the layout of DAF files is a Mobius trade secret. Mobius concedes that this alleged trade secret is embedded in data files created by, owned by, and in the possession of, its customers, which contain the customers' own documents. Mobius further concedes that it has never expressly informed its customers (1) that their DAF files contain Mobius trade secrets, or (2) that their DAF files should not be disclosed to others. Mobius argues, however, that its standard License Agreement implicitly requires that DAF files be retained in confidence. The Mobius License Agreement is part of the summary judgment record. Exh. U. Like any contract, its interpretation is a matter of law for the Court. *J.I. Hass Co., Inc. v. Gilbane Building Co.*, 881 F.2d 89, 92 (3d Cir. 1989). The relevant question is whether the License Agreement, properly interpreted, constitutes an

---

[4] Mobius' Counterstatement of Facts is replete with irrelevant "facts." For example, it is not significant that "the DAF container format is unique and very important to the high speed efficient operation of ViewDirect technology." Mob. Mem. at 4. Acartus did not attempt to copy the DAF format or to use it in Acartus' document archival system. It sought only to separate customer documents from their DAF containers and leave the container behind. ████████████ ████████████████████████████████████████████████ Moreover, at the time, Acartus was a start-up that employed approximately 20 people, while Mobius was "a leader in its field." Mob. Mem. at. 3. ████████████████████████████████████████████████ Mobius recently announced that it was sold for more than $211 million. Reply Exh. KK.

effort by Mobius that is "reasonable in the circumstances" to protect alleged Mobius trade secrets that Mobius states are embedded in its customer's DAF files.

The Mobius License Agreement does not mention DAF files and does not prohibit customers from disclosing their DAF files to third parties. In Section 1 of the Agreement, Mobius grants to the customer "a non-exclusive license for the use of the software components described in each attached Exhibit [to the License Agreement] (hereinafter referred to as the 'SYSTEM')." DAF files are not identified in any Exhibit to any License Agreement. Therefore, DAF files are not a part of the "SYSTEM," as that term is defined in the Mobius License Agreement. █████████

████████████████████████████████████████

████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[5]  Thus, Mobius' assertion that "computer software has received judicial recognition as a trade secret" (Mob. Mem. at 15) is off-target. DAF files are not software.

[6]  Mobius repeatedly refers to DAF files as part of the "ViewDirect system." Mob. Mem. at 2, 4, 9, 17. Its usage is misleading. "SYSTEM" is a contractually defined term. The definition does not include customer DAF files. In its brief, Mobius supplies a new litigation-inspired definition that includes "the various files, including DAF files, created by the [Mobius] software." Mob. Mem. at 17. Mobius could easily have so defined the word "SYSTEM" in its License Agreement. It did not.

Mobius' argument that DAF files are "internal" and "essential" to its software is linguistic slight of hand. In order to use data, a computer running software must know where the relevant data are stored. That does not convert the files containing data into software. Those files are data files. More to the point, they are not "software components described in" the Exhibits to any License Agreement and are not protected by the License Agreement.



████████████████████████████████████████████████

███████████████████████████████████

In addition, Acartus did not use information "made available" by Mobius to do anything. It compared customer documents before and after they were stored in DAF files. Its sole purpose was to develop a software utility that would remove the documents from their DAF containers and to restore them to their original form. Acartus did not try to recreate or imitate the DAF containers. It wanted to leave the container behind, not to mimic it. Similarly, there is no claim that Acartus' Export Utility, or its archival software, is similar to, or derived from, Mobius software.[9] Acartus created its own code which works in ways that are different from the way Mobius software works.[10]

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[9] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[10] The principal cases upon which Mobius relies are readily distinguishable. In *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 346-47 (M.D. Ga. 1992), the defendants repeatedly accessed plaintiff's computer software system, including source code, and blatantly copied file layouts, file structures, and screens to develop an in-house system which performed the same functions and exhibited the same capabilities as plaintiff's system. The court expressly distinguished defendants' activities from a situation in which a party simply writes "'a conversion program,' which permits the data from one system to be moved into another, structurally different system," which is precisely what Acartus did. *Id.* at 350. Similarly, in *Technicon Data Sys. Corp. v. Curtis 1000, Inc.*, 1984 WL 8268 at *328, 334-35 (Del. Ch. Aug. 21, 1984), the court found that the defendants had used improper means to develop its printed circuit board and emulation program by (a) accessing plaintiff's system after normal working hours without the permission of plaintiff's licensees, and (b) using confidential schematics. Mobius' failure/inability to cite factually analogous cases bespeaks the weakness of its position in this action.

███████████████████████████████████████████████████

████████████████████

Mobius states that it was not required to itemize each of Mobius' trade secrets in its License Agreement. Mob. Mem. at 2, 16. This contention misses the point. This is a case in which the challenged conduct falls outside any prohibition in the Mobius License Agreement. It is not a situation in which the Agreement used encompassing language, but failed to itemize individual trade secrets that fall within that language. Mobius drafted Mobius' License Agreement. It could have broadened the language of its Agreements to address DAF files specifically, or as part of a broader category of protected materials. It did not do so. Particularly in view of the ease with which Mobius could have caused its License Agreement to address DAF files, the License Agreement does not constitute an effort "reasonable in the circumstances" to protect alleged Mobius trade secrets in those customer files.[12]

> **2.    Mobius Did Not Otherwise Inform Its Customers That Their Files Contained Mobius Trade Secrets.**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

---

[11]  Mobius' brief contains additional allegations that are completely unsupported by the record evidence. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[12]  Mobius states that although customers may own their DAF files, the DAF files may nevertheless be subject to Mobius' intellectual property rights. Mob. Mem. at 28-30. Mobius could have such rights in customer property *if* it established those rights in a contractual agreement. For the reasons stated above, there was no such agreement.

[13]  Mobius argues that it "goes to great lengths to protect its trade secrets." Mob. Mem. at 5. The



Exh. J, Rogers at 69:17-19.[14]

Mobius now argues that it notified "the public" that customer DAF files were Mobius trade secrets by filing a piece of paper with the entity that is responsible for assigning Internet protocol addresses in which Mobius sought registration of the designation ".DAF." In the filing, Mobius said that "the specifications for this content type are proprietary" to Mobius. Mob. Exh. 38. Mobius' argument fails for at least two reasons.

First, it is a red herring. The word "proprietary" does not mean "trade secret." Norman Dugas, Mobius' Senior Vice President and the head of its Professional Services Division, repeatedly denied that "proprietary" meant "trade secret." Reply Exh. MM, Dugas at 19:23-25:17 ("It says proprietary; it doesn't say trade secret . . . .They are separate things."). The decided cases reach the same result. The courts have held that a statement that software is "proprietary" does *not* mean that the software is secret or create an obligation to refrain from disclosing that software to others. *Gemisys Corp. v. Phoenix Am. Inc.*, 186 F.R.D. 551, 559-60 (N.D. Cal. 1999) (although license

---

question is whether Mobius protected customer DAF files as Mobius trade secrets, not whether it protected something else as a secret. For example, Mobius' contention that Mobius labels its software as a trade secret (Mob. Mem. at 5) only adds significance to the undisputed fact that Mobius did *not* label DAF files as trade secrets.

[14] Mobius states that defendants' expert, Dr. Myron Zimmerman, "agreed that the Mobius license agreement would prohibit somebody trying to recreate the software by examining the software either directly or through orchestrating a series of inputs and outputs." Mob. Mem. at 9. In fact, Dr. Zimmerman testified that "as long as the inputs and outputs are being done without violating the trade secret[s] . . . then that certainly would be allowed." Mob. Exh. 14, Zimmerman at 114. The "inputs and outputs" (the customer documents before and after they were stored in DAF files) were not protected as Mobius trade secrets.

agreement designated software as proprietary – meaning that it is owned by the plaintiff – nothing in the agreement provided that software was a trade secret); *see also Dynamics Research Corp. v. Analytic Scis. Corp.*, 400 N.E.2d 1274, 1288 (Mass. App. Ct. 1980) (the "characterization of [a system] as proprietary does not seem to us more than a statement of [its] unique capability rather than an assertion that trade secrets were involved"); *Int'l Endoscope Mfrs. Inc. v. Harrington*, 1986 WL 11613, at *8 (E.D. Pa. Oct. 14, 1986) ("[T]he presence of a label that information in a laboratory book is proprietary does not create a trade secret"); *Hammock v. Hoffman-LaRoche, Inc.*, 662 A.2d 546, 560 (N.J. 1995) (distinguishing between proprietary and trade secret information).

Second, the filing of one document (in 1999, years after customers began creating DAF files), without informing customers of the filing, and without any evidence that any Mobius customer was aware of the filing, is not sufficient notification to Mobius' customers that Mobius claimed that the customers' DAF files contained Mobius proprietary information, much less Mobius trade secrets.

Mobius should have communicated directly and explicitly with its customers if Mobius wished to inform its customers that the customers' files contained Mobius trade secrets or if Mobius expected its customers to limit the use and disclosure of the customers' own property. Mobius' reliance on a filing made years ago, that did not use the words "trade secret," and was not communicated to its customers, illustrates the inadequacy of Mobius' efforts to protect its alleged secrets.

**3.     Mobius Failed to Take Corrective Action Against Real Vision to Preserve the Secrecy of Daksoft's DAF Files and Topic Index Files.**

The material facts concerning Daksoft's disclosure of its DAF files and topic index files to Real Vision are undisputed. Daksoft documents were stored in DAF files. Daksoft gave its DAF

files to Real Vision so that Real Vision could develop an export utility.   Real Vision is a Mobius

competitor.   Real Vision did develop an export utility.   Mobius knew of these facts and failed to take

steps to preserve the secrecy of Daksoft's DAF files or its related topic index files.[15]   These facts

provide an independent basis for determining that Mobius has failed to use efforts reasonable in the

circumstances to protect DAF files or Mobius trade secrets.



Mobius argues that the posting of these files "on the Internet does not

automatically result in the loss of trade secret status." It cites *DVD Copy Control Assoc., Inc. v. Bunner*, 10 Cal. Rptr. 3d 185, 192 (Cal. Ct. App. 2004) ("Publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure . . . so that it does not become generally known to the relevant people, i.e., potential competitors . . .") and *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 1997 U.S. Dist. LEXIS 23572 at *40-41 (N.D. Cal. Jan. 6, 1997) (same). Mobius Mem. at 22. *But see Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va. 1995) ("Once a trade secret is posted on the Internet, it is effectively part of the public domain, impossible to retrieve."). These cases do not support Mobius' position. The DAF files were not posted on the Internet for a brief period; they were publicly available for more than a year. They were not posted at an "obscure location;" they were posted on a website (Rentacoder) that is frequented by computer programmers, they were actually viewed at least 244 times, and they were easily locatable by using a simple Google® search. Reply Exh. NN.[17]

All of these facts are undisputed.[18] Mobius' failure to take reasonable steps to prevent DAF files from entering the public domain further establishes that Mobius failed to take reasonable steps to protect any alleged trade secrets in DAF files.

---

[17]

[18]



**C.     There Is No Evidence That Acartus Knew Or Had Reason To Know That Customer DAF Files Contained (Alleged) Mobius Trade Secrets.**

Mobius does not dispute the principle that, in order to be liable for trade secret misappropriation, Acartus must have known, or had reason to know, that a customer's DAF files containing the customer's own documents were Mobius trade secrets.  Mob. Mem. at 24-26.

Mobius argues that the provisions of the Mobius License Agreement are "standard."  It states that the Acartus License Agreement is similar to the Mobius Agreement.  It quotes the Acartus Agreement, and states that Acartus must have known that the DAF format was a Mobius trade secret because Acartus' "own license agreement defines material similar to DAF formats and layouts to be proprietary trade secret information."  Mob. Mem. at 25.  That is a remarkable argument.  It is correct that Acartus' standard license agreement was broadly similar to the Mobius Agreement.  However, it, most assuredly, did *not* protect as trade secrets the files, or file format, in which Acartus' customers (using Acartus' archival software) store their documents.  Acartus' customers store documents in the

widely-known PDF format. That format is "proprietary" to Adobe Software Inc., but it is not a trade secret. It is among the most widely-known and available formats in the world. Mobius does not explain why the similar language of the parties' license agreements protects alleged trade secrets in files generated by Mobius customers, but does not protect anything in the files generated by Acartus customers.

Mobius cites its filing with the entity that gives out Internet addresses. There is no evidence that Acartus understood a claim that the DAF specification was "proprietary" to be a claim that the specification was a trade secret. Acartus' witness testified uniformly that "proprietary" does not mean "trade secret." Reply Exhs. PP, Perkins at 81:1-7; QQ, Cowen at 79:19-80:4; RR, Florin at 99:21-100:13. Mobius' Senior Vice President Dugas agreed. Mobius' argument that internal Acartus documents refer to DAF files as "proprietary" fails for the same reason. As the cases cited above establish, the word "proprietary" connotes ownership and, in some contexts, may mean that a thing is unique, but that does not mean that it is a trade secret.

Finally, Mobius asserts that, once this action was commenced, Acartus (and later, EMC) knew that DAF files contained Mobius trade secrets. This argument fails. First, it assumes erroneously that the claim that Mobius asserts today is the same as the claim that Mobius asserted when this case was filed in May, 2005. Mobius' original claim was that Acartus obtained and copied Mobius software. *See* (First) Am. Compl., ¶ 24 (D.I. 22). That claim was entirely false and has since been abandoned. Mobius' present claim was first articulated in its expert report served in February, 2007. All of the allegedly wrongful conduct occurred before February, 2007. Second, Mobius' argument assumes that upon reading the Mobius License Agreement, Acartus would have discovered a prohibition that Mobius customers had not discovered (and that, for the reasons stated above, is not present) in the contract. In any event, as noted above, the Acartus Export Utility is not being marketed and has never been used to remove, consistently and successfully, any customer's documents from their DAF containers.

The Court should grant summary judgment dismissing Mobius' DAF-related trade secret claim.  Mobius' License Agreement may be interpreted by the Court.  The evidence cited above is undisputed.  It demonstrates that DAF files were not "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy."  DEL. CODE ANN. tit. 6, § 2001(4).

## II.    THE MOBIUS SALES DOCUMENTS ARE NOT CAUSALLY LINKED TO ANY INJURY TO MOBIUS OR BENEFIT TO DEFENDANTS.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

The Sales Documents were a set of PowerPoint slides used by Mobius to motivate more than 100 sales employees at its Worldwide Sales Conference in 2004.  They identify recent sales "success stories" achieved by Mobius, describe the features of Mobius' new products and provide other information that could be used by the sales force in future selling efforts.  Exh. C, Cowen at 52:21:53:12; Exh. Y; Exh. DD.[20]  It cannot plausibly be argued that Mobius expected its entire sales force to keep secret the sales ammunition contained in the Sales Documents.  And, it is indisputable that nothing appears on the Documents that distinguishes that which was truly confidential from that which was intended to be freely disseminated.  Although Mobius states that the Sales Documents

---

[19] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[20]    Contrary to Mobius' assertion, the Sales Documents do not include "customer lists."  They disclose the names of certain customers, presumably to allow the sales force to cite those customers as reference accounts during future selling efforts.  Mobius publishes similar "customer lists" on its website.  Reply Exh. SS.

were originally distributed on a CD that was labeled "Not for Distribution-Internal Use Only," it is undisputed that the Sales Documents that Acartus saw were not marked as "confidential" to Mobius. Mob. Exhs. 27-29.

In any event, there is no evidence that any information in the Sales Documents was used by Acartus (or EMC) in a way that injured Mobius. Mobius' damage claim is limited to business that Acartus or EMC obtained from only five customers.

███████████████████████████████████████████████████

██████████████████████████████████

Mobius' bare assertion that Acartus or EMC improperly obtained business by using information contained in the Sales Documents is insufficient to avoid summary judgment.[21]

## III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

For the reasons stated above, summary judgment should be granted dismissing Mobius' tortious interference claim. The Mobius License Agreement did not preclude Mobius' customers from disclosing to Acartus the customers' DAF files. *See Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *4 (Del. Ch. Apr. 19, 2006) ("Without a breach of contract, there can be no tortious interference"). Further, Mobius cannot establish that Acartus knew, or had reason to believe, that the Mobius License Agreement precluded customers from giving their own property – their DAF files and original documents – to Acartus. *See Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) ("The gravaman of the cause of action [of tortious interference] is the intentional or willful misconduct of the tortfeasor"). Mobius' interference claim regarding the Sales Documents fails because, as explained, there is no evidence that any information in any Sales Document is causally linked to any injury to Mobius or benefit to Acartus.

## IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON MOBIUS' FALSE ADVERTISING CLAIM.

The only statements identified in the Second Amended Complaint that are alleged to constitute false advertising are promotional statements that appeared on Acartus' website. *See* Sec. Am. Compl., ¶¶ 1, 55; Ex. R. Those statements were available for a short time period, ending in June, 2005. Exhs. S and II. Defendants explained in their opening brief that these statements

---

[21]   EMC acquired Acartus in October, 2005. EMC has represented that EMC has not used, and will not use, the Sales Documents. It has offered to return all copies of the documents and to agree that the information contained in them will never be used. ████████████████████████████
████████████████████████

constitute non-actionable puffing, and, in any event, were not likely to, and did not, influence the purchasing decision of, any customer. Defs. Opening Mem. at 33-38. Mobius responds that these statements are not puffing because they are "establishment" claims within the meaning of Lanham Act jurisprudence, and that they are false on their face.[22] This argument requires little discussion. Even if the accused statements were capable of being proved false, Mobius cannot establish that they were likely to influence any purchasing decision.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████    This testimony is fatal to Mobius' false advertising claim. *See W.L. Gore Assocs. v. Totes Inc.*, 788 F. Supp. 800, 805-06 (D. Del. 1992) (plaintiff must prove "that the persons receiving the message will be left with a false impression . . . *likely to influence the purchasing decision*") (emphasis added).

Mobius attempts to save its false advertising claim by citing – for the first time – certain other statements made by Acartus concerning the capabilities of its Export Utility. These statements were not likely to, and did not, deceive, or influence the purchasing decision of, any customer. The

---

[22] An "establishment claim" is one in which an advertiser "represents that tests or studies prove its product superior." *See Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992); *Rhone-Poulenc Rorer Pharms. v. Merrell Dow, Inc.*, 1994 U.S. Dist. Lexis 20782, at *10 (W.D. Mo. Sept. 30, 1994) ("[A]dvertising [that] involves representations allegedly based on scientific data . . . must be analyzed as 'establishment claims'"), *aff'd in part, vacated in part on other grounds,* 93 F.3d 511 (8th Cir. 1996). Where an advertisement simply makes a claim with no reference to testing or scientific data, however, the advertisement is not an establishment claim. *See id.* The statements identified by Mobius lack any mention of testing, studies or other scientific data used to prove the superiority of the Export Utility. Mobius' attempt to transform non-actionable puffing into actionable establishment claims should be rejected. *See id.*

recipients of these statements were major corporations that employ highly sophisticated information

technology professionals.  The archival software solutions purchased by these customers often cost

millions of dollars.  These companies would not – and did not –purchase anything from anybody

(much less a tiny company like Acartus) based upon self-congratulatory marketing statements.  *See*

*Rhone-Poulenc Rorer Pharms.*, 1994 U.S. Dist. Lexis 20782, at *9 n.4 ("[I]t is the medical

knowledge and intelligence of this group [doctors and pharmacists] . . . that is employed to measure

whether the 'intended audience' [of a prescription drug advertisement] has been deceived."), *aff'd in*

*part, vacated in part on other grounds,* 93 F.3d 511; *Rosenthall Collins Group, LLC v. Trading*

*Techs. Int'l, Inc.*, 2005 U.S. Dist. Lexis 37504, at *36 (N.D. Ill. Dec. 26, 2005) (dismissing false

advertising claims relating to futures trading software, stating that "as the [advertisement] was

directed at a specific sophisticated trade audience, no reasonable consumer would rely on such

statement"); *Allen Organ Co. v. Galanti Organ Builders, Inc.*, 798 F. Supp. 1162, 1168-70 (E.D. Pa.

1992) (statement was not likely to deceive intended audience where product was large financial

investment and sales process took weeks or months), *aff'd* 995 F.2d 215 (3d Cir. 1993).[23]

    The firms that purchase the parties' software evaluate competing products over a period of

months and conduct rigorous "Proof of Concept" tests to evaluate, for themselves, the capabilities of

the software prior to making a purchasing decision.  During such a Proof of Concept test, Acartus

delivered its software to the customer, the customer ran the software, and reported the results back to

---

[23]  Mobius cites a District Court case involving a preliminary injunction motion for the proposition
that, where a promotional statement is false on its face, courts will presume that the statement is
material to the audience's purchasing decision. Mob. Mem. at 39.  This case appears to be in the
distinct minority and, in any event, is not followed in the Third Circuit.  *See, e.g., Allen Organ
Co.,* 798 F. Supp. at 1170 ("[W]hile the [defendant's] claim is false . . . the court finds no
violation of the Lanham Act because [plaintiff] has not proved by a preponderance of the
evidence that the advertisement containing that claim had a tendency to deceive the purchasing
public . . . [i]n any event, any deception that existed was not likely to influence any purchasing
decision"), *aff'd* 995 F.2d 215, 215 (3d Cir. 1993); *Johnson & Johnson Vision Care, Inc. v. 1-800
Contacts, Inc.,* 299 F.3d 1242, 1250 (11th Cir. 2002) ("The plaintiff must establish materiality
even when a court finds that the defendant's advertisement is literally false . . .).

Acartus. Exh. I, Raicer at 83:10-84:9. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

The Court should grant summary judgment on Mobius' false advertising claim.[24]

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment dismissing each of Mobius' claims in this case.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
302.658.9200

OF COUNSEL:

Robert S. Frank Jr.
Paul D. Popeo
G. Mark Edgarton
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
617.248.5000

*Attorneys for Acartus, Inc. and EMC Corporation*

Dated: May 15, 2007
828324

---

[24] The Court should dismiss Mobius' Deceptive Trade Practices claim for the same reasons. *See Monsanto Co. v. Syngenta Seeds Inc.*, 443 F. Supp. 2d 648, 653 (D. Del. 2006) ("The Deceptive Trade Practices Act affords no greater protection than the Lanham Act"). Mobius' claim for violations of the common law of unfair competition also fails because (a) to the extent that this claim is based on factual allegations underlying Mobius' misappropriation of trade secrets claims, it is preempted by the Delaware Uniform Trade Secrets Act; and (b) to the extent that Mobius' unfair competition claim is based upon its false advertising or tortious interference with contractual relations claims, it fails for the same reasons that those claims fail.

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2007, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Kurt Michael Heyman
> PROCTOR HEYMAN LLP
> 1116 West Street
> Wilmington, DE  19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on May 29, 2007 upon the following individuals in the manner indicated:

### BY E-MAIL AND HAND DELIVERY:

Kurt Michael Heyman
PROCTOR HEYMAN LLP
1116 West Street
Wilmington, DE  19801

### BY E-MAIL:

Jonathan M. Wagner
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)

479192